JUDGE VYSKOCIL

# 25 CV 07164

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEON GREATHOUSE

_____

\_\_\_\_CV_____

PLAINTIFF

COMPLAINT
Do you want a jury trial?

-against-

_X_ Yes ___ No

CYRUS R. VANCE(PREVIOUS NY COUNTY D.A.)
ALVIN L.BRAGG(NEW YORK COUNTY DISTRICT ATTORNEY)
RACHEL MOVIUS(ASSISTANT DISTRICT ATTORNEY)
NYPD-PSA-6 POLICE OFFICER RICARDO SALINAS(#29581)
NYPD-PSA-6 POLICE OFFICER ORANDI GUZMAN(#23322)
NYPD-34TH PRECINCT-POLICE OFFICER AMANDA DIFRANCESCO(#3074)
NYSDOCCS BOARD OF PAROLE ASSISTANT REGIONAL DIRECTOR DEREK JONES
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE BUREAU CHIEF MARCUS BRYANT
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE SUPERVISOR JENNIFER SASS
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE SUPERVISOR SHAWN OLIVER
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE PAROLE OFFICER KIMBERLY MYERS-WASHINGTON
NYSDOCCS DEPARTMENT OF PAROLE SPECIALEST CHYNA MORRIS
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE PAROLE OFFICER MICHELE CHAMBERS(#1490)
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE PAROLE OFFICER M.FLORES
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE PAROLE OFFICER McGLOTHIN
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE PAROLE OFFICER SHARABIA CAMBELL McKINNEY(#688)
NYSDOCCS MANHATTAN 3 DIVISION OF PAROLE PAROLE OFFICER SANTIAGO

DEFENDANTS,

_____X

PAGE 1

## I.     LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☒  Violation of my federal constitutional rights

☐  Other: _____

## II.     PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

__Leon   Greathouse_____
First Name                    Middle Initial             Last Name

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

__Book/Case#3492304398_____
Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

__George R.Verno Center(G.R.V.C)_____
Current Place of Detention

__09-09 Hazen street East Elmhurst,New York 11370__
Institutional Address

__East Elmhurst,_____     __NY_____     __11370_____
County, City                          State                    Zip Code

## III.     PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☒  Pretrial detainee
☐  Civilly committed detainee
☐  Immigration detainee
☐  Convicted and sentenced prisoner
☐  Other: _____

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

**Defendant 1**     Cyrus R. Vance
First Name                     Last Name                          Shield #

(Previous)District Attorney of New York County
Current Job Title (or other identifying information)

One Hogan   Place
Current Work Address

New York                     NY                          10013
County, City                   State                      Zip Code

**Defendant 2**     Alvin L.   Bragg
First Name                     Last Name                          Shield #

District Attorney of New York County
Current Job Title (or other identifying information)

One Hogan Place
Current Work Address

New York                     NY                          10013
County, City                   State                      Zip Code

**Defendant 3**     Rachel  Movius
First Name                     Last Name                          Shield #

New York County Assistant District Attorney
Current Job Title (or other identifying information)

One Hogan Place
Current Work Address

New York                     NY                          10013
County, City                   State                      Zip Code

**Defendant 4**     Ricardo Salinas                    #29581
First Name                     Last Name                          Shield #

NYPD POLICE OFFICER
Current Job Title (or other identifying information)

Fredrick Douglas BLVD. West 148th   street
Current Work Address

New York                     NY                          10039
County, City                   State                      Zip Code

Page 3

Defendant 5

Orandi Guzman                                    #23322
First Name              Last Name                Shield #

NYPD Police Officer
Current Job Title (or other identifying information)

Fredrick Douglas BLVD. West 148th street
Current Work Address

New York              NY                          10039
County, City          State                       Zip Code

Defendant 6

Amanda Difrancesco                               #3074
First Name              Last Name                Shield #

NYPD Police Officer
Current Job Title (or other identifying information)


Current Work Address

New York              NY
County, City          State                       Zip Code

Defendant 7

Derek Jones
First Name              Last Name                Shield #

Assistant Regional Director(NYSDOCCS Board of Parole)
Current Job Title (or other identifying information)

1220 Washington Avenue #9
Current Work Address

Albany                NY 12226
County, City          State                       Zip Code

Defendant 8

Marcus Bryant
First Name              Last Name                Shield #

Manhattan 3 Division of Parole  Bureau Chief(NYSDOCCS)
Current Job Title (or other identifying information)

314 W. 40th street Manhattan,NY 10018
Current Work Address

New York              NY
County, City          State                       Zip Code

Page 4

Defendant 9    Jennifer Sass
_____
First Name                Last Name                Shield #

Supervisor Parole Officer (NYSDOCCS)
_____
Current Job Title (or other identifying information)

314 W. 40th street Manhattan,NY 10018
_____
Current Work Address

New York                         NY
_____
County, City                     State              Zip Code

Defendant 10    Shawn Oliver
_____
First Name                Last Name                Shield #

Supervisor Parole Officer(NYSDOCCS)
_____
Current Job Title (or other identifying information)

314 W. 40th street Manhattan,NY 10018
_____
Current Work Address

New York                         NY
_____
County, City                     State              Zip Code

Defendant 11    Kimberly Myers Washington
_____
First Name                Last Name                Shield #

Parole Officer(NYSDOCCS)
_____
Current Job Title (or other identifying information)

314 W. 40th street Manhattan,NY 10018
_____
Current Work Address

New York                         NY
_____
County, City                     State              Zip Code

Defendant 12    Chyna Morris
_____
First Name                Last Name                Shield #

Parole Specialest(NYSDOCCS)
_____
Current Job Title (or other identifying information)

314 W. 40th street Manhattan,NY 10018
_____
Current Work Address

New York                         NY              10018
_____
County, City                     State              Zip Code

Defendant 13    Michele    Chambers                    #1490

First Name            Last Name            Shield #

Parole officer (NYSDOCCS)

Current Job Title (or other Identifying Information)

314 W. 40th street Manhattan, NY 10018

Current Work Address

New York                    NY

County, City            State            Zip Code

Defendant 14    M.Flores

First Name            Last Name            Shield #

Parole officer (NYSDOCCS)

Current Job Title (or other Identifying Information)

314 W. 40th street Manhattan, NY 10018

Current Work Address

New York                    NY

County, City            State            Zip Code

Defendant 15                    McGlothin

First Name            Last Name            Shield #

Parole officer (NYSDOCCS)

Current Job Title (or other Identifying Information)

314 W. 40th street Manhattan, NY 10018

Current Work Address

New York                    NY

County, City            State            Zip Code

Defendant 16    Sharabia    Cambell    Mckinney            #688

First Name            Last Name            Shield #

Parole    officer (NYSDOCCS)

Current Job Title (or other Identifying Information)

314 W. 40th street Manhattan, NY 10018

Current Work Address

New York                    NY

County, City            State            Zip Code

Defendant 17                        Santiago
_____
First Name              Last Name              Shield #
Parole officer (NYSDOCCS)
_____
Current Job Title (or other identifying information)
314 W. 4th street Manhattan, NY 10018
_____
Current Work Address
New York
_____
County, City            State              Zip Code

Defendant 18
_____
First Name              Last Name              Shield #

_____
Current Job Title (or other identifying information)

_____
Current Work Address

_____
County, City            State              Zip Code

Defendant 19
_____
First Name              Last Name              Shield #

_____
Current Job Title (or other identifying information)

_____
Current Work Address

_____
County, City            State              Zip Code

Defendant 20
_____
First Name              Last Name              Shield #

_____
Current Job Title (or other identifying information)

_____
Current Work Address

_____
County, City            State              Zip Code

V.  STATEMENT OF CLAIM:

PLACES OF OCCURANCE: 1.One Hogan Place New York,NY 10013

2.1220 Washington Avenue # 9 Albany,New York 12226

3.317 West 40th street New York,NY 10018

4.114  West 137th street apt.#5C New York,NY 10030

5.20 West 115th street apt.#2B New York,New York 10026

DATE(S)  OF OCCURRENCE:Ongoing 12/13/2022—11/29/2023 and of a continued occurrence

throughout until the until the date of the filing of this current federal complaint.

In which is due to Plaintiff Leon Greathouse being unlawfully detained due to the circumstances

Of this matter.

Facts: SEE ATTACHED-Affidavit in fact as page #9

# AFFIDAVIT

Facts:

1.  On the date of 12/13/2022,the NYSDOCCS Board of Parole and the NYSDOCCS Manhattan 3 Division of Parole(defendant Parole Officer Kimberly Myers Washington would be notified by way of a letter from Plaintiff Leon Greathouse's civil attorney Bonita L.Robinson from the Law Firm of Patterson Belknap Webb & Tyler LLP. Of the regard of Plaintiff Leon Greathouse's favorable settlement claim with Case Greathouse v Vasquez et al.,20 Civ.8748(S.D.N.Y.)and of submitting the formal letter requesting Plaintiff Greathouse to be released from NYSDOCCS Parole(see exhibit-A:Attorney Bonit Robinson's letter).In which in the letter attorney Bonita Robinson referenced to state,"...certain facts and circumstances that may be relevant to the Board of Parole's determination",(see exhibit-A).Which lastly,attorney Robinson refenced an request for NYSDOCCS Board of Parole and the NYSDOCCS Manhattan 3 Division of Parole(P.O. Kimberly Myers Washington)to feel free to reach out to her and the law firm for further information in the regard of the issues raised throughout the letter.In which in the event if the department's(NYSDOCCS B.O.P. and Manhattan 3 Div. Of Parole)had any questions about the letter(see exhibit-A).However,the NYSDOCCS B.O.P. Assistant Regional Director Derek Jones and the Man.3 Div. Parole Bureau Chief Marcus Bryant,Supervisor Parole Officer Shawn Oliver,Parole Officer Kimberly Myers Washington,Specialest Chyna Morris,Parole Officer Michele Chambers,Parole Officer M.Flores,Parole Officer McGlothin,Parole Officer Sharabia Cambell KcKinney and Parole officer Santiago)would continue to act in concert with one another in a long history relationship with the New York County D.A.'s Ofice against Plaintifff greathouse in a ongoing course of unlawful systematic conduct with intent to defraud the state of New York.In which would consist of a plan to obtain Plaintiff as

page 9

and fraudulant pretenses to cause Plaintiff Greathouse the injuries of:1)False arrest,2)illegal search and seizure property by means of a malicous motive of retaliation,harassment fasle and fabricated documentation and unlawful imprisonment by NYPD Police Officer Ricardo Salinas on 11/29/2023 at 10:30 a.m.(see exhibit-C:NYPD Ricardo Salinas's false statement in written affidavit complaint).

2.    For Plaintiff Greathouse's cause of action against defendants' Cyrus R.Vance Jr.,et al.,and Plaintiff Greathouse states: By this refernce,Plaintiff Greathouse incorporates each and every allegation and averment contained in paragraph 1 through      this complaint as though fully set forth herin.

a.The defendants' Cyrus R.Vance Jr., et al., acting in their individual compacities and under color of law,having conspired together and with others,reached a mutual understanding and acted to undertake a course of conduct that violated Plaintiff Greathouse's civil rights to wit:

b.The defendants' Cyrus R. Vance Jr.,et al.,agreed and acted to intentionally falsely arrest and imprison Plaintiff Greathouse as aforedescribed.

c.The defendants' Cyrus R.Vance Jr., et al.,agreed and acted to intentionally fabricate and contrive the criminal charges lodged against Plaintiff as aforedescribed within NYPD Police Officer Ricardo Salinas's NYPD criminal complaint(see exhibit-C).

d.The defendants' Cyrus R. Vance Jr., agreed and acted to intentionally submit false NYPD Police Reports (see exhibit-N)and false NYPD Police Officer complaints(see exhibit-C),statements(see exhibit-P),and Testimony(see exhibit-O)to support and corroborate the fabric cated charges lodged against Plaintiff Greathouse.

d.The defendants' NYSDOCCS Dept. Of Parole Specialest Chyna Morris,Parole Officer Kimberly Myers Washington,SPO Jennifer Sass,SPO Shawn Oliver and Bureau Chief Marcus Bryant et al.,acted with others to punish Plaintiff Greathouse for having exerciseed his Constitionallly protected rights to confront and question the performance of "higher up" Assistant Regional Director Derek Jones(see exhibit-K).

Page 10

Under oath while on cross examination of specialest Chyna Morris testimony at Pre-trial hearing Specialest Chyna Morris then testified that she denied involvement("I never had a case conference with anybody."),claimin that searches are done every month and it was "randum"(seeexhibit-I:Pre-trial hearing transcript-Page 153 Line:18-19).Then specialest Morris later admitted, "I conducted multiple case conferences, which lead to the search,"(see exhibit-J:Pre-trial hearing transcript-Pg. 154 Line:24-25).In which the record indicates to show proof of the elements of  Penal Law 210 Perjury and related Offenses,42 USCS 1983(1)Deprivation of Plaintiff Greathouse's right of equal protection of the law. In which is not in accordance with NYSDOCCS Department of Parole's Policy and Procedures.Which as of a result of respondents et. al, actions effected to cause Plaintiff Greathouse a (3)Financial hardship in the amount of $355,000 and loss of income in the amount of $355,000,(4)14th Amendment Constitutional violation (Due Process),(5)8th Amendment Constitutional violation-due to the inhumane Treatment endangering the physical/mental well-being of Plaintiff Leon Greathouse.

4.   This systematic ongoing course of malicous acts of conduct caused to derive from gross negligence by NYSDOCCS Parole's willful misconduct,wanton misconduct and official misconduct committed by the defendants et. al.That which caused Plaintiff multiple injuries.In which that are currently ongoing and unequivocally displayed throughout the record of this affidavit with its exhibits hereby attached in the complaint.Which as of a result gave rise  of supervisor liability(higher ups!)(see exhibit-K:Plaintiff's October 02,2023 2nd NYSDOCCS Grievance complaint)In which indicates intel from specialest Chyna Morris,"the ones responsible for deferring Plaintiff Greathouse's merit time decisions May 2023 and November 2023 and not releasing you from parole".In which   is employer liability(Specialest Morris Failed to comply with NYSDOCCS Title 9 NYCRR section 8000.1(8) Policy and Procedure)

Moreover,defendants' NYSDOCCS Board of Parole/Dept. Of Parole Assistant Regional Director Derek

Jones et al.,agreed,conspired,and acted in concert with one another to falsely and maliciously initiate a

criminal Prosecution of Plaintiff Greathouse for the crime of:1.PL 220.16(1)criminal Possession of a

controlled substance in the 3rd degree,2. PL 265.03(1)(b)criminal Possession of a weapon in the 2nd

degree,3. PL 265.03(3)criminal Possession of a weapon in the 2nd degree and,4. PL 265.028)criminal

Possession of a weapon in the 3rd  degree.Among the acts pursuant to such conspiracy and

agreement,defendants' Cyrus R.Vance Jr.,et al.,committed criminal acts of misconduct such as

harassment,retaliation,fabrication of evidence,suppression of exculpatory evidence,misleading

Prosecutor,perjury,subornation of perjury,false statements,tampering with evidence,fraud,corruption

government,with improper purpose of procuring indictment #75963-23 against Plaintiff Leon

Greathouse in a criminal Prosecution.As of a result of the aforementioned acts, Plaintiff Greathouse was

Indicted by a grand jury of the county of New York for the same aforementioned criminal charges

recorded in the indictment(#75963-23),which was the docketed.The indictment was solely based on,and

in reliance on the false and perjured testimony of defendants' NYSDOCCS Dept. Of Parole Specialest

Chyna Morris et al. Animus ommisssions from the result of the unlawful initial NYSDOCCS Dept. Of

Parole entry search and seizure gave rise to the claims of injury within this complaint.

and municipal liability by defendant NYPD Police Officer Ricardo Salinas(negligent hiring,training, supervision and retention).Constitutional 4th & 14th Amendment violation(Due Process).In which the record displays that defendants from the NYSDOCCS Manhattan 3 Division of Parole unlawful acts of conduct of the initial unlawful tresspass and entry into 20 west 115th street apt.#2B NY,NY 10026 through the fraudulance of the false aliase James Burts on 11/29/2023 at approximately 9:25 a.m. (see exhibit-L:Notes from SW 11/29/30 Pg. 2 of 4 )and (see exhibit-N:NYPD DD5 document)indicating the alias James Burts residing at an permanent address of 24 west 117th street New York,NY.Which is inconsistant with the information that NYPD Police Officer Ricardo Salinas relied upon from NYSDOCCS Parole Officer Kimberly Myers Washington to obtain the already tainted warrant(exhibit-P).In which the false alias James Burts was the individual who provided Plaintiff Greathouse with the forged lease on 11/10/2023.Then falsey presented his self as the landlord and Property Manager for the NYCHA to Plaintiff (see exhibit-H:Fake lease)to in part cause a false arrest and unlawful imprisonment to Plaintiff Greathouse on 11/29/2023 at approximately 10:30 a.m. by NYPD Police Officer Ricardo Salinas(see Exhibit-C).That which would show cause that defendants(NYSDOCCS Manhattan 3 Division of Parole and The Board of Parol staff members[ARD Derek Jones])et al., acted with the New York County District Attorney's Office to cause to harass and retaliate against Plaintiff Greathouse.in which violated the "No Retaliation" clause agreement in Plaintiff Greathouse's settlement agreement(see exhibit-B: Greathouse v Vasquez et al. 20 Civ. 8748(S.D.N.Y.).In which where the record(Greathouse v. Vasquez, supra.)establishes that NYSDOCCS Board of Parole/Manhattan 3 Division of Parole and Cyrus R. Vance Jr., of the District Attorney's Office of New York County did establish a relationship of the "meeting of Minds" between one another in agreement in 2017 through a official statement handed down by the

District Attorney's Office of New York County to NYSDOCCS Board of Parole through the Board of Parole

Parole Board report records marked "Yes" for official statements from the Cyrus Vance R. Vance and

The New York County District Attorney's:In which the relationship between NYSDOCCS and

DANY(District Attorney New York) begins to extend back into the year 2002.Which when and where

NYSDOCCS unlawfully removed Plaintiff Greathouse from out of  NYSDOCCS Lakeview Shock

Incarceration Corr.Fac.intensive non-violent early release program due in favor for DANY because of

Plaintiff Greathouse's refusal to agree to a Proffer from DANY(see exhibit-B).

5.    The record (Greathouse V Vasquez, supra.)establishes that Cyrus R. Vance Jr. Of the New York

County District Attorney's Office in 2017 did inform the NYSDOCCS Board of Parole Commissioners

to not release Plaintiff Greathouse out on NYSDOCCS Parole conditions(see exhibit-B).In which in

2017 it is documented on record(Greathouse v. Vasquez, supra.)of the NYSDOCCS Board of Parole

Commissioners' personal involvement in the agreement with the animus of further causing the

Detainment of Plaintiff Leon Greathouse as personal property while under an unlawful 3 to life time

Parole A-2 non-violent eradicated felony under the old Rockerfeller felony sentencing guideline

Structure:In which Plaintiff Greathouse was deprived of recieving the new retroactive A-2 3-10 year

reformatory resentencing structure upobn his release in March 14,2005-2007 by NYSDOCCS Parole due

to the animus of the unlawful pending Murder 2 charge Plaintiff Greathouse carried on his criminal

record due to DANY's negligence and malicious prosecution(see exhibit-B).In which extended to cause

Plaintiff Greathouse further prejudice by Cyrus R. Vance Jr.,and DANY throughout two resentencing

applications for the 3 to life sentence to cause interference with Plaintiff Greathouse's civil rights(42 USCS

1985(3)) and deprivation of equal Protection of law(42 USCS 1983(1))(Const.14th Amendment violation).

Page 14

(see exhibit-Q:Plaintiff Greathouse's resentencing application Affirmation in Response[Preliminary

Statement Passage#3 and #4]/Plaintiff Greathouse's[ Defendant's Criminal History passage #12])-Ind. No.

3335/2001-Dated:May 22 ,2009).After the case(Murder 2 charge)unlawfully remained open on Plaintiff

Greathouse's criminal record for 17 ½ years.In which where it is indicated that DANY stated that the

murder case was still unlawfully pended at the time(2009)on Plaintiff Greathouse's criminal history

record(see exhibit-Q).In which where DANY further indicated its refusal to clear Plaintiff Greathouse of

the false charge due to his."refusal to cooperate with the investigation conducted by Cyrus R.Vance,Jr –

District Attorney's Office of New York County"(see exhibit-Q:Defendant's Criminal History #12).In which

caused a prejudice to the out come of the Decision and Order of the resentencing application.In which

also violated  Plaintiff Greathouse's Constitution 14th Amendment.In addition,Plaintiff Greathouse's

recent favorable settlement(see exhibit:A/B) to the murder case that pended on Plaintiff's record caused

animus to actively root throughout both departments'(1.)New York County District Attorney's Office

and 2.)NYSDOCCS Board of Parole/Manhattan 3 Division of Parole),records in this matter.Which the facts

of the fruits exposes both departments'conspiring corruptive motive of animus towards Plaintiff

Greathouse.In which caused Plaintiff to be subjected to further harassment/retaliation.In which are for

the specific reasons to deprive Plaintiff of theright of the relief to be resentenced to the new 2005 DRLA

sentencing  non-violent A-2 felony sentencing structure of a 3-10 year indeterminate sentence(which

Greathouse would have now completed since the year 2012)or either of his relief of completion of

NYSDOCCS Lakeview Shock Incarceration program in 2002 had Plaintiff Greathouse would not been

unlawfully removed from the program by NYSDOCCS.Which is the core reason behind this

unlawful sytematic ongoing curtan of animus consisting of harassment,retaliation,Malicious

Page 15

Prosecution,fraud,and other deceptions of misconducts from within the government's departments(DANY & NYSDOCCS Board of Parole/Manhattan 3 Division of Parole) in order to unlawfully keep Plaintiff Greathouse obtained as property under NYSDOCCS Board of Parole's care,custody and control under an otherwise unlawful 3 to life non- violent A2 felony sentence.In which is due to a personal involvement with NYSDOCCS Board of Parole's staff member's gross negligence in their failure to correctly resentence Plaintiff Greathouse throughout 2005-2007 to the lawful non violent A2 felony sentencing structure(42 USCS 1985(3))(42 USCS 1983)as of result of the aforementioned record(see exhibit-B).The entities(DANY and NYSDOCCS Parole) would result in a systematic ongoing scheming malicious method to cover up the tracks of their countless wrong doings they had done towards Plaintiff Greathouse. In which would be to cause Greathouse to be unlawfully imprisoned in NYSDOCCS custody throughout a life time of incarceration or either to cause Mr. Greathouse's demise through its unlawful out come.

6.  Aside from the founded animus connected to the present issue in this complaint,Plaintiff Greathouse's 11/29/2023 unlawful NYPD search and seizure and false arrest at 10:30 a.m.(see exhibit-C) and NYSDOCCS 11/30/2023 unlawful detention are unsupported by probable cause of the unlawful entry and inital warrantless search 11/29/2023 by NYSDOCCS Parole at 9:25 a.m.,followed by NYPD Police Officer

Ricardo Salinas's confirmatory search and tainted warrants(1st & 2nd warrants),(see exhibit-M)and(see exhibit-P).In which it is clear in his written affidavit that Police Officer Ricardo Salinas searched the apartment 20 west 115th street apt.#2b NY,NY 10026 before hand of obtaining any warrant.In which both warrants still presented tainted information.Including inconsistant information of Kennith James Burtis's aleged authentic name (see exhibit-P).In which is inconsistant with the aliase name James Burts on the already forged lease (see exhibit-H) .In which NYPD Police Officer Ricardo Salinas indicates to state in his

Page 16

written affidavit(see exhibit-C) in page 2 of 3;last paragraph that NYPD P.O.Salinias relied upon the information from NYSDOCCS Parole Officer Kimberly Myers Washington shield #708(see exhibitC).In

which indicates to show further proof that NYSDOCCS Parole Officer Kimberly and NYPD PSA-6 Ricardo

Salinas Knowingly intentionally and willfully conspired in a otherwise frame-work,fraudulant and

governmental corruptive entry,search and seizure and false arrest of Plaintiff Greathouse on

11/29/2023.In which stemmed from the fruits of theunlawful ongoing systematic animus of DANY and

NYSDOCCS Board of Parole.In which the initial entry into the apartment by the Parole Officers at

approximately 9:25 a.m., through the known fraud alias of James

Burts(see ehxibit-H:Fake lease 20 west 115th street apt.#2B NY,NY 10026 of James Burts)lacked common

authority/apparent authority.In which made theinital entry by the NYSDOCCS Parole Officers unlawful.

The Parole officers definitely needed a warrant before hand of entry into the unlawful premises that

Liably resided in through 11/10/2023-11/29/2023.Due to NYSDOCCS then Parole Officer Chyna Morris

(Currently Specialest Chyna Morris)liably allowing Plaintiff to reside into the reseidence that was not

Up to the standards of NYSDOCCS criteria for Parolees residences(see exhibit-S:9 NYCRR section 8000.1).

7.    On 11/29/2023 the arrest of James Burts at NYPD PSA-6 Precinct DD5 report of the arrest of James

Burts would illustrate proof that his home address was not the address of 20 west 115th street apt.#2B

NY,NY 10026(see exhibit-N:NYPD DD5 report of James Burts).Which indicates a inconsistant address of

24 west 117th street NY,NY 10026.In which information is inconsistant with NYPD Police Officer Ricardo

Salinas's grand Jury testimony of 12/04/2023(see exhibit-O:Grand Jury testimony NYPD Police Officer

Ricardo Salinas-Page #35 Line:17-24),(see People v Pelchat,62 NY 2d 97,106(1984)a defendant has

a procedural right to challenge an indictment founded upon inadequate or improper evidence which is of

constitutional dimension),(see People v Gordon,101 A.D. 3d 1473 (3rd Dept.2012)hearsay "impaired the

Page 17

integrity")where and when Police Officer Ricardo Salinas Knowingly provided false testimony on the

record when asked "what was Mr.Burts relation to the apartment?",Police Officer Ricardo Salinas

responded, "He also resided in the apartment".(See exhibit-H)In which indicates to show a blink space

on tenant #2 on page 13 of 13 of the forged lease next to Plaintiff Greathouse's name as #1 tenant.

To which is clear that even the fraud alias James Burts did not reside in the premises.Which was

ntentionally misleading and also  impaired the integrity of the grand jury.With due fact of it resulting in a

Prima facie issue!Making the information legally insufficient.Resulting in a miscarriage of justice!Due to

the information lacking to be thoroughly evaluated by the Court.In which leaving Plaintiff Greathouse's

arrest on 11/29/2023 and detention within NYCDOCS(New York City Department Of

Corrections)unlawful.Due to the arrest being unsupported by probable cause with due fact of NYPD Police

Officer Ricardo Salinas submitting false statements in his affidavit felony complaint and as well as in his

grand jury testimony to support the criminal charges he had arrested Plaintiff Greathouse on.In which

further caused Plaintiff Greathouse prejudice.Which deprived Plaintiff of  a impartial right to a trial(Pre-

trial suppression hearing)(CPL 710.20(1)).Constitution 14th Amendment violation(Due Process!).

8.    In People v Marinez,121 A.D. 3d 423 993 NYS 2d 304(1st Dept.,2014)after the Police arrested Plaintiff

Greathouse and seized his phone an officer looked through it without a warrant and found two photos

showing a pistol recovered in the case.After finding the photos the officer swore to an affidavit in support

of an application for a search warrant ,which sought to search photographs on the phone and

which stated that evidence concerning Plaintiff Greathouse Possession of a firearm existed on the

Plaintiff's phone(Unlawful!)and that he was prompted by what the Police had seen in the intial entry

Into the phone (see exhibit-P:2nd NYPD Police Officer Ricardo Salinas Warrant).In wich indicated to not

Page 18

bare a time stamp(unlike the 1st warrant[11/29/23—5:29 P.M.]).The 2nd warrant indicates to also bare

the name "Kennith James Burtis," as a resident of the premises(20 west 115th street apt.#2B).In which is

inconsistant with the information of NYPD Police Officer Ricardo Salinas testimony at Grand Jury.

Where he in factly indicated the name "James Burts",also spelling it out to a juror(see exhobit-O).

In which is a completely different alias.Secondly, NYPD Ricardo Salinas inconsistantly stated Kennith

James Burtis resided in the second bedroom in the premises within the tainted 2nd warrant(see exhibit-

P:NYPD2nd warrant Pg.#5 section-i).Thirdly,the NYPD information bares a completely different

name(James Burts)and home address(24 west 117th street).In which is inconsistant with the information

in the 2nd warrant.In which appears to be fraud and and false information.

9.   However,"rather than applying for a warrant on the basis of mere probable cause",the officer achieved

certain cause by conducting an unlawful confirmatory search",which undermines(the lawl)the

purpose of the warrant requirement and cannot be tolerated"(see exhibit-M)and (see exhibit-P)

(People v Burr,70 NY 2d 354,362,514 NE 2d 1363,520 NYS 2d 739(1987),cert denied 485 U.S. S. Ct. 1294

99 L.Ed 505(1988).Accordingly,even if there were independent probable cause for the warrant,it would

not immunize the initial warrantless search or permit the subsequently-granted warrant,to render the

photos admissible(see id.)nor may the inevitable discovery doctrine be applied to this evidence;the

exception does not apply where "the evidence sought to be suppressed is the very evidence obtained in

the illegal search"(People v Stith,69 NY 2 313 ,318,506 NE 2d 911,514 NYS 2d 202(1987).

10.   In the instant case,Police Officer Ricardo Salinas swore,in his affidavit requesting the search warrant

(see exhibit-P).He relied on their statements in his sworn affidavit that they had the right to search the

premises,as part of a consent previously given by the Plaintiff(see exhibit-R:NYSDOCCS Parole release

conditions "consent" document).He was not informed that the search may have gone beyond what was

Page 19

rationally and reasonably related to the performance of the Parole Officer's duty and may have been

motivated by other factors(see exhibit-A)(see exhibit-B)and(see exhibit-G).He was also told that the

Parole Officers had been given permission to enter the apartment by the false alias "James Burts",

Who had authority to give them permission to enter the premises.In fact,James Burts had no such

Authority and the Parole Officers knew that(see exhibit-G)(see exhibit-H)(see exhibit-I)(see exhibit-J)

(see exhibit-K)and(see exhibit-L:Indicating other resident as a "Kennith James Burtis").

It is submitted that since the information,that Police Officer Ricardo Salinas relied upon in his sworn

affidavit,was incorrect(see exhibit-M),(see exhibit-P);it did not create PROBABLE CAUSE for the search

*warrant to be issued and did not iimmunize the initial warrantless search by the
Parole Officers.*

11.   The People allege that when the Parole Officers arrived at Mr.Greathouse's apartment,they were

Invited to come into the apartment by an individual named James Burts and that individual directed

them to the room where Mr.Greathouse was located.Parole Officer Michele Chambers testified in the

Grand Jury(P 13,L 8)that the "leaseholder" opened the door.In fact ,the false alias James Burts was

not the leaseholder and the Parole Officers knew that because Plaintiff Greathouse had previously

provided the NYSDOCCS Manhattan 3 Division of Parole(specialest Chyna Morris)long before the

November 29,2023 search,with an alleged lease,dated November 10,2023(see exhibit-H).That purported

lease was a forged lease and signed in the fraud alias name "James Burts".In which is a completely

different name from "Kennith James Burtis".in which in the forged lease(see exhibit-H) it listed James

Burts as a Property Manager for the New York City Housing Authority(NYCHA),which clearly he was not!

Page 20

In the limited discovery provided by the People,this lease(see exhibit-H)is described as a "fake lease".

Fake lease attached as exhibit- 1 in the People's case.Therefore the Parole Officers knew that the alias

"James Burts" was fraud and otherwise did not have actual or apparent authority to grant them

permission to enter into the apartment or give consent to any search at the time that they arrived

on 11/29/2023 at the time of 9:25 a.m.They should have obtained  a search warrant before entering

the apartment,not after searching the apartment,under a mattress,and in closed dressers and bags.

12.    The burden of establishing either actual or apparent authority to consent "rests upon the state".

People v Gonzalez,88 NY 2d 289,295,644 NYS 2d 673(Ct. ofAppeals,1996),citing Illinois v Rodriguez,497

US 177,179(U.S.Sup. C.t.,1990).The People must prove by a preponderance of the evidence that the facts

available to the Parole Officers "Warrant a man of reasonable caution" to believe that the consenting

party had authority to consent.If not, then warrantless entry without further inquiry is unlawful unless

authority actually exists".Gonzalez,supra,at 295.Citng Illinois v Rodriguez,supra.The apparent authority

of a third party to consent "must rest on the Police Officer's reasonable held factual interpretation of the

circumstances;it cannot be based on a mistaken view of the law! "...the apparent authority doctrine

is applicable only if the facts believed by the officers to be true would justify the search as a matter of

law...A mistaken belief as to the law,no matter how reasonable,is not sufficient".Gonzalez,supra,at

295.Clearly,the Parole Officers could not have had a reasonable belief that the fraud alias "James Burts"

could give permission to enter the apartment,since they knew that the lease and the alias name James

Burts were both fake(see exhibit-H).

Page 21

13.    In reference to this passage please refer to exhibit-U
(Pre-Trial Hearing Transcript Ind.No.:75963-23;begaining-Procedural
Background).

## PROCEDURAL BACKGROUND

This matter commenced on or about November 29, 2023 when Mr. Greathouse was

arrested with this co-defendant Lucristia Johnson for possession of a firearm and narcotic drugs.

The People allege that on that date, Mr. Greathouse's parole officers discovered the contraband

during a routine parole search at Mr. Greathouse's approved residence at 20 West 115th Street,

Apartment 2B, New York, New York. The police were contacted, took immediate possession of

the firearm, placed Mr. Greathouse, co-defendant and James Burts – Mr. Greathouse's landlord –

under arrest. Later that evening, the police returned with a search warrant to take official

possession of the narcotics. Burts was released, and Mr. Greathouse and co-defendant were

page 22

charged with criminal possession of a weapon in the second degree, and related charges.

Following arraignment, Mr. Greathouse moved to suppress of the contraband on the grounds, *inter alia*, that the parole search was illegal. On April 15, 2024, the Honorable April Newbauer issued an order, directing *Mapp, Dunaway, Payton* hearings, as well as *Huntley* hearing for several alleged statements in the People's automatic disclosure form.

The hearings were conducted by this Honorable Court on February 26, 2025. The People called three witnesses: Parole Officer Kimberlee Myers Washington, Police Officer Ricardo Salinas, and Parole Revocation Specialist Chyna Morris. Mr. Greathouse called Paul Hill, his former landlord.

## THE HEARING

S.P.O. Chyna Morris testified that she was Leon Greathouse's supervising parole officer from January 2023 through the time of the search. Transcript of Hearing, Page 132 [for ease of reading, only the page number will be indicated hereinafter]. Prior to S.P.O. Morris, P.O. Kimberlee Myers Washington had supervised Mr. Greathouse from 2022 to March 2023. Page 9, 53. Mr. Greathouse was on lifetime parole and attempting to get downgraded. Pages 65-66. S.P.O. Morris indicated that he began as "level 4", which involved home visits every four months and no curfew, a relatively lower level of supervision. Page 136. P.O. Myers Washington had previously conducted home visits on Mr. Greathouse and met with his landlord Paul Hill. Page 75, 162. During the tenure of S.P.O. Morris, Mr. Greathouse reported to her in the months leading up to the November 29, 2023 search. Pages 151-152. Mr. Greathouse would come to S.P.O. Morris's office as required in the months leading up to November 29. Page 171.

page 23

Mr. Greathouse was not arrested in the months leading up to November 29. Page 171. Parole did not violate Mr. Greathouse in the months leading up to November 29, 2023. Page 172.

S.P.O. Morris testified that in April 2023, she began getting reports from Maine's police authorities that Mr. Greathouse was suspected of drug activity in Maine. Page 136. Based on this, according to S.P.O. Morris, her supervisors increased the amount of supervision on Mr. Greathouse, to "level 2", meaning that he had to submit to electronic monitoring, with monthly visits to his residence and a curfew. Page 138. S.P.O. Morris testified that this was in May 2023 and that the assistant regional director (A.R.D.) Jones made the decision. Page 150-151. These steps were taken even though S.P.O. Morris could not identify Mr. Greathouse as the perpetrator in the Maine case based on photographs she was sent. Pages 138-139. Further, Maine's confidential informant was unable to identify Mr. Greathouse as the perpetrator in Maine. Page 159. No surveillance was received from Maine despite possible requests by NYS Parole. Page 160-161. Maine never arrested Mr. Greathouse. Page 161-162. Nor did S.P.O. Morris ever violate Mr. Greathouse for leaving the state. Page 162. Indeed, Maine had contacted NYS parole prior to S.P.O. Morris's tenure in January 2023. Page 132, 174.

S.P.O. Morris acknowledged that Mr. Greathouse had filed a grievance against her, her supervisor, S.P.O. Jennifer Sass, and others regarding his parole downgrade. Page 155. This grievance was something S.P.O. Morris discussed with S.P.O. Sass and her other supervisors. Page 155. S.P.O. Morris was aware that prior to the November 29 search, Mr. Greathouse had retained a law firm in order to obtain parole's records. Page 155. S.P.O. Morris knew that Mr. Greathouse was trying to downgrade his parole status and even get off parole because the offense that put him on lifetime parole no longer qualified for lifetime parole. Page 157.

page 24

S.P.O. Morris also claimed Mr. Greathouse was not supposed to have a landlord for his approved residence on September 29, 2023 (Page 139, 164), however, during a home visit, she met with his landlord, Paul Hill, and admitted that the residence was, in fact, approved. S.P.O. Morris also admitted to having a contentious interaction with Paul Hill on September 29, 2023. Page 140, 164-165. Part of the issue was that Mr. Hill was upset about the hours that Parole came to his home (early morning, Page 182) and the frequency with which Parole came to his home. Page 165. Paul Hill, Mr. Greathouse's former landlord, appeared and gave testimony during the defense case. Pages 179, *et seq.* He confirmed the contentious interaction with S.P.O. Morris, indeed, testifying that she was "disgruntled" (Page 182), and that she tried to intimidate him by demanding his ID, treating him like a parolee, and placing her hand on her pistol. Page 183. Mr. Hill testified that S.P.O. Morris left before she could confirm that Mr. Greathouse was, in fact, at home. Page 182. Based on this interaction, S.P.O. Morris prepared to disallow the address, but Mr. Hill – according to S.P.O. Morris – felt threatened and terminated Mr. Greathouse's residence first. Page 140, 164. S.P.O. Morris contradicted her own testimony on this point, indicated that she was going to disapprove the Hill residence (Pages 140-141), yet testifying – contradictorily – on cross that it was not an approved address. Page 152. S.P.O. Morris ultimately admitted that the Hill address was Mr. Greathouse's approved address. Page 153. Indeed, S.P.O. Morris was so incensed over the situation that she told Mr. Greathouse to check into the Bellevue Men's Shelter. Page 175-176.

S.P.O. Morris acknowledged that she had previously approved Mr. Greathouse's trip to Miami, Florida for work as a musical artist, and that Mr. Greathouse in fact followed proper procedure to get this permission. Page 143-144. Mr. Greathouse indicated that he had several

**page 25**

businesses, including music and a clothing company, which he provided some documentation. Page 144-145. Mr. Greathouse provided S.P.O. Morris with proof of $355,000 of income[1] from a separate civil rights lawsuit against the City of New York. Page 157.

S.P.O. Morris approved Mr. Greathouse's final residence at 20 West 115th Street in Manhattan. Page 141. She referenced Defendant's Exhibit B, in evidence, which she testified was "a legit lease." Page 171. S.P.O. Morris confirmed that the lease was a NYCHA lease between James Burts and Mr. Greathouse. Page 169. While S.P.O. Morris claimed Mr. Burts was a roommate, the lease clearly states that he is the landlord. Page 169, Defendant's Exhibit B. James Burts' name appears as the NYCHA property manager. Page 170, Defendant's Exhibit B.

On November 29, 2023, the date of the incident and arrest, PO Myers Washington was part of the team of parole officers who conducted the search. Page 7. She testified that a home visit was part of parole procedure whereby the officer would make sure the home was livable, clean and safe. Page 7-8. On that day, Officer Myers Washington began her shift at 5:00 AM. She and her team were doing community searches and home safety searches. Page 10. Other parole officers present were P.O. Chambers, P.O Stevenson, P.O. Flores, P.O. Cambell Mckinney, P.O. Santiago, P.O. McLoughlin, and some NYPD officers. Page 10.

Officer Myers Washington testified that neither she nor anyone on her team were involved with the decision to search Mr. Greathouse's home on November 29, 2023. Page 10-11. Rather this came from their supervisors, including S.P.O. Sass. Page 54-55, 155. P.O.

page 26

Myers Washington denied speaking with her supervisors as to whey they requested the search of Mr. Greathouse's residence on November 29, 2023.  Page 75.  S.P.O. Morris was involved in the decision to conduct the parole search on November 29.  Pages 147-148.  She claimed the constant, albeit unverified, visits to Maine in a "very high drug area" "met the criteria for a search at that time."  Page 147-148.  S.P.O. Morris was not involved in the search itself because "I believe I was off that day."  Page 148.  As will be seen, it is respectfully submitted that she did not want her fingerprints on the murder weapon.

P.O. Myers Washington testified that the searches performed on November 29, 2023 were part of a community search in which several home searches were performed that day.  Page 55.  The parolees' homes being searched were located throughout Manhattan.  Page 57.  The search of Mr. Greathouse's home was the last one scheduled for that day, following 3-4 other searches.  Page 12-13.  About 15-30 minutes before going to Mr. Greathouse's home, the police officers departed.  Page 13; 57.  P.O. Myers Washington testified that they had been there in case there were dangerous areas where the parole officers were.  Page 56.  Indeed, Police Officer Salinas testified that he was only requested to assist Parole with respect to only one other parolee that morning.  Page 103.

S.P.O. Morris again waffled on her testimony in regard to how the search was decided.  S.P.O. Morris initially claimed it was due to the "trips" to Maine and unemployment issues (Page 147-148), then on cross-examination, she denied involvement ("I never had a case conference with anybody"), claiming that searches are done every month, and it was "random."  Page 153.  Then she later admitted "I conducted multiple case conferences, which lead to the search."  Page 154.

page 27

P.O. Myers Washington testified that she and her team arrived at Mr. Greathouse's apartment around 10:00 AM. Page 13. When parole arrived at the apartment, Officer Myers Washington knocked on the apartment door and was greeted by an individual she described as Mr. Greathouse's roommate. Page 14. Upon inquiry, the person (later determined to be James Burts [Page 94]) let the officers into the apartment and lead her to what he said was Mr. Greathouse's door. Page 14. She testified that Mr. Burts knocked on Mr. Greathouse's door and stated that Parole was present. Page 14. Mr. Greathouse opened the door, and P.O. Chambers announced they were there for a search. Page 14. He was handcuffed outside the door and taken into the room. Page 14. At that time, Mr. Burts entered into another room next to Mr. Greathouse's. Page 15.

Upon entry into Mr. Greathouse's room, co-defendant was in the bed. Page 16. While Officer Myers Washington claims that she and her team were not looking for anything specifically because it was a simple safety search (Page 18), she claims that she found narcotic drugs inside a drawer with a matter of minutes of entry. Page 84. Additionally, she testified that P.O. Chambers discovered a firearm in a duffel bag between the bed and the window at about the same time. Page 20. P.O. Myers Washington did not see P.O. Chambers discover the firearm because her own attention was focused on the dresser at that time. Page 61-62. Inside a fanny pack in the bed was money and the co-defendant's identification. Page 27. Photos were taken of the gun, however, P.O. Myers Washington did not know where the gun was when the pictures were taken. Page 64. When Officer Chambers left Mr. Greathouse's with the duffel bag and gun, P.O. Myers Washington did not accompany her. Page 65. P.O. Myers Washington confirmed that parole officers do not use body-worn camera, hence, there was no live evidence

page 28

of the parole search itself. Page 65. PO Salinas, the arresting officer, was not present for nor did

he participate in the parole search of Mr. Greathouse's apartment. Page 108.

P.O. Myers Washington testified that the parole officers then contacted the police officers

who had previously left them, and they came to Mr. Greathouse's apartment building. Page 42.

They arrived about 45 minutes after the parole officers first got there at 10:00 AM. Page 42.

However, when confronted with the body-worn camera of NYPD, which she authenticated, she

could not explain why they indicated that the police arrived at 9:55 AM, after the parole search

had been initiated. Page 59-60. PO Salinas, the arresting officer, was able to confirm the

accuracy of the BWC's 9:55 AM time when the NYPD arrived at the scene of the search, thereby

confirming that P.O. Myers Washington's testimony was off by almost a full hour. Pages 106,

107.

Almost immediately after Mr. Greathouse's arrest, S.P.O. Morris was promoted from

P.O. to S.P.O. Page 132, 149. No testimony was adduced as to any of Mr. Greathouse's

statements as set forth in the People's automatic disclosures dated May 30, 2024.

## THE LAW

### BURDENS OF PROOF AND STANDARDS

#### *Mapp/Dunaway*

For the *Mapp/Dunaway* hearings, the burden of production to establish credible facts

constituting a lawful search and seizure lies with the government. *Mapp v. Ohio*, 367 U.S. 643,

81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60

L. Ed. 2d 824 (1979); *People v. Dodt*, 61 NY2d 408, 415, 462 N.E.2d 1159, 474 N.Y.S.2d 441

(1984); *People v. Berrios*, 28 NY2d 361, 270 N.E.2d 709, 321 N.Y.S.2d 884 (1971). To do so,

page 29

the government *must* present credible testimony. *People v. Carmona*, 233 A.D.2d 142, 649

N.Y.S.2d 432 (1st Dept. 1996); *People v. Quinones*, 61 AD2d 765, 402 N.Y.S.2d 196 (1st Dept.

1978). *Only* then, does the burden shift to the defense to establish the illegality of police conduct

by a fair preponderance of the evidence. *See People v. Berrios, supra.*

State and federal constitutions prohibit unreasonable searches and seizures. NY

Constitution, Art. I, § 12; U.S. Const. Am. IV; *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.

Ed. 2d 889 (1968). Under the Fourth and Fourteenth Amendments a search conducted without a

warrant issued upon probable cause is *per se* unreasonable...subject only to a few specifically

established and well-delineated exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct.

2041, 36 L. Ed. 2d 854 (1973). Such exceptions generally require, *inter alia*, probable cause:

"Probable cause exists if the facts and circumstances known to the arresting officer

warrant a prudent man in believing that the offense has been committed." *People v. Oden*, 36

NY2d 382, 384). And further, that the person arrested is the perpetrator. *See People v.*

*Carrasquillo*, 54 NY2d 248, 254. The basis for the belief must not only be reasonable, "but it

must appear to be at least more probable than not that a crime has taken place and that the one

arrested is its perpetrator" *People v Carrasquillo, supra*, at 254; *see also*, *People v De Bour*, 40

N.Y.2d 210, 215-216 (1976). The existence of probable cause "must necessarily turn on the

facts in each individual case" *People v. Green*, 35 N.Y.2d 193, 195.

Evidence recovered in violation of these principles must be suppressed, and further

evidence derived from such illegal searches and seizures, such as identifications of Mr.

Greathouse as the perpetrator and statements taken from him, must be suppressed as fruit of the

poisonous tree. *See Mapp v. Ohio*, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961);

**page 30**

*Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979).

Information from a confidential informant may provide probable cause if the prosecution can demonstrate the informant's (1) reliability and (2) the basis of their knowledge. *See People v. Portelli*, 116 A.D.3d 1163, 983 N.Y.S.2d 355 (3d Dep't 2014), *citing to People v. Chisholm*, 21 NY3d 990, 994, 995 NE2d 164, 972 NYS2d 202 (2013), *Spinelli v. United States*, 393 US 410, 416, 89 S Ct 584, 21 L Ed 2d 637 [1969]; *Aguilar v. Texas*, 378 US 108, 114, 84 S Ct 1509, 12 L Ed 2d 723 (1964); *People v. Coffey*, 107 AD3d at 1049; *People v. Porter*, 101 AD3d 44, 46, 952 NYS2d 678 (2012), *lv. denied* 20 NY3d 1064, 985 NE2d 925, 962 NYS2d 615; 20 NY3d 1065, 962 NYS2d 616, 985 NE2d 926 (2013). The government must satisfy both prongs of the *Aguilar-Spinelli* test to justify a finding of probable cause. *See People v. Walker*, 289 A.D.2d 1074, 1075, 735 N.Y.S.2d 903, 904 (4th Dep't 2001)(suppressing evidence for failure to establish probable cause).

### *Huntley*

In a *Huntley* hearing, the government must prove beyond a reasonable doubt that a defendant's statements were made voluntarily *and* that any custodial statements were made after properly administered and properly waived *Miranda* warnings. *People v. Huntley*, 15 N.Y.2d 72, 78, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965); *People v. Valeruis*, 31 NY2d 51, 286 N.E.2d 254, 334 N.Y.S.2d 871 (1972). *See also People v. Anderson*, 42 NY2d 35, 364 N.E.2d 1318, 396 N.Y.S.2d 625 (1977). Additionally, "[t]he People have a heavy burden to demonstrate that [a] defendant's waiver was knowing, intelligent, and voluntary." *People v. Adames*, 121 A.D.3d 507, 994 N.Y.S.2d 334 (1st Dep't 2014).

Generally, statements that are the product of custodial interrogation must be preceded by

*Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "As an 'absolute prerequisite to interrogation, individuals taken into custody by law enforcement authorities ... must be adequately and effectively apprised of [their] rights' safeguarded by the Fifth Amendment." *See People v. Dunbar*, 24 NY3d 304, 313-314, 998 N.Y.S.2d 679, 23 N.E.3d 946 (2014), *quoting Miranda v. Arizona*, *supra* at 467; *People v. Dorvil*, 175 AD3d 708, 709, 108 N.Y.S.3d 43 (2nd Dept. 2019); U.S. Constitution Amendment V; NY Constitution, Art I, § 6.

"*Miranda* warnings are required when a person's freedom of movement is restricted and the questioning is designed to elicit incriminating evidence." *See People v. Chappelle*, 189 AD2d 695, 592 N.Y.S.2d 713 (1st Dept. 1993). A person is said to be in "custody" when a "reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave." *People v. Paulman*, 5 NY3d 122, 129, 833 N.E.2d 239, 800 N.Y.S.2d 96 (2005). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *People v. Paulman*, *supra* at 129, *quoting People v. Ferro*, 63 NY2d 316, 472 N.E.2d 13, 482 N.Y.S.2d 237 (1984).

The waiver of Miranda rights following their reading must be voluntary, unequivocal and clear. *See Davis v. United States*, 512 U.S. 452 (1994); *People v. Davis*, 75 N.Y.2d 517, 523, 553 N.E.2d 1008, 554 N.Y.S.2d 460 (1990); *People v. Adames*, 121 A.D.3d 507, 994 N.Y.S.2d 334 (1st Dep't 2014). Involuntary statements and improperly mirandized statements must be suppressed. *See People v. Huntley*, 15 N.Y.2d 72, 78, 204 N.E.2d 179, 255 N.Y.S.2d 838

page 32

(1965).

<u>PL 710.60 and the Limits of Hearsay at Pretrial Hearings</u>

While CPL 710.60 makes hearsay admissible in evidence at a suppression hearing, courts have stressed that such hearsay alone is not sufficient to permit the government to establish the legality of the contested police conduct, nor does it necessarily carry the requisite weight or probativeness to meet the government's burden of production. Hence, CPL 710.60 does not excuse the government from establishing the basis of the hearsay declarant's knowledge, and if they fail to do so, courts will disregard the hearsay, even if admitted into evidence. *People v. Foy*, 212 A.D.2d 446 (1st Dept. 1995); *People v. Lee*, 193 A.D.2d 529 (1st Dept. 1993).

Indeed, Court of Appeals held that it was insufficient as a matter of law to attempt to establish a fact through hearsay, where the witness has no personal knowledge of the facts establishing the declarant's basis of knowledge. *People v. Gonzalez*, 80 N.Y.2d 883 (1992).

As such, the mere fact that the government's witnesses may have testified to hearsay statements does not excuse them from establishing the basis of the declarant's knowledge. Indeed, failure to do so is equivalent to failure of the government to meet its burdens at pre-hearings.

## SUBSTANTIVE LAW AND DISCUSSION

### *Huntley Motion Should Be Summarily Granted*

At the hearing herein, no testimony or evidence was adduced as to any of the statements attributed to Mr. Greathouse as allegedly by their May 30, 2024 automatic disclosure form. Accordingly, that portion of the motion to suppress should be summarily granted.

## POINT I: PAROLEES ARE STILL ENTITLED TO 4TH AMENDMENT PROTECTIONS AGAINST UNREASONABLE SEARCHES AND SEIZURES

Parolees/probationers do not fully surrender all their 4th Amendment rights. *See People v. Hale*, 93 N.Y.2d 454, 459, 714 N.E.2d 861, 692 N.Y.S.2d 649 (1999), *citing to* US Const 4th Amend; NY Const, art I, § 12; *Griffin v. Wisconsin*, 483 US 868, 873; *People v. Jackson*, 46 NY2d 171, 177; *People v. Hunter*, 43 N.Y.2d 175, 180-181, 371 N.E.2d 794, 401 N.Y.S.2d 31 (1977). Where the parole officer acts as an agent for the police, then the search is illegal notwithstanding a defendant's status as a parolee. *See People v. Candelaria*, 63 A.D.2d 85, 406 N.Y.S.2d 783 (1st Dep't 1978); *see also People v. Hale, supra*, 93 N.Y.2d at 462.

"A probationer's[2] home is protected by the constitutional requirement that searches be reasonable." *People v. Hale*, 93 N.Y.2d 454, 459, 714 N.E.2d 861, 692 N.Y.S.2d 649 (1999), *citing to* US Const 4th Amend; NY Const, art I, § 12; *Griffin v. Wisconsin*, 483 US 868, 873; *People v. Jackson*, 46 NY2d 171, 177. "Where, however, as here, the search and seizure is undertaken by the parolee's own parole officer, in our view whether the action was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *People v. Hunter*, 43 N.Y.2d 175, 180-181, 371 N.E.2d 794, 401 N.Y.S.2d 31 (1977) ("[W]e

---

[2] The caselaw roundly does not distinguish between (1) Parole and Probation Searches, or (2) Whether or not a probationer/parolee executed a consent. *See People v. Huntley*, 43 N.Y.2d 175, 182-183 (1977) ("Finally, we observe that the standard authorization signed by defendant as parolee for searches of his person, residence or property does not affect the determination we make. That authorization is not to be taken as an unrestricted consent to any and all searches whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures. In our analysis, it merely parallels, by way of confirmation, the right of the parole officer which we uphold -- namely, the right to conduct searches rationally and substantially related to the performance of his duty. Because parole is a matter of legislative grace and not of constitutional right does not mean that unconstitutional conditions may be attached when it is granted.").

immediately agree with defendant that in consequence of his acquiring status as a parolee, he did

not surrender his constitutional rights against unreasonable searches and seizures").

In particular, where the parole officer acts as a conduit or agent of the police, a parole

search is illegal. "[A] parolee's status ought not to be exploited to allow a search which is

designed solely to collect contraband or evidence in aid of the prosecution of an independent

criminal investigation. When the search is of such a nature, the parole officer becomes the

conduit of the police officer in doing what the police officer could not do himself." *People v.

Candelaria*, 63 A.D.2d 85, 406 N.Y.S.2d 783 (1st Dep't 1978) ("We find that, in searching

Candelaria's apartment, the parole officers were acting as the agents of the police officer in his

efforts to find incriminating evidence as to the homicide."). Additionally, while the police are

permitted to accompany a probation officer, the probation officer is the one who initiates and

performs the search as rationally and reasonably related to the performance of their duties. *See

People v. Hale*, *supra*, 93 N.Y.2d at 462 ("Moreover, the probation officer, although

accompanied by the police, initiated and undertook the search by virtue of his own responsibility

for and relationship with the defendant, as his supervisor, motivated by his duty to monitor the

terms of defendant's probation and rehabilitation").

In *People v. Huntley* [pertaining to parole searches *not* statements], 43 N.Y.2d 175, 401

N.Y.S.2d 31 (Ct. of Appeals, 1977), the New York Court of Appeals found that whether a search

by defendant's Parole Officer is unreasonable and thus constitutionally impermissible is

determined by whether the conduct of the Parole Officer was "rationally and reasonable related

to the performance of the Parole Officer's duty. It would not be enough necessarily that there

was some rational connection; the particular conduct must also have been substantially related to

page 35

the performance of duty in the particular circumstances". *Id.* at 181. The Parole Officer does not have a carte blanche to intrude on the private life of the parolee. *Id.* The standard authorization signed by the defendant, as a parolee, to search his residence is "not to be taken as unrestricted consent to any and all searches and seizures whatsoever or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures...Because parole is a matter of legislative grace and not of constitutional right does not mean that unconstitutional conditions may be attached when it is granted". *Id.* at 182.

In *Huntley, supra,* the Court did not suppress the drugs that were recovered. However, in *People v. Jackson,* 46 N.Y.2d 171 (1978) the Court distinguished its finding from the *Huntley* case. The Court said that in *Huntley,* the Parole Officers had personal knowledge that the defendant had violated conditions of his parole. In *Jackson, supra,* there was no such evidence or indication that the defendant was unreliable. The Court said that it was unreasonable for the Officer to begin his investigation by conducting a wholesale search of the defendant. There was no apparent need for haste. Why not wait to get a search warrant? The Court found that the search was completely arbitrary. "To uphold the search in this case would hardly be consistent with the recognition of a probationer's constitutional right to be free of unreasonable searches and seizures. If that right means anything it must means that a probationer who has not previously violated the conditions of his sentence should not be subjected to a complete search of his person and property whenever his probation officer receives an anonymous phone call." *Id.* at 176.

page 36

In this case, Defendant Leon Greathouse retained 4th Amendment protections notwithstanding his status as a parolee. As will be demonstrated, *infra* Point III, those rights were violated.

### POINT II: THE STANDARD PAROLE CONSENT TO SEARCH DOES NOT CONSTITUTE A FULL AND COMPLETE WAIVER OF 4TH AMENDMENT PROTECTIONS AGAINST UNREASONABLE SEARCHES AND SEIZURES

The standard authorization for home entry and searches by Parole Officers, given by a defendant, does not constitute an unrestricted consent to any and all searches. There must be an individualized reasonable suspicion that this defendant had engaged in criminal conduct. *People v. Hill*, 2002 N.Y.Misc. Lexis 1388 (Appellate Term, First Dept., 2002). In *People v. Tony*, 30 Misc. 3d 867, 874 (Supreme Ct, Bronx County, 2010) the Court suppressed the fruits of the search where it found that the Parole Officers had no reason to think that the defendant was in violation of any of his conditions of his parole, they "were not aware of any particular circumstances indicating that a search would further the performance of their duties, either to detect and prevent parole violations or promote parolee's reintegration into the community."

In *People v. Tony, Id.*, although the defendant had signed the blanket consent form, the court found that although a person may consent to the warrantless search of his home, "It is the People's burden to establish the voluntariness of defendant's consent, and that burden is not easily carried, for a consent to search is not voluntary unless "it is a true act of the will, an unequivocal product of an essentially free and unconstrained choice. Voluntariness is incompatible with official coercion, actual, or implicit, overt or subtle" (*People v. Packer*, 49 AD3d 184, 187, 851 NYS2d 40 (1st Dept. 2008, *quoting People v. Gonzalez*, 39 NY2d 122, 128, 347 NE2d 575, 483 NYS2d 215 (1976). *People v.Tony, Supra*, at 875.

page 38

In *People v. Tony, supra* at 875, when the Parole Officer arrived at the premises, she told the defendant that "she was there to conduct a search-she did not ask for his permission." The court found that the defendant's conduct could not be construed as giving consent to the search, even though he had previously signed the standard consent form. "A Parole Officer's particular stated purpose of a search involving a parolee must be reasonably designed to lead to evidence of a parole violation such that it is reasonable related to the Parole Officers duty to prevent parole violations. *People v. Lafontant*, 46 AD3d 840, 841, 847 N.Y.S.2d 650 (2d Dept., 2007): *see also*, *People v. Candelaria*, 63 AD 2d 85, 90, 406 N.Y.S.2d 783 (2d Dept., 1978); *People v. Mackie*, 77 AD2d 778, 779, 430 N.Y.S.2d 733 (4th Dept, 1980)." *People v. Tony, Supra.*

The reason for the search conducted by the Parole Officers cannot be for "arbitrary, capricious, or harassing reasons". *United States v. Turner*, 2021 U.S. Dist. LEXIS 242565, 21 Cr. 409 (CM) (S.D.N.Y., 2021). "If, for example, a Parole Officer conducted a search for a personal reason-such as to retaliate against a parolee for a perceived slight-that action would not be "rationally and reasonably related" to his duties (and likewise would be 'arbitrary, capricious, or harassing") *Citing Samson v. California*, 547 U.S. 843, 847 126 S. Ct. 2193 (US Sup. Ct., 2006).

## POINT III: MR. GREATHOUSE WAS ILLEGALLY TARGETED AND SEARCH AS PART OF A PATTERN OF HARASSMENT BY PAROLE AGAINST HIM

In this case, the People have failed to meet their initial burden of production of credible evidence of legality; even if they have – a contention wholly rejected by Mr. Greathouse – the defense has established the illegality of the parole search. In particular, the People presented two mutually exclusive and contradictory versions of the justification for the parole search at issue.

page 39

P.O. Myers Washington testified that she received a list of several parolees to do community searches. Pages 10, 55, 57. She also testified that they were accompanied by the police for safety concerns, but this did not involve Mr. Greathouse as PO Salinas and his team left prior to the search of his apartment. Page 10, 13, 57. Indeed, she did not know the reason for the search of Mr. Greathouse's apartment and attempted to sell it as a routine parole search. Page 10-13, 55. This is not surprising because at the time of the search, Mr. Greathouse had not been violated by Parole for leaving the State, was making his office visits, nor had he been arrested for anything, and he was otherwise in compliance. Page 162, 171-172. Nonetheless, when P.O. Morris took the stand, she told a completely different and contradictory version of the events. She testified that they suspected Mr. Greathouse had surreptitiously gone out of State to Maine based on calls from Maine authorities. Page 147-148. She also testified that he was not in compliance with his proof of employment. Page 147-148. However, S.P.O. Morris acknowledged that Mr. Greathouse was never arrested in Maine for anything, that Maine's "informant" could not identify Mr. Greathouse as any perpetrator for anything in Maine, and that Parole had known about the reports from Maine since the beginning of the year but took no action. Page 138-139, 159-162. She also admitted that Mr. Greathouse showed her proof of income through a federal lawsuit settlement. Page 157. Hence, P.O. Morris's own proffered reasons for suspecting Mr. Greathouse was breaking the law was belied by her own actions and testimony. It also shows that the downgrade in his Parole status by Parole was unwarranted.

P.O. Morris also lied about her role in selecting Mr. Greathouse for the search. She initially claimed that her supervisors put Mr. Greathouse on the list to search because of the spurious allegations about Maine and the lack of employment information. Page 147-148. She

page 40

then backed away and claimed she never participated in the discussions pertaining to the decision to search Mr. Greathouse's apartment. Page 153. She then admitted to being present at these meetings. Page 154. More importantly, this version of the events (targeting Mr. Greathouse because of "information") is at odds with P.O. Myers Washington's version, which was a routine parole search as part of a community search, wherein the police officers were excused because Mr. Greathouse was not considered dangerous. Page 10, 13, 55, 57. This is corroborated by P.O. Morris's shifting story when she testified that the basis for Mr. Greathouse's search was "random." Page 153.

The motive of P.O. Morris to lie is due to an unreasonable bias against Mr. Greathouse by her, her supervisors and Parole. Mr. Greathouse was attempting to downgrade his Parole status, and that had been denied. Pages 65-66, 157. Mr. Greathouse had brought a grievance against S.P.O. Morris and her supervisor, S.P.O. Sass, and others in Parole, which he is well within his rights to do. Page 155. Indeed, S.P.O. Sass was involved in the decision to order a search of Mr. Greathouse's residence. Page 54-55. Further, Mr. Greathouse hired lawyers to address his concerns with Parole. Page 155. Additionally, Mr. Greathouse had won a windfall lawsuit against the City of New York for over $350,000, a fact of which S.P.O. Morris and Parole was aware. Page 157.

Indeed both S.P.O. Morris's personal animus against Mr. Greathouse and her motivation to lie to get him in trouble is unequivocally demonstrated by her altercation with Mr. Greathouse's prior landlord, Paul Hill. In particular, on or about September 29, 2023, then-P.O. Morris attempted to conduct a home visit on Mr. Greathouse at Mr. Hill's abode. Page 139, 164. She and Mr. Hill engaged in a verbal dispute since she was present early in the morning. Page

page 41

140, 164-165, 182. Even though Mr. Greathouse was at home, P.O. Morris – who placed her hand on her side arm during the argument -- stormed off without completing her visit. Page 179, 182-183. There is testimony both that P.O. Morris ordered Mr. Greathouse to leave Mr. Hill's residence, even if it meant going to Bellevue Men's Shelter, Page 140-141, 175-176, and that Mr. Hill -- feeling uncomfortable with P.O. Morris's behavior, directed Mr. Greathouse to find new housing. Page 140, 164. Either way, the impact of P.O. Morris's conduct caused Mr. Greathouse to loose his residence. Nonetheless, Mr. Greathouse complied. Page 141. Indeed, she was rewarded with a promotion following the search and arrest of Mr. Greathouse. Page 132, 149.

Accordingly, in light of the testimony adduced at hearing, this is a case where the Parole search was unlawful, illegal, unconstitutional and in violation of Mr. Greathouse's rights. As such, the motion should be granted.

## POINT IV: THE PEOPLE FAILED TO ESTABLISH THAT JAMES BURTS HAD AUTHORITY TO ADMIT THEM INTO THE PREMISES

Where someone with apparent authority consents to an entry, the apparency of that authority must be reasonable. Indeed, the police must demonstrate that the consenting person "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *People v. Gonzalez*, 88 N.Y.2d 289, 293 (1996), *citing to United States v. Matlock*, 415 U.S. 164, 171. *Gonzalez* ruled: "The Court construed "common authority" not in any narrow property law sense, but "rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of such persons has the right to permit the inspection in his own right and that the others have

page 42

assumed the risk that one of their number might permit the common area to be searched." *Id.*

Additionally, "[t]he burden of establishing either actual or apparent authority rests upon the

State." *Id.* at 295. Finally, "the apparent authority doctrine is applicable only if the facts

believed by the officers to be true would justify the search as a matter of law. ... A mistaken

belief as to the law, no matter how reasonable, is not sufficient." *Id.*, *citing to United States v.*

*Welch*, 4 F.3d 761 (9th Cir. 1993).

According to the testimony, when the Parole Officers arrived at Mr. Greathouse's

apartment, they were invited to come into the apartment by an individual named James Burts,

and that Mr. Burts directed them to the room where Mr. Greathouse was located. While both

P.O. Myers Washington and P.O. Morris claimed that Mr. Burts was a roommate of Mr.

Greathouse, Pages 14, 169, in fact, P.O. Morris had approved a sublease indicating that Mr.

Burts was the landlord. Page 169-170. Moreover, Mr. Burts was not the leaseholder as this was

a NYCHA building and the Parole Officers knew that because Mr. Greathouse had previously

provided the Parole Department, long before the November 29, 2023 search, with an alleged

lease, dated November 10, 2023. Defense Exhibit B. That purported lease was signed in the

name of James Burts and listed Mr. Burts as a Property Manager for the New York City Housing

Authority, which clearly he was not. *Id.* Indeed, in the discovery provided by the People, this

lease is described as a "fake lease" and "forged". *See* People's COC/discovery list. Therefore

the Parole Officers knew that Mr. Burts did not have actual or apparent authority to grant them

permission to enter into the apartment or give consent to any search at the time that they arrived.

They should have obtained a search warrant before entering the apartment, not after searching

the apartment, under a mattress, and in closed dressers and bags.

page 43

"The burden of establishing either actual or apparent authority to consent "rests upon the State." *People v. Gonzalez*, 88 N.Y.2d 289, 295, 644 N.Y.S.2d 673 (Ct. of Appeals, 1996), *citing Illinois v. Rodriguez*, 497 US 177, 179 (US. Sup. Ct., 1990). The People must prove by a preponderance of the evidence that the facts available to the Parole Officers "warrant a man of reasonable caution" to believe that the consenting party had authority to consent. "If not, then warrantless entry without further inquiry is unlawful unless authority actually exists." *Gonzalez, Supra*, at 295. *Citing Illinois v. Rodriguez, Supra*. The apparent authority of a third party to consent "must rest on the police officer's reasonable held factual interpretation of the circumstance; it cannot be based on a mistaken view of the law. ... "the apparent authority doctrine is applicable only if the facts believed by the officers to be true would justify the search as a matter of law...A mistaken belief as to the law, no matter how reasonable, is not sufficient". *Gonzalez, Supra*, at 295. Clearly, the Parole Officers could not have had a reasonable belief that Mr. Burts could give permission to enter the apartment, since they knew that the lease with his name on it was fake.

"Overwhelmingly, the Courts have rejected the sufficiency of a host's general consent to search premises to validate the search of a guest's overnight bag, purse, dresser drawers used exclusively for the guest's personal effects or similar objects." *Gonzalez, Supra*, at 294. Mr. Burts did not have "common authority" over the room that Mr. Greathouse was found in, or over the dresser, mattress or duffle bags in that room, as required by *United States v. Matlock*, 415 U.S. 164.

page 44

Accordingly, since Mr. Burts did not have authority – apparent or otherwise – he could not lawfully admit the parole officers, and as such, the search was unlawful. Accordingly, the fruits of that search should be suppressed.

## POINT V: PO SALINAS'S SEARCH WARRANT WAS INVALID

In *People v. Marinez*, 121 A.D.3d 423, 993 N.Y.S.2d 304 (1st Dept., 2014) after the police arrested defendant and seized his phone, an officer looked through it without a warrant and found two photos showing a pistol recovered in the case. After finding the photos, the officer swore to an affidavit in support of an application for a search warrant, which sought to search photographs on the phone and which stated that evidence concerning defendant's possession of a firearm existed on the defendant's phone and that he was prompted by what the police had seen in the initial entry into the phone.

> "Rather than applying for a warrant on the basis of mere probable cause, the officer "achieved certain cause by conducting an unlawful confirmatory search" which undermines the purpose of the warrant requirement and cannot be tolerated"(*People v. Burr*, 70 NY2d 354, 362, 514 NE2d 1363, 520 NYS2d 739 (1987), cert denied 485 US S. Ct. 1294, 99 L.Ed 505 (1988). Accordingly, even if there were independent probable cause for the warrant, it would not immunize the initial warrantless search, or permit the subsequently-granted warrant to render the photos admissible (see id.). Nor may the inevitable discovery doctrine be applied to this evidence; the exception does not apply where "the evidence sought to be suppressed is the very evidence obtained in the illegal search" (*People v. Stith*, 69 NY2 313, 318, 506 NE2d 911, 514 NYS2d 202 (1987).

In the instant case, Police Officer Ricardo Salinas relied on what the Parole Officers told him in requesting the search warrant. Page 90, 110. He relied on their statements because he

**page 45**

was not present for the search. Page 108, 110. He was not informed that the search may have gone beyond what was rationally and reasonably related to the performance of the Parole Officer's duty and may have been motivated by other factors. He was also told that the Parole Officers had been given permission to enter the apartment by Mr. Burts, who had authority to give them permission to enter the premises. Page 94, 108. In fact, Mr. Burts had no such authority and the Parole Officers knew that. It is submitted that since information, that he relied on in his sworn affidavit, was incorrect, it did not create probable cause for the search warrant to be issued and did not immunize the initial warrantless search by the Parole Officers.

When Officer Salinas arrived, he indicated that he saw that the firearm had already been taken out of the apartment, outside the front door. Page 116. He saw that the Parole Officers had already recovered alleged narcotics from inside a closed drawer and under the mattress and a firearm, ammunition, magazines, a speed loader, US Currency, etc from duffle bags. Page 92. The only items that the police recovered after obtaining the search warrant, that hadn't already been recovered by the Parole Officers, appears to be more peripheral items, such as some proof of residence documents, cell phones and drug paraphernalia. Page 92, 108, 110.

It is submitted that the search in the instant case was analogous to the search done in *People v. Marinez, supra,* and the cases cited therein. In *People v. Marinez, supra,* the police first searched the defendant's phone for photos, then applied for the search warrant to search the phone, based on seeing the photos on the phone. Here, Officer Salinas applied for the search warrant on the basis of the evidence already illegally recovered by the Parole Officers, which he had seen. As found in *People v. Marinez, supra,* even if there was probable cause for the warrant to be issued, it did not immunize the initial warrantless search. Nor would the inevitable

page 46

discovery doctrine apply because the evidence sought to be suppressed is the very evidence obtained in the initial illegal search.

Accordingly, any limited fruits of the search warrant should be suppressed. This includes not only the firearm and ammunition which were seized by PO Salinas prior to the warrant application, but also, the drugs and paraphernalia which were discovered and secured well before the warrant was obtained.

## CONCLUSION

Parole submitted contradictory and inconsistent testimony in this case. The defense established that Parole, and in particular S.P.O. Morris and S.P.O. Sass, had personal animus against Leon Greathouse predating the search in this matter. The supposed search was retaliatory based on his grievances, use of lawyers to obtain his parole records, his windfall lawsuit, and the fact that Paul Hill – Defendant's one time landlord – stood up to Parole when they came to his residence. Mr. Greathouse was in compliance with the conditions of parole, had agreed to move when ordered by S.P.O. Morris, and had not been arrested or violated prior to November 29, 2023. Parole's excuse that Mr. Greathouse was suspected of illegal activity in Maine is belied by the fact that Parole received uncorroborated reports since January 2023, but took no action. Clearly, Parole did not believe this information. Mr. Greathouse established income through his lawsuit, yet, S.P.O. Morris claimed he only submitted one financial document.

Accordingly, the People incontestably failed to meet their burden with respect the statements and the physical evidence; even if they met their burden, the defense has established

**page 47**

that the parole search in this case was illegal.The arrest was not justified by probale cause or other legal privilege and any decision contrary to the stated facts of this complaint of this unconstitutional entry, search and seizure shall be rendered as of a miscarriage of justice and prejudice to the Plaintiff Greathouse by violation of his civil rights 4th,6th,and 14th United States Constitutional Amendments. As a direct and proximate result of the conspiracy between defendants' Cyrus R.Vance Jr.,et al.,and others as aforedescribed,Plaintiff Greathouse was harassed,illegally searched and seized and falsely arrested on 11/29/22023 by NYPD PSA-6 Police Officer Ricardo Salinas and Plaintiff Greathouse was deprived of his right to be free from unreasonable and unlawful seizures,to equal protection of the laws, to due process rights to be free from arbitrary and unreasonable actions,which are secured under the fourth,fifth and fourteenth amendments to the United States Constitution and protected by 42 USCS 1983(see Monell v Dep't of Soc.Servs.,436U.S.658).

14.   The illegal arrest of Plaintiff Greathouse by defendant NYPD PSA-6 Police Officer Ricardo Salinas et al.,was solely motivated by defenants' Cyrus R. Vance Jr., et al.,personal animus towards Plaintiff Leon Greathouse and by Plaintiff Greathouse's windful lawsuit Greathouse v Vasquez 20 Civ.8748(S.D.N.Y.)and of the filing of Plaintiff Greathouse's additional civil case(Greathouse NYSDOCCS,23-Civ-6192(DEH)(GS)at Plaintiff Greathouse's previous address:114 west 137th street apt.#5C New York,NY 10039(see exhibit-T)and was an unlawful and malicious attempt to harass, intimidate,and punish Plaintiff Leon Greathouse for excersing his Constitutional rights and forcing Plaintiff Greathouse out of the residence was an oppressive and unlawful attempt to limit Plaintiff Greathouse access to the Courts,and  detained,all in violation of the 1st ,4th, & 14th Amendments to the United States Constitution and 42 USC Section 1983.

Page 48

15.  On 06/23/2023 defendant NYSDOCCS Manhattan 3 Division Parole Specialest Chyna Morris

unauthorizingly altered and breached Plaintiff Greathouse's NYSDOCCS Parole Release Conditions

agreement from a no curfew level 4 into an 10 P.M. to 7 A.M. curfew special conditions stipulation with

a GPS ankle monitor based upon false information of Plainitff Greathouse to not have any contact with

a alleged "VICTIM"(see exhibit-V:NYSDOCCS Manhattan 3 Division of Parole document adminstered by

defendant Specialest Chyna Morris).Based upon the erroneous information of NYSDOCCS Man.3 Div.

Parole Defendant Specialest Chyna Morris's false "victem" claim within Plaintiff Greathouse's Parole

record file would give cause for Plaintiff Greathouse excercising his right to; 1.)file a civil suit(see exhibit-

T); 2.)a grievance complaint(see exhibit-K)complaining of  the regard issues of the erroneous stated

"VICTEM" in the Special Conditions stipulation.After Plaintiff Greathouse would file the grievance

complaint in response defendant Specialest Chyna Morris would tamper with the evidence.Which is in

violation of Penal law section 215.35.Crossing out the "victem" in the special conditions on 10/02/2023

to furhter falsely claim that she was referring to associates(see exhibit-W:NYSDOCCS Manhattan 3

Division Paroel tampered with evidence document)and that it was a clerical error.

16.   With due fact that Plaintiff Greathouse is being further injured throughout the animus

demonstrated in Plaintiff Greathouse's complaint,Plaintiff Greathouse endured a Post Traumatic Stress

Disorder(PTSD)through the observance of documents bearing defendant Cyrus R.Vance Jr's.,name on

the face of the record of the Pre-trial  hearing transcript on page #1(see exhibit-U:Pre Trial Hearing

Transcript IND.#75963-23).In which coincidently,is not of an typographical error or accident.Since

Plaintiff Greathouse's windful settlement(Greathouse v Vance, et al.,20 Civ.8748(S.D.N.Y.)against Cyrus

R.Vance Jr.,and the New York County District Attorney's Office for Malicous Prosecution is of an

Page 49

fact.Which leaves no doubt that the subject of a conflict of interest with DANY is very much of a fact demonstrated throughout the record of this complaint.

17.  As a result of defendants' Cyrus R.Vance Jr,et al.,conduct,described in this complaint,Plaintiff Leon Greathouse incurred property damage in the amount of $355,000.00.

18.  In acting as is alleged in this complaint,defendants' Cyrus R. Vance Jr.,et al.,acted knowingly,willfully, and maliciously,and with reckless and callous disregard for Plaintiff Greathouse federally protectected rights.

19.  As of result of defendants' Cyrus R.Vance Jr.,et al.,actions,Plaintiff Greathouse has suffered and will continue to suffer extreme hardship and actual and impending irrparable damages in that defendants' Cyrus R.Vance Jr.,et al.,did in fact cause a unlawful entry illegal search and seizure and false arrest on 11/29/2023 at the time 9:25 a.m.,in the residence of 20 west 115th street apt.#2B New York,NY 10026.In which further caused the injury of an unlawful detention at Rikers' Island on 11/30/2023.That Which unlawful detention has been ongoing to Plaintiff Greathouse due to a unlawful NYSDOCCS Parole warrant(see exhibit-F),leaving Plaintiff Greathouse to be misinformed under the belief and thereon alleging that defendants' Cyrus R.Vance Jr.,et al.,investigation of Plaintiff Greathouse is continuing,and that defendants' Cyrus R.Vance Jr., may conduct another unlawful search and seizure of Plaintiff Greathouse's property at any time.

20.  Plaintiff Greathouse has no adequate or speedy remedy at law for the conduct of defendants' Cyrus R. Vance Jr.,et al.,described above.This action for injunctive relief is Plaintiff Greathouse's Only means of securing prospective relief,preventing further unlawful searches and seizures of Plaintiff Greathouse's property.

Page 50

**INJURIES**

1. The nature of this claim is inter alia,for monetary damages (Special,compensatory,punitive)for personal,physical,and emotional injuries sustained by claimant Greathouse as a result of intentional,reckless,and/or negligent conduct by agents,servants,and employees of the City of New York("City"),and by the New York City NYPD,who while acting under the color of law or regulation of the state,deprived claimant of the rights and privileges secured to him under the constitutions of the United States of America and the state of New York,as well as civil rights pursuant to 42 USCS 1983,US law,NYS,law and common law,including claimant's right to be free from illegal searches ,harassment,unconstitutional conditions of confinement,excessive force,outrageous conduct giving rise to personal injuries,intentional infliction of emotional distress,and negligent infliction of emotional distress.

2. PLEASE TAKE FURTHER NOTICE that on November 29,2023 at approximately 9:25 a.m.defendants NYSDOCCS Manhattan 3 Division of Parole Parole officers et al.,falsely arrsted Plaintiff/claimant Leon Greathouse at 20 west 115th street apt.#2B New York,NY 10026 leaving Plaintiff Greathouse to suffer severe and permanent injuries from a illegal search and seizure that resulted in a false arrest and unlawful detention on Riker's Island.Plainitff/claimant Greathouse injuries arose after his false arrest on 11/29/2023 by NYPD P.O. Ricardo Salinas.Defendants NYPD P.O.Ricardo Salinas failed to keep the conditions safe in there was improper training of the officers involved in this incident.which resulted in the injuries of Plaintiff Greathouse's loss of liberty,mental anguish,pain and suffering from the incident and its aftermath,financial loss that claiment has incurred or will incur,intentional,reckless and negligent infliction of emotional distress,negligence in training,false arrest and illegal search & seizure.

Page 51

3.     each of the defendant's Cyrus R. Vance Jr.et al., individually and in concert with the others, acted

under pretense and color of law and their official capacities but the acts were beyond the scope of their

jurisdiction and without authorization of law and in above of their powers,and each defendant Cyrus R.

Vance Jr.,et al., acted willfully,knowingly,and with specific intent to deprive Plaintiff Greathouse of right

to freedom from unlawful arrest,detention and imprisonment all which rights are secured to Plaintiff

Leon Greathouse by the 4th ,6th ,and 14th Amendment to the Constitution of the United States and by 42

U.S.C. Section 1983,to cause the injuries listed in the aforemation of this complaint.

4.   Plaintiff/Claimant Greathouse alleges that in doing the acts and things above complained of

throughout each enumerated cause of action in this complaint,the defendant's Cyrus R. Vance Jr.,et at.,

Were conspirators engaged in a corruption government sytematic ongoing scheme and conspiracy

designed and intended to deny and deprive Plaintiff Greathouse of rights guranteed to Plaintiff Leon

Greathouse under the Constitution and laws of the United States and particularly those hereinabove

enumerated.

# RELIEF

WHEREFORE,Plaintiff Leon Greathouse prays for judgment against defendant as follows:

1.  For a preliminary injuction ordering defendants' Cyrus R.Vance Jr.,et al.,and their Officers,agents,employees,successors,and attorneys,and all those in active concert or participation with defendants' Cyrus R.Vance Jr.,et al.,to return the property(esp.Plaintiff Greathouse's interlectual property-[Thumb nail USB] of US trademark/Copyright music)of Plaintiff Greathouse that was unlawfully seized on 11/29/2023,and to refrain immediately and pending final hearing and resolution of this action from further searches and seizures of Plaintiff Greathouse's property without a search warrant and in the absence of exigent circumstances allowing a search without a search warrant under applicable law.

2.  For a permanent injunction permanently enjoining and restraining defendants Cyrus R. Vance Jr.,et al.,and their Officers,agents,employees,successors,and attorneys,and all those in active concert or participation with defendants' Cyrus R.Vance Jr.,from the rise of the unlawful entry,illegal search and Seizure on 11/29/2023 at 20 west 115th street apt.#2B NY,NY 10026.

3.  For compensatory damages,in an amount of twenty-five million dollars;

4.  For punitve damages,in an amount of twenty-five million dollars.

5.  For reasonable attorneys' fees,pursuant to 42 U.S.C. Section 1988;

6.  For costs of suit incurred in this action;and

7.  For such other and further relif as the Court deems proper.

Plaintiff Leon Greathouse hereby demands a jury trial.

Page 53

**VERIFICATION**

STATE OF NEW YORK }
                          } SS:
COUNTY OF BRONX    }


Leon Greathouse,being duly sworn,deposes and says:I am the above name claimant.I have read the

foregoing civil claim under 42 U.S.C. Section's 1983 & 42 U.S.C.S. 1985 in the City of New York and know

its contents:the same is true to my own knowledge,except as to those matters I believe them to be true.


Leon Greathouse
Claimant-Pro Se


Sworn to before me this

21ᵗʰ day of August ,20 25

Notary Public

D Gary
Commissioner of Deeds, City of New York
No. 4-7215
Cert. Filed in Queens County
Commission Expires on 5/1/2026

# INDEX-EXHIBITS

A.   Attorney Bonit L.Robinson's letter from Patterson Belknap Webb & Tyler (Pg. 2 of 2)

B.   Greathouse v Vasquez,2021 U.S. Dist.Lexis 249704(10 of10)

C.   NYPD PSA-6 Police Officer Ricardo Salinas felony complaint 11/30/2023 (Pg.3 of 3

D.   Pre-trial Hrearing Transcript IND. #75963-23 Page 119 Line:7-9

E.   NYSDOCCS Man. 3 Div. Parole violation of release report charge sheet(Pg. 4 of 5)

F.   NYSDOCCS Man. 3 Div. Parole warrant # 852555 issued:11/30/2023

G.   NYSDOCCS Man. 3 Div. Parole Parolee Chrono reprt Page #2  11/22/2023

H.   NYCHA forged lease 11/10/2023 )Pages 13 Of 13)

I.   Pre-Trial Hearing Transcript IND#75963-23 Pg.153

J.   Pre-Trial Hearing Transcript IND#75963-23 Pg.154

K.   Plainitff Leon Greathouse's grievance complaint 10/02/2023(pg. 2 of 2)

L.   NYS government document bearing the name "Kennith James Burtis"

M.   NYPD PSA-6 Police Officer Ricardo Salinas affidavit for warrant #1 (Page 4 of 4)

N.   NYPD PSA-6 DD5 "James Burts"

O.   Grand Jury Testimony-NYPD Police Officer Ricardo Salinas Page 35

P.   NYPD PSA-6 Police Officer Ricardo Salinas affidavit for warrant #2 (Pg.7 of 7)

Q.   People's response to defendant Greathouse resentencing application(CPL 440.16)case#3335-2001

R.   NYSDOCCS Dept. Of Parole Conditions of Release(Pg. 2 of 2)

S.   9 NYCRR Section 8000.1 Applicability document(Pg.2 Of 2)

T.   Greathouse v. NYSDOCCS,23-Civ.6192 letter dismissing case.

I

U. -Pre-Trial Hearing Transcript (entire record Ind.75963-23 pgs.190)

V. NYSDOCCS Man.3 Div. Parole Special Conditions document 06/23/2023

W. NYSDOCCS Man 3 Div. Parole Special Conditions document 10/02/2023

II

EXHIBIT-A

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

December 13, 2022

Bonita L. Robinson
(212) 336-2554
brobinson@pbwt.com

ATTN: NYS Board of Parole
NYS Department of Corrections and Community Supervision
1220 Washington Avenue #9
Albany, NY 12226

**Re: Mr. Leon Greathouse**

Dear P.O. Myers,

This Firm is *pro bono* counsel to Mr. Leon Greathouse in the federal case captioned *Greathouse v. Vasquez, et al.*, 20 Civ. 8748 (S.D.N.Y.), and we have represented him in this matter since early 2022. We submit this letter in connection with Mr. Greathouse's request to be released from parole restrictions. We do not represent Mr. Greathouse in connection with the matter for which he has been released to parole, but, as his counsel in the aforementioned action, we are familiar with certain facts and circumstances that may be relevant to the Board of Parole's determination.

The *Greathouse v. Vasquez* case in which we represent Mr. Greathouse centers on a felony criminal complaint issued by the New York County District Attorney's Office ("DANY") charging Mr. Greathouse with murder in the second degree in 2000. Mr. Greathouse was released within days of that complaint, after multiple eyewitnesses identified other individuals as the person responsible for that horrible crime. Although, based on our review of documents produced in discovery in this litigation, the New York City Police Department "closed" the case in 2000 and DANY was not actively investigating Mr. Greathouse following his release, DANY did not agree to dismiss the case against Mr. Greathouse until October 2017, after Mr. Greathouse obtained the assistance of the Legal Aid Society. When the responsible prosecutor explained to a court its reasons for agreeing to dismiss the case, the prosecutor emphasized that DANY lacked evidence to secure any indictment and that other witnesses had come forward identifying others as the perpetrator; and the prosecutor euphemistically conceded that the open prosecution had resulted in "adverse consequences" for Mr. Greathouse.

These "adverse consequences" were substantial: based on our review of relevant records, the existence of the open murder case directly impeded Mr. Greathouse's ability to access certain rehabilitative institutional programming and work release. Most pertinently, the outstanding charge (understandably) troubled the Board of Parole: the Board of Parole considered Mr. Greathouse for release to parole in 2013, 2015, and more than once in 2017, but made clear that the murder charge "needs to be addressed" before parole could be granted. In short, our review

December 13, 2022
Page 2

suggests that Mr. Greathouse was incarcerated for several more years than he would have had the murder case against him been dismissed timely. Through our firm, Mr. Greathouse asserted certain claims against an individual defendant and the City of New York, premised on the harms he incurred because this murder case against him remained open for seventeen years, despite DANY's conceded lack of sufficient evidence even to present the case against the grand jury. This case recently reached a favorable settlement in principle.

We do not claim to be familiar with the details of the case for which Mr. Greathouse has been paroled, nor with Mr. Greathouse's conduct while on parole. We do wish to convey, however, our perceptions of Mr. Greathouse based on our many interactions over the course of our retention in his civil case: to state it succinctly, it has been our privilege and pleasure to represent him. Mr. Greathouse is intelligent, hardworking, determined, responsive, responsible, and unfailingly polite. He is a committed father seeking now to make up for lost years with children; a loving fiancé to a supportive future wife we've had the great pleasure of meeting; and a devoted son. These qualities and circumstances, will, we believe, continue to help him distance himself from his years of incarceration and continue to serve as a productive member of society.

We hope this information is helpful as you consider whether continued parole restrictions are necessary. Please feel free to contact me at (212) 336-2554 with any questions about this letter.

Respectfully submitted,

/s/ Bonita Robinson
Bonita Robinson

EXHIBIT-B

.1ouse v. Vasquez, 2021 U.S. Dist. LEXIS 249704

## Greathouse v. Vasquez, 2021 U.S. Dist. LEXIS 249704

Copy Citation

United States District Court for the Southern District of New York

December 20, 2021, Decided; December 17, 2021, Filed

20-CV-8748 (PAE)(SN)

.eporter

2021 U.S. Dist. LEXIS 249704 * | 2021 WL 6334689

LEON GREATHOUSE, Plaintiff, -against- FREDDIE VASQUEZ, et al., Defendants.

## Core Terms

malicious prosecution claim, municipal liability, arrest, motion to dismiss, false arrest, immunity, district attorney, parole, recommend, personal involvement, speedy trial, grounds, prosecutorial immunity, murder charges, pro se, termination, murder, rights, train, criminal proceeding, allegations, policymaker, municipal, supervise, asserts

**Counsel:** [*1] Leon Greathouse, Plaintiff, Pro se, Rome, NY.

**Judges:** SARAH NETBURN, United States Magistrate Judge. HONORABLE PAUL A. ENGELMAYER.

**Opinion by:** SARAH NETBURN

## Opinion

## REPORT AND RECOMMENDATION

*Greathouse v. Vasquez, US. Dist. Lexis 249704*
*20-CV-8748*

SARAH NETBURN, **United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. ENGELMAYER:**

Leon Greathouse, proceeding as a plaintiff *pro se*, asserts claims of false arrest and
malicious prosecution arising out of an allegedly unlawful arrest and arraignment for
second-degree murder that took place in June 2000. ECF No. 2 (Compl.) ¶¶ 11-13. He sues
NYPD Detective Freddie Vasquez, District Attorney Cyrus Vance in his official capacity, and
the City of New York.

Defendants Vasquez, Vance, and the City of New York (collectively "Defendants") jointly
move to dismiss Greathouse's complaint in its entirety pursuant to Federal Rule of Civil
Procedure 12(b)(6) on the grounds that: (1) Greathouse's claims for false arrest and
municipal liability against Vasquez and the City of New York are time-barred; (2) even if
Greathouse's claim against the City of New York is timely, he fails to state a claim for
municipal liability; (3) Greathouse cannot show that the criminal proceeding terminated in
a manner that affirmatively indicates his innocence, and therefore cannot state a malicious
prosecution [*2] claim against Vasquez; and (4) Greathouse's malicious prosecution claim
against Vance fails for lack of personal involvement and due to Eleventh Amendment and
prosecutorial immunity. See ECF Nos. 27, 32.

I recommend that the Court grant Defendants' motion to dismiss Greathouse's false arrest
claim against Vasquez, malicious prosecution claim against Vance, and municipal liability
claim against the City of New York, and deny the motion to dismiss Greathouse's malicious
prosecution claim against Vasquez.

## BACKGROUND

On or about June 2, 2000, a warrant was issued for Greathouse's arrest for murder in the
second degree. Compl. ¶ 11. Greathouse presented himself to the police on June 12, 2000,
and Vasquez interviewed and arrested him. Id. ¶¶ 12, 34-35. Greathouse claims that, during
that interview, Vasquez said that he did not believe Greathouse had committed the murder
in question, but that he had to arrest Greathouse because the charge was so serious and
because Greathouse was shown on the "wanted" poster associated with the murder. Id. ¶
35; but see ECF No. 34 (Pl. Opp.) Ex. C (state court document containing Vasquez's sworn
statement that a "person known to the District Attorney's Office" had informed
him [*3] that Greathouse shot another person and caused their death).

Greathouse was arraigned soon after, and by June 16, 2000, he was released on his own
recognizance. Compl. ¶¶ 13-14. The charge remained pending for the next 17 years, despite
Greathouse being summoned to court multiple times. Id. ¶¶ 19-20, 23-25. During that time,
he was convicted in two unrelated criminal cases. In 2002, he was sentenced to three years

in prison, and in 2008 to another seven years. Id. ¶¶ 17, 22. During his first sentence, Greathouse was removed from the Lakeview Shock Incarceration Correctional Facility[1] because the program received a memorandum on the pending murder charge and his refusal to agree to a proffer (also known as a "queen for a day" offer). Id. ¶ 18. During his second sentence, Greathouse appeared before the parole board three times, was questioned about the murder charge on at least two occasions, and was denied parole twice; the third time, the parole board's report noted the outstanding warrant and charge. Id. ¶¶ 26-27. In April 2017, Greathouse sought and received legal assistance from the Legal Aid Society, which filed an order to show cause in criminal court, presumably related either [*4] to his parole denial or to the pending murder charge. Id. ¶ 28. On October 19, 2017, over 17 years after Greathouse was arrested for second-degree murder, the murder charge was dismissed without explanation. Id. ¶ 31; Pl. Opp. Ex. A (state court certificate of disposition). This case was filed three years later. (The complaint was received by the Court on October 19, 2020, but it was signed by Greathouse on October 13, 2020.)

## DISCUSSION

### I. Standard of Review

To survive a 12(b)(6) motion to dismiss, the complaint "must allege sufficient facts . . . to state a plausible claim for relief." Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013) (citing Bell Atl. Corp v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "The Court 'accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). But the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. The complaint must raise factual allegations "enough to raise a right to relief above the speculative level." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (quoting Twombly, 550 U.S. at 555).

The "submissions of a pro se litigant must [*5] be construed liberally and interpreted to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (cleaned up); see Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011). The Court, however, examines a pro se plaintiff's complaint "for factual allegations sufficient to meet the plausibility requirement." Hill, 657 F.3d at 122; see Twombly, 550 U.S. at 570 (a complaint must allege "enough facts to state a claim for relief that is plausible on its face"). Courts "are obligated to draw the most favorable inferences that [a pro se]

complaint supports," but "cannot invent factual allegations that [the plaintiff] has not pled." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). The Court will not assume the truth of mere legal conclusions or conclusory statements. See Iqbal, 556 U.S. at 678-79.

Because a motion to dismiss "challenges the complaint as presented by the plaintiff," the Court may ordinarily review "only a narrow universe" of materials in assessing whether the motion should be granted. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). Courts may consider the complaint itself, as well as documents incorporated by reference or appended. Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991). "[I]n ruling on a 12(b) motion to dismiss," courts are also "permitted to consider matters of which judicial notice may be taken." Simmons v. Trans Express Inc., 16 F.4th 357, 360 (2d Cir. 2021) (internal quotation omitted). State court filings and prior rulings are public records and subject to judicial notice. See Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004); Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992) ("A court may [*6] take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings.") (internal quotation omitted).

## II. Timeliness of False Arrest and Municipal Liability Claims

Claims brought under 42 U.S.C. § 1983 that accrued in New York have a statute of limitations of three years. See Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 331 (2d Cir. 1997); Owens v. Okure, 488 U.S. 235, 250-51, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989). Section 1983 claims accrue when the plaintiff "knows or has reason to know of the injury which is the basis for the action." Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980). A false arrest claim accrues at the time of detention. Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

Greathouse was arrested and arraigned on or around June 12, 2000, and any false arrest claim accrued at that time. He commenced this action over 17 years after the three-year statute of limitations had run. Greathouse's false arrest claim is therefore time-barred. Similarly, his municipal liability claim is predicated on the City's alleged failure to "properly train and/or supervise its New York City police officers regarding the officers['] knowingly, but falsely, swearing to, and filing false and misleading[] and unsupported criminal charges," Compl. at 9—that is, it depends on the same arrest at the core of his false arrest claim. Greathouse's arrest occurred 20 years before he sued, and his municipal [*7] liability claim is therefore time-barred as well. Accordingly, I recommend that Greathouse's false arrest claims against Vasquez and the City should be dismissed as time-barred.

### III. Pleading Requirement for the Municipal Liability Claim

Even assuming the timeliness of Greathouse's municipal liability claim against the City of New York, he must still establish that "the violation of his constitutional rights resulted from a municipal custom or policy." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991). The City of New York "cannot be held liable [under § 1983] *solely* because it employs a tortfeasor—or, in other words, [it] cannot be held liable . . . on a *respondeat superior* theory." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) (emphasis in original).

Greathouse may establish municipal liability by alleging: (1) the existence of a formal policy officially promulgated or adopted by the City of New York, Monell, 436 U.S. at 690; (2) a "single challenged act" that was the decision of a municipal policymaker, Walker v. City of New York, 974 F.2d 293, 296 (2d Cir. 1992) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)); (3) unconstitutional practices by city employees "so manifest as to imply the constructive acquiescence of senior policy-making officials," Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992) (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 130, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)); or (4) the City's "failure to train or supervise" its employees in a manner that evidences "deliberate indifference to the rights of [the City's] [*8] inhabitants." Jenkins v. City of New York, 478 F.3d 76, 94 (2d Cir. 2007) (quoting City of Canton v. Harris, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).

Greathouse's complaint does not identify any formal policy, specific act by a municipal policymaker, manifest unconstitutional practices by city employees, or defined municipal failure to train or supervise. Greathouse asserts in one paragraph that the City of New York violated his Fourth Amendment rights by failing properly to train and supervise its police officers, who allegedly swore to and filed false criminal charges, even though the City "knew that its failure to properly train and properly supervise[] would violate the rights" of people like himself. Compl. at 9. Beyond this sentence, Greathouse's complaint focuses almost solely on his arrest by Vasquez, a police detective not alleged to be a policymaker. But "a single incident alleged in a complaint" that "involved only actors below the policy-making level[] does not suffice to show a municipal policy." Ricciuti, 941 F.2d at 123 (citation omitted); see Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) (holding same), overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993). Therefore, if the Court disagrees with my conclusion that Greathouse's municipal liability claim against the City of New York should be dismissed as untimely, I recommend that it be dismissed for failing to state a claim.

## IV. Malicious Prosecution [*9]  Claim Against Vasquez

To establish a malicious prosecution claim under § 1983, a plaintiff "must plead both a violation of his rights under the Fourth Amendment and the elements of a malicious prosecution claim under state law." Dettelis v. Sharbaugh, 919 F.3d 161, 163 (2d Cir. 2019) (internal quotation omitted); see Lanning v. City of Glens Falls, 908 F.3d 19, 24 (2d Cir. 2018) (same). Under New York law, a malicious prosecution claim requires: "(1) the initiation or continuation of a criminal proceeding against [the] plaintiff; (2) termination of the proceeding in [the] plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions." Dettelis, 919 F.3d at 163-64 (quoting Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997)).

Defendants' only challenge to Greathouse's malicious prosecution claim against Vasquez is that Greathouse has not adequately pleaded that the criminal prosecution was dismissed in a manner indicating his innocence, which they base exclusively on Lanning v. City of Glens Falls. There, the Court of Appeals held that the criminal proceeding underlying a plaintiff's malicious prosecution claim must have been terminated in a manner "indicative of" the plaintiff's innocence. 908 F.3d at 25. "When a person has been arrested and indicted, absent an affirmative indication that the person is innocent of the offense charged, the government's failure to [*10] proceed does not necessarily 'imply a lack of reasonable grounds for the prosecution.'" Id. at 28 (quoting Conway v. Village of Mount Kisco, 750 F.2d 205, 215 (2d Cir. 1984)) (cleaned up).

The Lanning decision apparently created some confusion among the district courts, specifically as to whether a dismissal on speedy trial grounds qualified as a favorable termination for purposes of a malicious prosecution claim under § 1983. See Kee v. City of New York, 12 F.4th 150, 163 (2d Cir. 2021) (citing cases). To address the lower court inconsistencies, the Court of Appeals held that a "speedy trial dismissal is generally a favorable termination for purposes of a malicious prosecution claim under Section 1983." Id. at 165. Where "there is no evidence in the record to support a non-merits-based reason for the dismissal," it is error to conclude that the plaintiff has "failed to satisfy this element on his federal malicious prosecution claim." Id. at 166.

As a pro se litigant, Greathouse's submissions must be construed liberally. Triestman, 470 F.3d at 474. "This policy . . . is driven by the understanding that 'implicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" Id. at 475 (quoting Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983)) (cleaned up).

In New York, speedy trial [*11] motions must be granted if more than six months have passed since "the commencement of a criminal action wherein a defendant is accused of . . .

a felony," N.Y. Crim. Proc. Law § 30.30(1)(a), such as second-degree murder, N.Y. Penal Law § 125.25. The record before the Court on the dismissal of the charge against Greathouse is, at best, ambiguous: the murder charge remained pending for *over 17 years*, well past the six months required for a speedy trial dismissal, and there is no evidence that the District Attorney's office meaningfully pursued trial during that period. The certificate of disposition does not explain the rationale for the dismissal. Pl. Opp. Ex. A. That the case was dismissed after the Legal Aid Society filed an order to show cause, Compl. ¶ 28, further supports a finding either that there was insufficient cause for the prosecution or that the case was dismissed because it violated Greathouse's right to a speedy trial. There is no allegation in the complaint to suggest that the dismissal was for "non-merits-based" reasons. Given the inconclusive record and Greathouse's *pro se* status, I find that Greathouse has adequately alleged a favorable termination of the proceeding underlying his malicious prosecution claim. I therefore [*12] recommend that the Court deny Defendants' motion to dismiss Greathouse's malicious prosecution claim against Vasquez.

## V. Malicious Prosecution Claim Against Vance

Finally, Defendants move to dismiss Greathouse's malicious prosecution claim against Vance, who served as the New York County District Attorney when the complaint was filed, on the grounds that (1) there is no evidence of Vance's personal involvement in Greathouse's prosecution, and (2) Vance is immune from suit whether he is sued in his official or personal capacity.

## A. Personal Involvement

When suing a government official under § 1983, "a plaintiff must plead that each [such] defendant, through the official's own individual actions, has violated the Constitution." Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020) (quoting Iqbal, 556 U.S. at 676). A supervisor's "mere knowledge" of a subordinate's unconstitutional behavior is insufficient. Id. "The violation must be established against the supervisory official directly." Id. at 618. It is unclear whether Greathouse alleges Vance's involvement in his capacity as a supervisor of assistant district attorneys or whether Greathouse asserts that Vance personally "continued a felony prosecution . . . that he knew was false." Compl. at 8-9. Either way, Greathouse must [*13] plead that Vance directly caused the malicious prosecution.

Defendants argue that there is no way Vance could have played a role in initiating the prosecution because he was elected as New York County District Attorney a decade *after* Greathouse's arrest. That may be, but the first element of a malicious

prosecution claim is "the initiation *or continuation*" of a criminal proceeding against the plaintiff. Dettelis, 919 F.3d at 163 (emphasis added). The murder charge remained pending for seven years after Vance was elected as District Attorney. During that time, Vance was properly positioned to decide whether to continue to prosecute Greathouse. See Pl. Opp. Ex. G (2012 court transcript ordering warrant for Greathouse's arrest for failure to appear, which identifies Vance as District Attorney). Again, the record is ambiguous as to Vance's personal involvement in continuing the ultimately dismissed criminal proceeding against Greathouse. Given Greathouse's *pro se* status, I construe his filings liberally and find that he has adequately alleged Vance's personal involvement to survive a motion to dismiss. Greathouse's malicious prosecution claim against Vance should not be dismissed on the grounds that he failed to [*14] allege Vance's personal involvement.

## B. Eleventh Amendment and Prosecutorial Immunity

"When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county," and is therefore entitled to invoke Eleventh Amendment immunity. Ying Jing Gan v. City of New York, 996 F.2d 522, 535-36 (2d Cir. 1993) (citation omitted). Additionally, "prosecutors performing prosecutorial activities that are 'intimately associated with the judicial phase of the criminal process' are entitled to absolute immunity from an action for damages under § 1983." Id., 996 F.2d at 530 (quoting Imbler v. Pachtman, 424 U.S. 409, 430, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)). "For an official who has absolute immunity, this immunity extends to all acts 'closely associated with the conduct of litigation.'" Williams v. Savory, 87 F. Supp. 3d 437, 455 (S.D.N.Y. 2015) (quoting Barrett v. United States, 798 F.2d 565, 571-72 (2d Cir. 1986)). District attorneys, however, serve "more than one role in discharging the duties of the prosecutorial office," and "whether a district attorney is or is not entitled to absolute immunity for his or her conduct depends on the function being performed at that time." Hill v. City of New York, 45 F.3d 653, 656 (2d Cir. 1995); see Corley v. Wittner, 811 F. App'x 62, 63 (2d Cir. 2020) (prosecutorial immunity as to speedy trial, fair trial, obstruction of justice claims); see also Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1148 (2d Cir. 1995) (conspiracy among prosecutors shielded by immunity); Montero v. Travis, 171 F.3d 757, 761 (2d Cir. 1999) (officials deciding whether to grant parole entitled to absolute immunity).

Greathouse's claim against Vance is based on [*15] Vance's involvement in the prosecution and proffer, Compl. at 8-9, which are quintessentially prosecutorial activities. Vance is therefore entitled to both Eleventh Amendment immunity and absolute prosecutorial immunity as related to any participation in the prosecution and proffer. Similarly, Vance is entitled to immunity as related to any alleged conspiracy with the parole board to deny Greathouse parole. See Pl. Opp. at 3-4. Thus, regardless of whether Greathouse has adequately alleged Vance's personal involvement in his prosecution, the Court should grant Defendants' motion to dismiss Greathouse's malicious prosecution claim against Vance on the grounds that he is immune from suit.

## VI. Leave to Amend

To the extent that Greathouse's opposition to Defendants' motion to dismiss includes new causes of action, see ECF No. 34 (Pl. Opp.) at 2-4, he "cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss." K.D. v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013) (citing cases). Construing those portions of the opposition as a motion for leave to amend the complaint, the Court may deny the motion if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his [proposed [*16] new] claim which would entitle him to relief." Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991). Greathouse asserts additional constitutional violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments and suggests that Defendant Vance conspired with the parole board to deny him parole but offers insufficient proof for either of these new claims. Any allegations of a "speedy trial" violation are indivisible from Greathouse's malicious prosecution claim. Allegations of conspiracy by Vance must be dismissed due to Vance's prosecutorial immunity. Greathouse provides no facts to support his asserted due process violation. If the Court construes Greathouse's opposition as a motion for leave to amend his complaint, I recommend that the motion be denied.

## CONCLUSION

Greathouse's false arrest and municipal liability claims are untimely, and he fails to state a municipal liability claim. The malicious prosecution claim against Vance is barred by Eleventh Amendment and prosecutorial immunity. Greathouse, however, states a plausible malicious prosecution claim again Vasquez sufficient to satisfy Rule 12(b)(6). Accordingly, I recommend that the Court grant in part the Defendants' motion, dismiss Greathouse's false arrest claim against Vasquez, and dismiss the case as to the City of New York and Vance. [*17] Greathouse's malicious prosecution claim against Vasquez should proceed.

The Clerk of Court is respectfully requested to mail a copy of this Report and Recommendation to the pro se Plaintiff.

DATED: December 20, 2021

New York, New York

/s/ Sarah Netburn

SARAH NETBURN

United States Magistrate Judge

**Footnotes**



The New York State Department of Corrections and Community Supervision administers a Shock Incarceration Program to provide "a highly structured routine of discipline, intensive regimentation, exercise, and work therapy, together with substance abuse treatment, education, pre-release counseling, and life skills counseling." N.Y. State Dep't of Corr. & Cmty. Supervision, Directive 86 (Jul. 29, 2021), https://doccs.ny.gov/system/files/documents/2021/08/0086_0.pdf.

**Content Type:** Cases

**Terms:** leon greathouse v. freddy Vasquez (2021)

**Narrow By:** -None-

**Date and Time:** Jan 03, 2024   11:24:23 a.m. EST



EXHIBIT-C

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

1. Leon Greathouse (M 43),
2. Lucristia Johnson (F 50),

Defendants.

FELONY

ADA Rachel Movius
(212)335-9631

Police Officer Ricardo Salinas, Shield # 29581 of the Housing Bureau PSA 6, states as follows:

*The defendants are charged with:*

| | | |
|---|---|---|
| 1 | PL 220.16(1) | Criminal Possession of a Controlled Substance in the Third Degree<br>(defendant # 1 : 1 count)<br>(defendant # 2 : 1 count) |
| 2 | PL 265.03(1)(b) | Criminal Possession of a Weapon in the Second Degree<br>(defendant # 2 : 1 count)<br>(defendant # 1 : 1 count) |
| 3 | PL 265.03(3) | Criminal Possession of a Weapon in the Second Degree<br>(defendant # 1 : 1 count) |
| 4 | PL 265.02(8) | Criminal Possession of a Weapon in the Third Degree<br>(defendant # 1 : 2 count)<br>(defendant # 2 : 2 count) |

On or about November 29, 2023 at about 10:30 AM, inside 20 West 115 Street, in the County and State of New York, the defendant knowingly and unlawfully possessed a narcotic drug with intent to sell it; the defendant possessed a loaded firearm with intent to use it unlawfully against another; the defendant possessed a loaded firearm outside of his home and place of business; the defendant possessed a large capacity ammunition feeding device.;

*The factual basis for these charges are as follows:*

I observed Police Officer Amanda Difrancesco, Shield #3074 of the 34th Precinct, recover a black .9mm Glock pistol from inside of a black duffel bag at the above-described location. I further observed Officer Difrancesco recover 2 large capacity magazines, containing 15 cartridges each, 1 empty magazine, one speed-loader, and one box

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | FELONY |
| -against- | |
| 1. Leon Greathouse (M 43),<br>2. Lucristia Johnson (F 50), | ADA Rachel Movius<br>(212)335-9631 |
| Defendants. | |

of ammunition containing 20 cartridges, from inside of the same black duffel bag.

I observed Police Officer Orandi Guzman, Shield #23322 of the Housing Bureau PSA 6, recover the following items from inside of the above-described location: (a) 114 vials containing crack/cocaine; (b) 14 additional vials containing crack/cocaine; (c) 1 large plastic bag containing crack/cocaine; (d) 2 additional plastic bags containing crack/cocaine; (e) 3 plates with crack/cocaine residue; (f) 2 razor blades with crack/cocaine residue; (g) 2 boxes containing empty small glass tubes; (h) 2 bags containing empty small glass tubes; (i) 1 bag containing empty plastic tubes; (j) 3 bags containing empty vials; (k) 3 bags containing empty small plastic containers; and (l) 1 bag containing glassine envelopes.

I have examined the substances described above as crack/cocaine and have determined that they are in fact crack/cocaine. This determination is based on my professional training as a police officer in the identification of drugs, my prior experience as a police officer making drug arrests, and my observation of the packaging and the substance, which consisted of white crystalline powder inside of various colored containers and bags and is characteristic of crack/cocaine.

I further observed Officer Guzman recover approximately $990 in United States Currency from inside of a black fanny pack at the above-described location. I further observed Officer Guzman recover a wallet from inside the same black fanny pack containing a Maine State identification document for defendant Lucristia Johnson.

I am informed by Parole Officer Kimberlee Myers-Washington, Shield #708 of the Department of Corrections & Community Supervision, the defendant resides at the above-described location. I am further informed by Officer Myers-Washington that, prior to the observation and recovery of the above-described items, both defendants were inside of the room where the above-described items were located.

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

1. Leon Greathouse (M 43),
2. Lucristia Johnson (F 50),

Defendants.

FELONY

ADA Rachel Movius
(212)335-9631

False statements made in this written instrument are punishable as a class A misdemeanor pursuant to section 210.45 of the Penal Law, and as other crimes.

Police Officer Ricardo Salinas

Date 11/30/2023

Time 1229

EXHIBIT-D

1          MR. SIMMONS: That's all, thank you.

2          THE COURT:  No re-direct, right?

3          MR. TURCHI:  One question, Judge.

4          THE COURT:  What?

5    RE-CROSS EXAMINATION

6    BY MR. TURCHI:

7    Q    Did you observe Police Officer Arandi Guzman of PSA 6

8    recover the alleged drugs from Mr. Greathouse's apartment?

9    A    I don't recall.

10         THE COURT:  That was the one question. Do you have

11    something else?

12         MS. MOVIUS:  I have one question, your Honor.

13         THE COURT:  What?

14    RE-DIRECT EXAMINATION

15    BY MS. MOVIUS:

16    Q    So, on cross you mentioned that a cellphone and a USB

17    was recovered during the search warrant?

18    A    I believe so, yes.

19    Q    How many cell phones were recovered; if you remember?

20    A    If I remember correctly, it was like five or six of

21    them.

22    Q    And the bag that the firearm was in and the duffle bag,

23    did you voucher the contents of that bag?

24    A    Yes.

25    Q    And that duffle bag as well?

EXHIBIT-E



**NEW YORK STATE | Corrections and Community Supervision**

### VIOLATION OF RELEASE REPORT

#### CHARGE SHEET

Warrant Issued: ☒

Name: GREATHOUSE, LEON

NYSID: 08465767L

DIN: 19R1258

DOCCS Releasing
Facility: MOHAWK CF

Date of Birth: 5/30/1980

COMPAS Level: 2

M.E. Date: LIFE

P.R.S.M.E. Date: LIFE

No Warrant Issued: ☐

Date Released: 1/27/2021

Date of Warrant: 11/30/2023

Warrant #: 852555 / A# 008321

Date Warrant Enforced: 11/30/2023

Location Warrant Enforced: NY

Sexually Motivated Felony: No

Hate Crime: No

Crime of Terrorism: No

Delinquency Date: 9/25/2023

| Instant Offense | Sentence |
|---|---|
| CRIM POSS CONTR SUBSTANCE 3RD(REV 09/79) | 00-00 02-00 |
| CRIM POSS CONTR SUBSTANCE 3RD(REV 09/79) | 00-00 02-00 |

Time on Parole:  2 Years 07 Months 29 Days

Since their release, the above-named individual has violated the Conditions of Release in the following manner:

| | |
|---|---|
| Charge #1 | Leon Greathouse violated Rule #9 of the Conditions of Release in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed a Glock 9MM Handgun (serial #BMFT.107) without the permission of their Parole Officer |
| Charge #2 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed a Glock 9MM Handgun (serial # BMFT.107) without permission or authority to do so. |
| Charge #3 | Leon Greathouse violated Rule #9 of the Conditions of Release in that on or about 11/29/2023 at approximately 9:30am inside of 20 W 115th St # 2B, New York NY, they possessed 2 Magazines with 30 live rounds of 9MM caliber ammunition each without the permission of their Parole Officer. |
| Charge #4 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th Street # 2B, New York, NY, they possessed 2 Magazines with 30 live rounds of 9MM caliber ammunition each without the permission or authority to do so. |
| Charge #5 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed approximately 128 vials of crack/cocaine. |

CS4003 (08 22)

NEW YORK STATE | **Corrections and Community Supervision**

| | |
|---|---|
| Charge #6 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115 St # 2B, New York, NY, they possessed approximately 128 vials of crack/cocaine. |
| Charge #7 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the safety and well-being of themselves and others in that, on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York NY, they possessed a Glock 9MM Handgun (serial #.BMFT107) without permission or authority to do so. |
| Charge #8 | Leon Greathouse violated Rule #9 of the Conditions of Release in that on or about 11/29/2023 at approximately 9:30am inside of 20 W 115TH St # 2B, NY NY they possessed ammunition without the permission of their Parole Officer. |
| Charge #9 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed ammunition without the permission or authority to do so. |
| Charge #10 | Leon Greathouse violated Rule #9 of the Conditions of Release in that on or about 11/29/2023 at approximately 9:30am inside of 20 W 115th St # 2B, New York NY, they possessed 1 empty Magazine without the permission of their Parole Officer |
| Charge #11 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W. 115th Street # 2B, New York, NY, they possessed 1 empty Magazine without the permission or authority to do so. |
| Charge #12 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed a plastic baggy containing an unknown weighted amount of alleged cocaine. |
| Charge #13 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, at inside of 20 W 115th St # 2B, New York, NY, they possessed 2 red cellophane baggies containing an unknown weighted amount of alleged cocaine. |
| Charge #14 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY. they possessed approximately 128 vials of crack/cocaine. |
| Charge #15 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed a plastic baggy containing an unknown weighted amount of alleged cocaine. |
| Charge #16 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed a plastic baggy containing an unknown weighted amount of alleged cocaine. |
| Charge #17 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed 2 red cellophane baggies containing an unknown weighted amount of alleged cocaine. |
| Charge #18 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed 2 red cellophane baggies containing an unknown weighted amount of alleged cocaine. |

CS4003 (08 22)



NEW YORK STATE | Corrections and Community Supervision

| | |
|---|---|
| Charge #19 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed a speed loader. |
| Charge #20 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed a speed loader. |
| Charge #21 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed 2 Magazines with 30 live rounds of 9MM ammunition each without the permission of their Parole Officer |
| Charge #22 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: 2 boxes of Glass Tubes. |
| Charge #23 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit : 2 Clear Ziplock Bags. |
| Charge #24 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: a Clear Ziplock Bag containing small black vials. |
| Charge #25 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: a Clear Ziplock Bag containing small clear vials. |
| Charge #26 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: 1 large Clear Ziplock Bag. |
| Charge #27 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: 1 large Clear Ziplock Bags containing small plastic tubes. |
| Charge #28 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: 4 medium Clear Ziplock Bags. |
| Charge #29 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit : 3 medium Clear Ziplock Bags containing small plastic containers. |
| Charge #30 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: 1 medium Clear Ziplock Bags containing small glass tubes. |
| Charge #31 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit : 1 small Clear Ziplock Bag. |
| Charge #32 | Leon Greathouse violated Rule #11 of the Conditions of Release in that on or about 11/29/2023, inside of 20 W 115th St # 2B, New York, NY, they possessed drug paraphernalia to wit: 1 small Clear Ziplock Bag containing small Ziplock bags |
| Charge #33 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed ammunition. |
| Charge #34 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately |

CS4003 (08 22)

**NEW YORK STATE** | **Corrections and Community Supervision**

| | 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed an ammunition box with .380 caliber rounds. |
|---|---|
| Charge #35 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior violated the provisions of law to which they are subject which provides for a penalty of imprisonment, in that on or about 11/29/2023 at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY, they possessed an ammunition box with 17 9MM caliber rounds. |
| Charge #36 | Leon Greathouse violated Rule #8 of the Conditions of Release when their behavior threatened the health and safety of themselves or others, in that on or about 11/29/2023 at approximately at approximately 9:30 am inside of 20 W 115th St # 2B, New York, NY they possessed an ammunition box with 17 9MM caliber rounds. |
| Charge #37 | Leon Greathouse violated Rule #5 of the Conditions of Release when on or about 11/29/2023 they failed to reply promptly, fully, and truthfully to their Parole Officer when they replied "no" when asked by PO Chambers if his residence contained anything that will harm anyone. |
| Charge #38 | Leon Greathouse violated Rule #5 of the Conditions of Release when on or about 10/31/2023 they failed to reply promptly, fully, and truthfully to their Parole Officer when they replied they did not have any police contact during an office report conducted at the Manhattan 3 Area Office located at 314 W 40th Street New York, NY. |
| Charge #39 | Leon Greathouse violated Rule #5 of the Conditions of Release when on or about 10/31/2023 they failed to reply promptly, fully, and truthfully to their Parole Officer when they replied they did not have any police contact when asked by PO Morris if they had any police contact during an office report conducted at the Manhattan 3 Area Office located at 314 W 40th Street New York, NY. |
| Charge #40 | Leon Greathouse violated Rule #5 of the Conditions of Release when on or about 10/31/2023 they failed to reply promptly, fully, and truthfully to their Parole Officer when they replied they did not leave the State of New York when asked by Bureau Chief Bryant if they left the State of New York during an office report conducted at the Manhattan 3 Area Office located at 314 W 40th Street New York, NY. |
| Charge #41 | Leon Greathouse violated Rule #5 of the Conditions of Release when on or about 10/24/2023 they failed to reply promptly, fully, and truthfully to their Parole Officer when they replied they did not have any police contact when asked by PO Morris if they had any police contact during an office report conducted at the Manhattan 3 Area Office located at 314 W 40th Street New York, NY. |
| Charge #42 | Leon Greathouse violated Rule #2 of the Conditions of Release in that they left the State of New York on or about 9/25/2023 without the permission of their Parole Officer. |
| Charge #43 | Leon Greathouse violated Rule #2 of the Conditions of Release in that they left the State of New York on or about 10/19/2023 without the permission of their Parole Officer. |
| Charge #44 | Leon Greathouse violated Rule #13 of the Conditions of Release in that on or about 9/25/2023 they failed to fully comply with the instructions of their Parole Officer and/or the special written conditions that were imposed when they failed to remain within the confines of their approved residence at 114 W 137TH ST # 5C NEW YORK, NY during mandated curfew hours of 10pm-7am. |
| Charge #45 | Leo Greathouse violated Rule #13 of the Conditions of Release in that on or about 9/25/2023 they failed to comply with a Board ordered condition when they failed to remain within the confines of their approved residence at 114 W 137TH ST # 5C NEW YORK, NY during mandated curfew hours of 10pm-7am.. |

CS4003 (08 22)

EXHIBIT-F

STATE OF NEW YORK
## DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION



852555

### WARRANT FOR RETAKING AND DETAINING A PAROLED OR CONDITIONALLY RELEASED PERSON OR A PERSON RELEASED TO POST-RELEASE SUPERVISION AND/OR STRICT AND INTENSIVE SUPERVISION AND TREATMENT

TO ANY PAROLE OFFICER, PEACE OFFICER OR ANY OFFICER authorized to serve criminal or civil process and to the superintendent or other person in charge of any jail, penitentiary, lockup or other place of detention in the State of New York, any other state, or other jurisdiction:

Having reasonable cause to believe that _Greathouse, Leon_
Name

_08465767L_  _19R1258_ a person under the supervision of the
NYSID #        DIN #

New York State Department of Corrections and Community Supervision has violated his/her release agreement, and/or conditions of strict and intensive supervision and treatment, or has lapsed, or is probably about to lapse, into criminal ways or company, now, therefore, pursuant to the provisions of Article 12B of the Executive Law and the Rules and Regulations of the Board of Parole, and/or Article 10 of the Mental Hygiene Law, I hereby order that said person be retaken and placed in detention to await the action of the New York State Department of Corrections and Community Supervision or a court of competent jurisdiction and for so doing, this shall be your sufficient warrant.

_A008521_

Violation of Strict and Intensive Supervision    ☐
and Treatment

Violation of Parole, Conditional Release          ☒
or Post Release Supervision

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

Per: _SPODliver #114_

Dated at: _11/30/2023_

Form 4054CS (Rev. 12/2015)

EXHIBIT-G

```
CMSCHRON* * *        NEW YORK STATE - DOCCS      * * *      DATE: 03/12/2024
                     COMMUNITY SUPERVISION                  PAGE:    2
                     PAROLEE CHRONO REPORT
                  FROM 09/25/2023 THRU 11/29/2023

  NAME: GREATHOUSE,LEON                        AREA: PVU-DOWNSTATE
  NYSID: 08465767L                         SPO NAME: LUCES,ANTOINETTE
  DIN: 19R1258                              PO NAME: SKYERS,MARIE


 DATE      TIME    TYPE                      ACTIVITY        LOCATION
```

ENTERED BY: OLIVER,SHAWN H
AREA: MANHATTAN III  SPO NAME: OLIVER,SHAWN      PO NAME: MORRIS,CHYNA
11/27/2023 03:52PM SUPV STANDARDS CONFERENCE
CONFERENCE DETAILS: CONFERENCE WITH PO MORRIS, RELEASEE IS A COMPAS LEVEL # 2
PO REPORTS RELEASEE JUST MOVED.
CURFEW:10PM TO 7AM
HOME VISIT(S): 11/9/23 - CURFEW VIOLATION
OFFICE: 11/21,
EV VERIFICATION: PO REPORTS THEY HAVE MULTIPLE EMPLOYMENTS
PV VERIFICATION: COMPLETED.
DRUG TEST: 08/2/2023, NEW ONE NEEDED.
ACTION PLAN: PO IS TO ENSURE THAT ALL CONTACTS IE: HOMEVISITS, PROGRAM AND
EMPLOYMENT VISITS ARE MADE ACCORDING TO SUPERVISION STANDARDS.
SPO REVIEW: 11/30/2023
-------------------------------------------------------------------------
ENTERED BY: JONES,DEREK
AREA: MANHATTAN III  SPO NAME: OLIVER,SHAWN      PO NAME: MORRIS,CHYNA
11/24/2023 09:28AM OTHER WORK
                          CASE REVIEWED FOR MERIT DEFFERAL RECOMENDED

SPO REVIEW: NONE
-------------------------------------------------------------------------
ENTERED BY: BRYANT,MARCUS
AREA: MANHATTAN III  SPO NAME: OLIVER,SHAWN      PO NAME: MORRIS,CHYNA
11/22/2023 03:20PM CASE CONFERENCE
*REDACTED - THIS INFORMATION HAS BEEN REDACTED AS IT IS EXEMPT FROM PUBLIC
DISCLOSURE PURSUANT TO SECTION 87(2)(A), (B), (F), AND (G) OF THE PUBLIC
OFFICERS LAW AND 9 NYCRR SECTION 8000.5(C)(2)
-------------------------------------------------------------------------
ENTERED BY: MORRIS,CHYNA D
AREA: MANHATTAN III  SPO NAME: OLIVER,SHAWN      PO NAME: MORRIS,CHYNA
11/21/2023 12:39PM OFFICE REPORT W/PAROLEE    REVIEWED CONDITI
                                             CURFEW DISCUSSED

SUBJECT REPORTED AS DIRECTED
NO POLICE CONTACT,  NO DRUGS/ALCOHOL, SAME CONTACT
RESIDENCE: 20 W 115TH ST NY NY. #2B
CURFEW DISCUSSED 10PM-7AM
SUBJECT EMAILED LEASE TO WRITER
SUBJECT STATED HE IS LOOKING INTO OWNING A FOOD TRUCK BUISNESS AND HAS OTHER BU
ISNESS OPTIONS IN MIND
SUBJECT STATED HE LIVES WITH A ROOMMATE NAMED JAMES BURTS, HE RENTS A ROOM
NRD 12/5/23
SPO REVIEW: NONE
-------------------------------------------------------------------------
ENTERED BY: MORRIS,CHYNA D
AREA: MANHATTAN III  SPO NAME: SASS,JENNIFER     PO NAME: MORRIS,CHYNA
11/09/2023 07:32PM TELEPHONE FROM PAROLEE
T/M FROM SUBJECT- SUBJECT STATED HIS NEW ADDRESS IS 20 WEST 115TH ST APT 2B NY
NY 10026, BETWEEN LENOX AND 5TH AVE. SUBJECT STATED HE WILL PROVIDE WRITER WITH
 THE LEASE TOMM AS THERE WERE SOME AMENDMENTS THAT WAS REQUIRED.
SPO REVIEW: NONE
-------------------------------------------------------------------------

EXHIBIT-H

NEW YORK CITY HOUSING AUTHORITY

# NYCHA Resident Lease Agreement

Development: _Martin Luther King Houses_

Account # _101 26 74 2_    AIR Quarter: _____

1. New York City Housing Authority ("Landlord"), in consideration of the rental herein paid and the

   representations made by _James Burts_ and

   _Leon Greathouse Jr_ ("Tenant")

   as set forth in his/her/their signed application, and his/her/their undertaking to comply with
   the Tenant's obligations in this Lease and with all of the rules and regulations of the Landlord,
   hereby leases to the Tenant and the Tenant hereby rents from the Landlord Apartment number _2B_

   in (address) _20 West 115th Street NY, NY 10026_

   in the Borough of _Manhattan_, City and State of New York ("Leased Premises").

   beginning the first day of _10/01/2023_ (insert the month that follows the month
   in which this Lease is signed by the Tenant), and terminating midnight on the last day of the month

   of _11/01/2024_ (insert the month before the Annual Income Review (AIR)
   effective date for the building in which the Leased Premises are located),
   and automatically renewable thereafter, unless otherwise terminated, for terms of 12 months,
   each 12-month term terminating at midnight on the last day of the 12th month, at a rental of $ _1,500.00_
   per month, due and payable the first day of each month or at such other day each month as the
   Landlord may decide. All money tendered pursuant to this Lease shall be by check or money order,
   or as otherwise accepted by the Landlord.

   Possession of the Leased Premises is hereby granted and the provisions of this Lease apply as of the
   date this Lease is signed by the Tenant. The above rental includes the costs of the Tenant's consumption
   of gas and electricity (except as otherwise indicated in Paragraphs 10 and 15 hereof) not in excess of a
   quantity which the Landlord in its discretion will fix and may from time to time change. The above terms
   may be changed by the Landlord, in accordance with its rules and regulations, upon 30 days prior written
   notice to the Tenant. Subject to the provisions herein, the Landlord or the Tenant may each terminate this
   Lease and tenancy by giving to the other 30 days prior notice in writing. This Lease, unless terminated as
   herein provided, shall automatically be renewed except as otherwise provided in Paragraph 19 hereof.

   **SPRINKLER SYSTEM:**

   The Leased Premises do not have a maintained and operative sprinkler system unless indicated below.

   ☐ The Leased Premises have a maintained
   and operative sprinkler system.
   The last date of maintenance and inspection was: _N/A_

# NYCHA Resident Lease Agreement

**2.    PRO-RATA RENT**

The Tenant agrees to pay additional rent in the sum of $ __1,000.00__, or in such sum to be determined at a later date, which represents monthly rent pro-rated from the date the keys to the Leased Premises are made through and including the day before the first date specified above. This additional rent, deemed rent for all purposes under this Lease including collection by a non-payment summary proceeding, is due the first day of the first month after notification of this amount or otherwise as the Landlord may decide.

**3.    ADDITIONAL RENT FOR TRANSFERRING TENANT**

In consideration for being permitted to transfer to the Leased Premises from another Housing Authority apartment without first paying all rents and charges due for that former agreement, the Tenant hereby consents to pay such sum as additional rent under this Lease. The additional rent, deemed rent for all purposes under this Lease including collection by a non-payment summary proceeding, is due the first day of the first month of this Lease or otherwise as the Landlord may decide.

**4.    COMMUNITY SERVICE OR SELF-SUFFICIENCY PROGRAM REQUIREMENT**

The Tenant shall comply, and shall cause the non-exempt members of the Tenant's household to comply, with the Landlord's policy for administration of the community service and economic self-sufficiency activities required of public housing residents ("Community Service Policy"). Community service is the performance of voluntary work or duties that are a public benefit, and that serve to improve the quality of life, enhance resident self-sufficiency, or increase resident self-responsibility in the community. Community service is not employment and may not include political activities. Each adult non-exempt member of Tenant's household must perform eight hours of community service per month or participate in an economic self-sufficiency program for eight hours per month, as specified in the Landlord's Community Service Policy. Violation of the requirements of the Community Service Policy is grounds for non-renewal of this Lease pursuant to Paragraph 19, hereof. The Landlord will deliver to the Tenant a detailed written description of the service requirement, exemption and compliance provisions of the Community Service Policy.

**5.    OCCUPANCY**

a.    The Leased Premises shall be the Tenant's only residence and only the Tenant and members of the Tenant's household (i.e., those named in the signed application, born or adopted into the household, or authorized by the Landlord) who remain in continuous occupancy since the inception of the tenancy, since birth, or since authorization of the Landlord shall use it as a residence. The Tenant and the members of the Tenant's household shall have the right to exclusive use and occupancy of the Leased Premises.

b.    The Tenant shall obtain the written consent of the Property Manager of the development in which the Leased Premises is located ("Development"), or such Property Manager's designee, before allowing any person to reside in the Leased premises other than a family member named in the Tenant's signed application or born or adopted into the household, or subsequently authorized by the Landlord, who remains in continuous occupancy since the inception of the tenancy, since birth or since subsequent authorization by the Landlord.

**6.    REDETERMINATION OF RENT**

a.    The rent shall be redetermined by the Landlord on a date to be fixed by the Landlord and annually thereafter or within such other period as may be hereafter fixed by the Landlord. In addition to the annual redetermination, interim redetermination of rent shall be made in accordance with the rules, regulations and rent schedules of the Landlord which are posted in the manner set forth in Paragraph 22 hereof.

b.    If the Tenant fails to accurately report a change in income within 30 days after the event as provided in Paragraph 7 (d), or otherwise as the Landlord may direct, or misrepresents or misstates the correct income of the Tenant or any member of the Tenant's household, then, in addition to any other remedy

# NYCHA Resident Lease Agreement

income of the Tenant or any member of the Tenant's household, then, in addition to any other remedy available to the Landlord, the Tenant shall pay to the Landlord additional rent in the amount of the difference between the rent which would have been charged by the Landlord to the Tenant had the correct income been reported to the Landlord at the time required and the rent actually paid by the Tenant during the period involved. Any retroactive charge shall be deemed rent for all purposes under this Lease including collection by a non-payment summary proceeding.

e. If the Tenant fails to provide all reportable income for the Tenant and other members of the Tenant's household, or if the Landlord is unable to verify such information as the Tenant does provide, then in addition to any other remedy available to the Landlord, the Tenant shall pay to the Landlord the applicable maximum rent for the Leased Premises as determined by the Landlord.

7. **INFORMATION TO BE FURNISHED BY THE TENANT**

a. The Tenant agrees to furnish such information, certification or signed statement, in the form fixed and at the times required by the Landlord, regarding the income, identity and composition of his/her/their household necessary to determine the rent, eligibility and the appropriateness of the size of the Leased Premises.

b. The Tenant agrees to furnish to the Landlord upon request: such birth certificate; death certificate; Social Security Number; proof of citizenship or eligible immigration status; signed consent forms authorizing the disclosure of salary and wage information, unemployment compensation claim information, or tax return information; and such other documents or information as the Landlord may require to make the determination described in the preceding sub-paragraph or to otherwise comply with the requirements of law. The accuracy of any information furnished or document submitted by the Tenant is subject to independent verification by the Landlord.

c. The Tenant shall notify the management office of the Development ("Property Management Office") of any birth or death or other changes in Tenant's household, within 30 days after the event.

d. The Tenant shall report to the Property Management Office, within 30 days after the event,

   (i)   the receipt of new public assistance by the Tenant or any member of the Tenant's household or the discontinuance of public assistance for any such person;

   (ii)  the permanent cessation of full-time employment of the Tenant or any member of the Tenant's household;

   (iii) the loss of full-time employment by the Tenant or a member of the Tenant's household which continues for a period of three months or the resumption by such person of full-time employment; or

   (iv)  the commencement of full-time employment by the Tenant or any member of the Tenant's household.

e. If the Tenant's income is derived in whole or in part from other than employment by a third party, the Tenant shall keep adequate and verifiable records, as required by the Landlord, of all cash transactions relating to investments, loans, funds received under trusts or grants, income and expense. These records and their supporting evidence, including bills, receipts, bank pass books, statements, canceled checks, and copies of returns submitted to government agencies, shall be made available for examination by the Landlord.

8. **TRANSFER TO APPROPRIATE SIZE APARTMENT**

The Tenant agrees to transfer, and to cause all members of the Tenant's household to transfer, to an appropriate size apartment in the Development or any other development, consistent with the regulations of the Landlord based on family composition, following notice that such transfer is required.

# NYCHA Resident Lease Agreement

**9.   TRANSFER TO ANOTHER APARTMENT**

The Tenant agrees to transfer, and to cause all members of the Tenant's household to transfer, to another apartment in the Development or any other development, if the Landlord requests vacant possession of the Leased Premises in order to repair or renovate the Leased Premises or the building in which they are located (which repairs and renovations Landlord in its sole discretion determines can not be accomplished while the Leased Premises is occupied), or if the Leased Premises is otherwise required by the Landlord for some other lawful purpose.

**10.   UTILITIES, SERVICES AND EQUIPMENT**

The Landlord shall furnish without additional cost (except as otherwise provided in Paragraph 11(a.) heat and hot water in accordance with requirements of law and applicable rules and regulations of municipal and state agencies, gas and electricity in normal quantities which may be fixed hereafter by the Landlord (except that the Landlord shall not supply gas and electricity if the Development or unit in which resides or are charged directly by the provider utility company), and use of a stove and a refrigerator.

**11.   SECURITY DEPOSIT**

a.   Except as otherwise provided in subparagraph "b" or "c" below, the Tenant shall deposit with the Landlord a security deposit to be used following the Tenant's vacating the Leased Premises as reimbursement for the cost of repairs beyond normal wear and tear and for rent or other charges owed by the Tenant. The amount of such deposit shall be the greater of one month's rent, or as set forth in Paragraph 1 above, or the amount set forth in the appropriate item below:

| Efficiency Apartment | $ 154.00 |
|---|---|
| 3-1/2 Rooms | $ 174.00 |
| 4-1/2 Rooms | $ 194.00 |
| 5-1/2 Rooms | $ 212.00 |
| 6-1/2 Rooms | $ 223.00 |
| 7-1/2 Rooms | $ 230.00 |

b.   Notwithstanding the foregoing, if the Tenant is in possession of the Leased Premises on the 1st day of January, 2001, Tenant shall not be required to pay any additional security for the Leased Premises under this Lease except as provided in the following sentence. The Tenant agrees to pay such additional security as may be required by reason of any modification of the foregoing schedule by the Landlord, provided such modification is lawfully adopted. Modification of the security deposit schedule shall be in accordance with the procedure for notice set forth in Paragraph 22 hereof.

c.   If the Tenant is subject to a Rent Security Agreement provided by the New York City Human Resources Administration instead of a cash security deposit, and if said Agreement ceases to be in effect, the Tenant shall, on the first day of the first month that said Agreement is no longer in effect or by such other date as the Landlord may direct, pay the Landlord a security deposit according to the terms of this Paragraph. If unpaid, such sum shall be assessed and charged as additional rent and shall be deemed rent for the purpose of a non-payment proceeding.

# NYCHA Resident Lease Agreement

12. TENANT'S OBLIGATIONS

It shall be the Tenant's obligations:

a. Not to occupy the Leased as to sublease the Leased Premises or to transfer possession of the Leased Premises;

b. Not to provide accommodations for boarders or lodgers;

c. To use the Leased Premises solely as a residential dwelling for the Tenant and the Tenant's household as identified in the Tenant's signed application, or subsequently authorized by the Landlord, and not to use the Leased Premises or permit its use for any other purpose, except that the Tenant and other members of the Tenant's household may engage in legal and permissible professional activities incidental to the primary use of the Leased Premises as a residence in accordance with the Landlord's home business policy.

d. To abide by all necessary and reasonable regulations promulgated from time to time by the Landlord, which shall be posted in the Property Management Office and incorporated by reference in this Lease;

e. To comply with all obligations imposed upon tenants in the City of New York by applicable laws, rules or regulations;

f. To keep the Leased Premises and such other areas as may be assigned to the Tenant for the Tenant's exclusive use in a clean, sanitary and safe condition;

g. To take every reasonable precaution to prevent fires;

h. To dispose of all garbage, rubbish and other waste from the Leased Premises in a sanitary, safe and lawful manner.

i. To maintain, care for, and at all times keep free from litter, any space on the grounds of the Development assigned to the Tenant for exclusive use;

j. To refrain from littering the grounds of the Development and from shaking, cleaning or airing any bedclothes, rugs, mops, dust cloths, etc., at the windows, in the halls or on the roof of any building in the Development;

k. To use only in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air conditioning and other facilities and appurtenances including elevators;

l. Not to alter the Leased Premises, or any fixtures or fittings in the Leased Premises, without the prior written consent of the Landlord, which may be granted or withheld in the Landlord's sole and absolute discretion;

m. Not to install in the Leased Premises, without the prior written consent of the Landlord, any freezer, air conditioning unit, washing machine, clothes dryer, dishwasher, "ham" or other radio transmitter, or other electrical appliances hereafter restricted by the Landlord, or any television antenna or other antenna on the window sill or at any place outside of the Leased Premises, and, if such consent is given, not to install the same in any manner other than as prescribed by the Landlord;

n. To remove any prohibited electrical or other appliances or equipment from the Leased Premises whenever required by the Landlord;

# NYCHA Resident Lease Agreement

o    To refrain from and to cause the Tenant's household and guests to refrain from destroying, defacing, damaging or removing any part of the Leased Premises or the Development;

p.    To pay reasonable charges for the repair of damages to Landlord owned appliances or the Leased Premises, other than for ordinary wear and tear, or to the Development, including damages to Development buildings, facilities or common areas, caused by the Tenant or the Tenant's household or guests;

q.    To act, and cause other persons who are in the Leased Premises with the consent of the Tenant to act, in a manner that will not disturb other residents' peaceful enjoyment of their accommodations and will be conducive to maintaining the Development in a decent, safe and sanitary condition;

r.    To assure that the Tenant, any member of the household, a guest, or another person under the Tenant's control, shall not engage in:

   (i)    Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the Development by other residents or by the Landlord's employees, as

   (ii)    Any violent or drug-related criminal activity on or off the Leased Premises or the Development, or

   (iii)    Any activity, on or off the Leased Premises or the Development, that results in a felony conviction;

s.    To pay all rent, additional rent, charges and security deposits provided herein on the first day of the month such sum becomes due, or otherwise as directed by or consented to by the Landlord;

t.    To comply with all of the provisions of this Lease applicable to the Tenant;

u.    To do everything necessary and proper to permit the Landlord to carry out its duties to all residents of the Development, and to do everything necessary and proper to permit the Landlord to comply with applicable laws, rules and regulations of federal, state and municipal agencies;

v.    Not to keep any animals in the Leased Premises or on Development grounds, except for one domesticated dog or cat responsibly maintained as a household pet, or except as otherwise provided by statute or regulation or the Landlord's Pet Policy, and subject to the provisions of such policy including the following:

   (i)    Permission to keep such pet must be obtained from the Landlord in compliance with the Landlord's Pet Policy;

   (ii)    Any pet fee and/or pet deposit required by the Landlord's Pet Policy shall be paid as required thereunder and, if unpaid, shall be deemed and collectible as additional rent; and

   (iii)    In addition to any other remedy available to the Landlord, violation of the Landlord's Pet Policy may be grounds for removal of any pet or termination of the tenancy, or both.

w.    To comply with the directions given by the Landlord concerning moving date and time;

x.    To abide by all regulations pertaining to the moving in of furniture in order to provide for proper vermin control, and to pay the cost of fumigation or extermination reasonably required in the Leased Premises following move-in;

y.    To clean windows in the Leased Premises from the inside and NOT from the outside;

z.    Not to display any sign or notice of any kind in the Leased Premises or have any exhibited from the windows of the Leased Premises;

## NYCHA Resident Lease Agreement

aa    Not to paint the Leased Premises without the prior written consent of the Landlord

bb    To comply with and obey all rules and regulations prescribed from time to time by the Landlord concerning the use and care of the Leased Premises or any common or community spaces or other places in the Development, including but not limited to stairs, halls, laundries, community or recreation rooms, walks, drives, playgrounds and parking areas; and

cc.    To comply with and to do everything necessary and proper to permit the Landlord to comply with applicable laws, rules and regulations concerning the installation and maintenance of smoke detectors, window guards and fire safety notices

dd.    *(Effective July 30th, 2018)* To assure that, in compliance with the Landlord's Smoke-Free Policy, the tenant, any member of the household, a guest, or another person under the tenant's control, shall not smoke prohibited tobacco products in restricted areas, as described in the Landlord's Smoke-Free Policy. Restricted areas include, but are not limited to, the Leased Premises, all indoor areas of the Development or other developments of the Landlord, and areas within 25 feet of the aforesaid buildings, or to the property boundary where that boundary is less than 25 feet from the property line of a development building. Prohibited tobacco products include, but are not limited to, cigarettes, cigars, pipes, and hookahs (water pipes).

The Landlord's adoption of the requirements in this paragraph 12(dd) does not make the Landlord a guarantor of the Tenant's or any other resident's health or of the smoke-free condition of restricted areas. The Landlord specifically disclaims any implied or express warranties that the Landlord's public housing properties will have higher or improved air quality or will be free from secondhand smoke

The Landlord will take reasonable steps to enforce the requirements of this paragraph 12(dd) without a graduated enforcement policy, as provided in the Landlord's Smoke-Free Policy.

13.    **THE LANDLORD'S OBLIGATION**

Except with respect to any condition beyond the control of the Landlord, it shall be the Landlord's obligation:

a.    To maintain the common areas of the Development in a decent, safe and sanitary condition;

b.    To comply with applicable laws, rules and regulations of federal, state and municipal agencies;

c.    To make necessary repairs to the Leased Premises, excluding all Tenant owned appliances;

d.    To keep the Development buildings, facilities and common areas, not otherwise assigned to the Tenant for maintenance and upkeep, in a clean and safe condition;

e.    To maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, and other facilities and appliances, including elevators, supplied by the Landlord;

f.    To provide and maintain appropriate receptacles and facilities (except containers for the exclusive use of an individual tenant family) for the deposit of garbage, rubbish and other waste removed from the premises by the Tenant in accordance with Paragraph 12(h) hereof; and

g.    To supply running water and reasonable amounts of hot water and reasonable amounts of heat at appropriate times of the year as hereinbefore provided except where heat or hot water is generated by an installation within the exclusive control of the Tenant and supplied by a direct utility connection.

# NYCHA Resident Lease Agreement

elastic (i); (iv) the cost of replacing equipment lost by the Tenant or damaged beyond ordinary wear and tear; and (v) such charges as may be hereafter imposed by the Landlord regarding dishonored checks.

d.  Except in the case of a written agreement between the Landlord and Tenant which sets forth a set provide, any charge accessed under the foregoing sub-paragraphs shall become due and collectible on the first day of the second month following the month in which such charge is made. If at period the special charges set forth above shall be collectible as any credit has on paracion thereof.

16. **INSPECTION**

The Landlord or its representative and the Tenant shall be obligated to inspect the Leased Premises prior to the commencement of occupancy by the Tenant. The Landlord will furnish the Tenant with a written statement of the condition of the Leased Premises and the equipment provided with the Leased Premises. The statement shall be signed by the Landlord and the Tenant and a copy of the statement shall be retained by the Landlord in the Tenant folder. The Landlord shall be further obligated to inspect the Leased Premises at the time the Tenant vacates the same and to furnish the Tenant with a statement of any changes to be made in accordance with this Lease. The Tenant shall be invited to participate in the latter inspection during working hours of a regular business day unless the Tenant vacates without notice to the Landlord. In the event that the Tenant shall fail or refuse to sign any written statement provided for herein, the statement signed by the Landlord shall, nevertheless, be filed and shall be deemed to be accurate unless the Tenant files a grievance in accordance with the Grievance Procedures described in Paragraph 20 hereof.

17. **RIGHT OF ENTRY**

a.  The Landlord shall, upon reasonable advance notification to the Tenant, be permitted to enter the Leased Premises during reasonable hours for the purpose of performing routine inspection and maintenance, making improvements or repairs, or showing the premises for re-leasing. A written statement specifying the purpose of the Landlord's entry, delivered to the Leased Premises at least two days before such entry, shall be considered reasonable advance notification. If the Tenant fails to permit such entry to the Leased Premises after such notice has been given, the Landlord may enter the Leased Premises at any time thereafter without further notification;

b.  The Landlord may enter the Leased Premises at any time without advance notification when there is a reasonable cause to believe that an emergency exists;

c.  In the event that the Tenant and all adult members of the household are absent from the Leased Premises at the time of entry as permitted in this Paragraph 17, the Landlord shall leave at the Leased Premises a written statement specifying the date, time and purpose of entry prior to leaving the Leased Premises;

18. **NOTICES**

a.  Except as provided in Paragraph 22 hereof or as may be otherwise provided by law or specified in this Lease, any notice to the Tenant required hereunder shall be in writing and delivered to the Tenant or an adult member of the Tenant's household residing in the Leased Premises or sent by prepaid or first class mail properly addressed to the Tenant;

# NYCHA Resident Lease Agreement

    b.   Notice to the Landlord shall be in writing, delivered to the Property Management Office or sent in first class mail properly addressed to the Property Management Office.

19.  **TERMINATION OF LEASE**

    a.   The Landlord shall not terminate or refuse to renew this Lease other than for:

        (i)   violation of material terms of the Lease, such as failure to make payments due under the Lease or failure to fulfill any of the Tenant's obligations set forth in Paragraph 13 hereof; or

        (ii)   violation by any non-exempt member(s) of the Tenant's household of the Community Service Policy, referenced in Paragraph 4 hereof, except that such violation will be grounds solely for non-renewal of the Lease at the end of any twelve-month Lease term; or

        (iii)  other good cause.

    b.   Prior to the commencement of a non-payment proceeding, the Landlord shall give notice in writing to the Tenant requiring, in the alternative, the payment of the rent or surrender of the possession of the Leased Premises, (except that Landlord shall not have waived any right to collect all rent and additional rent due and owing should the lease be terminated and the tenant evicted from the Leased Premises) and advising the Tenant of his/her/their right to request a hearing upon his/her their compliance with the conditions contained in the Grievance Procedures described in Paragraph 20 hereof. Such written notice shall be given no less than 14 days prior to commencement of the non-payment proceeding in the manner provided by Paragraph 18 of this Lease.

    c.   (i)   The Landlord shall give written notice of termination of the Lease within a reasonable time commensurate with the exigencies of the situation in the case of the creation or maintenance of a threat to the health or safety of other tenants or Landlord's employees or to the property;

        (ii)  In all other cases, the Landlord shall give 30 days' prior written notice of termination. The said notice of termination shall state the reason therefor.

20.  **GRIEVANCE PROCEDURES**

    a.   All grievances concerning the obligations of the Tenant or the Landlord shall be resolved in accordance with the grievance procedures that are in effect at the time such grievance arises ("Grievance Procedures"), which Grievance Procedures are, or shall be, posted in the Property Management Office and are incorporated by reference in this Lease.

    b.   Selection of Hearing Officer: The Hearing Officer shall be an impartial disinterested attorney other than the person who made or approved the decision under review and shall have at least five years' experience as an attorney at law admitted to practice before the Courts of New York State.

21.  **MODIFICATION OF LEASE**

    Except as otherwise provided herein this Lease may be modified by the Landlord on 30 days' prior written notice and only by a written rider or other amendment to the Lease.

# NYCHA Resident Lease Agreement

### 22. POSTING OF POLICIES, RULES AND REGULATIONS

Schedules of special charges for services, repairs and utilities, rules and regulations and all items specifically herein required to be posted shall be publicly posted in a conspicuous manner in the Management Office and shall be furnished to the Tenant on request. Such schedules, rules and regulations may be modified from time to time by the Landlord, provided that the Landlord shall give at least 30 days' prior written notice to the Tenant if the Landlord, in its discretion, determines that the Tenant is affected thereby. Such notice shall set forth the proposed modification and the reason therefore and shall provide the Tenant an opportunity to present written comments which shall be taken into consideration by the Landlord prior to the proposed modification becoming effective. A copy of such notice shall be

a.    delivered directly or mailed to the Tenant; or

b.    posted in at least 3 conspicuous places within the building in which the Leased Premises are located, as well as in a conspicuous place in the Property Management Office.

### 23. AMENDMENTS TO RENT SCHEDULES

The Landlord may amend the rent/additional rent/charges schedules and the Tenant agrees to pay such sums due in accordance with such amendment, provided that, in effecting such amendment, the Landlord complies with all requirements of law, and further provided that notice thereof is given to the Tenant in the manner set forth in Paragraph 22 hereof.

### 24. COMPLIANCE WITH LANDLORD'S RULES AND REGULATIONS

The Tenant agrees to comply with all lawful rules and regulations promulgated by the Landlord from time to time, provided notice thereof is given in accordance with the procedure for notice set forth in Paragraph 22 hereof.

### 25. CONDITION OF PREMISES UPON VACATING

The Tenant shall quit and surrender the Leased Premises in good order and repair, reasonable wear and tear excepted, whenever and for whatever reason this Lease is terminated.

### 26. SEVERABILITY

In the event that any provision of this Lease shall violate any requirement of law, then such provision shall be deemed void, the applicable provision of law shall be deemed substituted, and all other provisions of this Lease shall remain in full force and effect.

### 27. JOINT AND SEVERAL OBLIGATION

If more than one person joins in the execution of this agreement as Tenant, the covenants and agreements contained herein shall be deemed to be joint and several obligations, as though the applicable words were written in the plural.

NYCHA 040.507 (Rev. 2/12/15)-4   NYCHA RESIDENT LEASE AGREEMENT - PUBLIC HOUSING

# NYCHA Resident Lease Agreement

**28.  CONTINUING TENANCY OBLIGATIONS**

If this Lease is not the original lease signed by the Tenant and the Landlord, but is subsequent to an existing lease, the existing lease shall be deemed terminated upon the execution of this Lease. However all non-payment or breaches of tenancy obligations arising under the Tenant's former lease shall remain enforceable under this Lease, without regard to whether the former lease was for the Leased Premises or for a different apartment, either in the Development or any other development of the Landlord. All legal proceedings, including administrative actions, that commenced or could have commenced under the terms of the former lease, may commence or continue under this Lease. Any conditions placed against the tenancy under the former lease (for example, Probation or Permanent Exclusion) shall remain valid and will continue under this Lease. Permanent Exclusion of an individual from a former apartment shall continue as Permanent Exclusion of that individual from the Leased Premises.

**29.  VOID LEASE**

This Lease shall not confer rights of public housing tenancy and shall be void if public housing tenancy rights do not exist or have been terminated.

**30.  VIOLENCE AGAINST WOMEN ACT PROVISIONS (VAWA)**

a.    An incident or incidents of actual or threatened domestic violence, dating violence, sexual assault, or stalking will not be construed as a serious or repeated violation of the Lease by the victim or threatened victim of that violence, and will not be good cause for terminating the tenancy or occupancy rights of the victim of such violence.

b.    Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants, or any drug-related criminal activity on or off the Leased Premises, engaged in by the Tenant, any member of the Tenant's household, or any guest or other person under the Tenant's control, shall be cause for termination of tenancy, except that:

    (i)    criminal activity directly relating to domestic violence, dating violence, sexual assault, or stalking, engaged in by a member of the Tenant's household or any guest or other person under the Tenant's control, shall not be cause for termination of the tenancy or occupancy rights, if the Tenant or immediate member of the Tenant's family is a victim of that domestic violence, dating violence, sexual assault, or stalking.

        (1)    Notwithstanding subparagraph (b)(i), the New York City Housing Authority ("Landlord") may bifurcate the Lease in order to evict, remove, or terminate assistance to any individual who is a Tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others, without evicting, removing, terminating assistance to, or otherwise penalizing the victim of such violence who is also a Tenant or lawful occupant.

    (ii)    Nothing in subparagraph (b)(i) may be construed to limit the Landlord's authority, when notified, to honor court orders addressing rights of access to or control of the Leased Premises, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

# NYCHA Resident Lease Agreement

    (iii)    Nothing in subparagraph (b)(i) limits any otherwise available authority of the Landlord to evict the Tenant for any violation of the Lease not premised on the act or acts of violence in question against the Tenant or a member of the Tenant's household, provided that the Landlord does not subject an individual who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking to a more demanding standard than other tenants in determining whether to evict or terminate.

    (iv)    Nothing in subparagraph (b)(i) may be construed to limit the Landlord's authority to terminate the tenancy of any Tenant if the Landlord can demonstrate an actual and imminent threat to other tenants, to the Landlord's employees, or to those providing service to the Premises if the Tenant's tenancy is not terminated.

c.    The Landlord will provide the Tenant with a Notice of Occupancy Rights Under VAWA and a HUD VAWA Certification Form in accordance with federal regulations.

d.    Under the Landlord's emergency transfer plan, tenants who are victims of domestic violence, dating violence, sexual assault, or stalking can apply for an emergency transfer. Eligible tenants who meet the requirements will be given a transfer priority on NYCHA's waiting list.

e.    Nothing in paragraph b. shall be construed to supersede any provision of any federal, state, or local law that provides greater protection than paragraph b, for victims of domestic violence, dating violence, sexual assault, or stalking.

---

In Witness Whereof, the undersigned have executed this agreement on the 10ᵗʰ day of November, 20 23.

Tenant: _____    Tenant: _____

In the Presence of: _____
New York City Housing Authority        James Burts

By Property Manager *(print and sign name)*.

---

The translation is provided to you as a convenience to assist you to understand your rights and obligations.
The English language version of this document is the official, legal, controlling document.
The translation is not an official document.

| A translation of this document is available in your management office. |
| --- |
| La traducción de este documento está disponible en la Oficina de Administración de su residencial. |
| 所居公房管理處備有文件譯本可供索取。 |
| Перевод этого документа находится в Вашем домоуправлении. |

EXHIBIT-I

CROSS EXAMINATION/MORRIS/DEFENSE

1      Q     All right.  At that time you reviewed his

2   file?

3      A     Yes.

4      Q     You became familiar with his approved

5   address?

6      A     Yes.

7      Q     What was his approved address at this

8   time?

9      A     The address on West 137th Street.

10     Q     Is that the Paul Hill address?

11     A     Yes.

12     Q     Okay.  Thank you.

13            Now, you were involved in the

14  decision to conduct a house search for Mr.

15  Greathouse on November 29, 2023, that's when the

16  search was done, but the decision was made, you were

17  part of that decision?

18     A     I never had a case conference with

19  anybody.  We do searches every month, and there are

20  certain cases that we consider eligible for a

21  search.  Sometimes it's random, sometimes we

22  consider them eligible.

23            I was not apart of the search, so

24  that case was reviewed, and selected on that day.

25     Q     But were you part of the decision to do

EXHIBIT-J

CROSS EXAMINATION/MORRIS/DEFENSE

1    the search that day?

2         A    I wasn't part of the decision.    I wasn't

3    there that day.

4         Q    Did you previously testify on direct that

5    you were present with supervisors and discussed with

6    them issues of employment, and Maine?

7         A    Not on that day during a case conference.

8         Q    I'm not talking about that day

9    specifically.    I know you weren't working.

10              What I am asking when the decision

11   was made, let me ask this way --

12              THE COURT:    Do you know when the decision

13        was made to search?

14              MS. MORRIS:    I don't know specifically

15        when the decision was made, no.

16        Q    Within a few weeks before?

17        A    I don't know specifically when the

18   decision was made.    I know why it was made.

19        Q    Okay.    You were present at the time the

20   decision itself was made, not the search, but for

21   the decision?

Perjury -- 22        A    I don't know when it was made, so I can't

23   say I was present.    I don't know when they made that

24   exact decision.    I know I conducted multiple case

25   conferences, which led to the search.

EXHIBIT-K

Form #9402BCS (4/17)
Photocopy Locally

## New York State Department of Corrections and Community

## Supervision PAROLEE GRIEVANCE PROGRAM (DIRECTIVE #9402)

### STEP ONE – PAROLEE GRIEVANCE COMPLAINT FORM
One (1) *"Grievance Continuation Form," #9402ECS, may also be used.*

Name:  Leon Greathouse Jr. DIN:19R1258 Phone #:  (929)837-6445  Address:  114 West 137th

Street Apt 5C New York, NY 10030

Bureau: MANHATTAN III AND NYSDOCCS ALBANY COMMISONERS OFFICE Date: 10/ 02 /2023 .

Describe the problem. Include date and time the incident occurred, names of staff involved, description of any evidence, and names of any witnesses. **Name the person(s).** WHAT did they do? WHEN did they do it? WHERE did this happen? And WHAT have you done so far to get the problem resolved?

Let the record reflect to show the cause of action in the event of this matter within the following:

On 09/29/2023 I was summoned to appear at a non reporting day on Monday 10/02/2023 to be interviewed by my Parole Officer Morris. Within the interview PO Morris indicated that she was not  the one responsible for deferring my merit time documentation and that the "Higher Ups " in NYSDOCCS within Albany who make the decisions on merit time (NYSDOCCS Commissioners) are the ones responsible for making your deferred merit time decisions May 2023 and November 2023 and not releasing you from Parole. PO Morris further states that the "Higher Ups" that made the deferred decisions (NYSDOCCS Commissioners) on both of your merit time May 2023 and November 2023 also are the individuals responsible for ordering Manhattan III Parole office employees Bureau Chief Bryant, SPO Jennifer Sass, PO Morris, and PO Myers to unlawfully alter my Parole stipulations from Level 4 to Level 2, to unlawfully place an ankle monitor on me, and to unlawfully place me under Special Conditions of NYS parole. Within those Special Conditions the documents were further altered with an INDICATION being the reason for the cause of action 1."VICTIM " 2. Not providing income. This paperwork was all documented and delivered to me on the same day the ankle monitor was placed on me. However, on this interviewing date of 10/02/2023 PO Morris states that it was a mistake of her putting a "VICTIM" in my paperwork that was somehow a clerical error; so she scratched out the paperwork as a clean up job to cover up the unlawful things she has done on the record. On the interviewing date 10/02/2023 PO Morris further stated that victim wasn't the only reason for my merit time and that my parole case file and verified income was deemed not sufficient for my merit time determination to be approved in my favor for me to be removed off of parole. This information and the decision by NYSDOCCS "HIGHER UPS " who decide on merit time boards(NYSDOCCS Commissioners) deferred decision should be reversed because it is based on erroneous information contrary to the record. It is noted that December 13, 2022 my lawyers from Patterson Belknap Webb & Tyler sent a letter to NYSDOCCS Albany and Manhattan Area III informing them of my substantial settlement.In which indicated that I was  financially well off. In addition I also submitted my tax returns from 2019, 2021, and 2022 and my Tax Identification Numbers for my businesses.This matter is a violation of Due Process and there are also Civil Violations and criminal charges. After PO Morris informed me of everything she then provided me with a new reporting day of October 24, 2023.

(Use "**GRIEVANCE CONTINUATION FORM**," #9402ECS, if necessary)

ACTION REQUESTED:

The Resolution I want is for :

1. Leon Greathouse Jr's merit time that was deferred by NYSDOCCS in  May 2023 and November2023 to be reversed and for myself Leon Greathouse Jr., to be released from  off of NYSDOCCS parole immediately!

2. I need NYSDOCCS "Higher Ups" who decided on my deferred merit times November 2023 and Bureau

Chief Bryant, SPO Jennifer Sass, PO Morris and PO Myers to all be held accountable for their unlawful actions at the behest of following unlawful orders of the "Higher Ups" doing a job of a Civil Service Worker in the State of New York.

*Continuation of grievance: Parolee Grievance Complaint*
*Leon Greathouse Jr. Din: 19R1258*
*Date: 10/02/2023*

PAROLEE SIGNATURE:  By my signature, I waive confidentiality to any records necessary to investigate and resolve my complaint and certify the  truth of all my statements herein.

DO NOT WRITE BELOW THIS LINE

SPO Decision: The action you request is / is not appropriate because:

Requested action is ☐ granted / ☐ denied. You have the right to grieve if this response does not satisfy you.

RESPONDENT'S SIGNATURE Name (Print) DATE I acknowledge that I have received this decision.

PAROLEE'S SIGNATURE DATE RECEIVED

**AN APPEAL USING FORM #9402CCS MUST BE SUBMITTED TO THE BUREAU CHIEF VIA U.S. MAIL OR VIA THE COMMUNITY SUPERVISION SHARED MAILBOX (E-MAIL) WITHIN SEVEN (7) CALENDAR DAYS AFTER RECEIPT OF THE SENIOR PAROLE OFFICER'S WRITTEN DECISION. ATTACH COPIES OF ALL PERTINENT INFORMATION.**

**Do not write in this space**
Non-Grievable EMERGENCY Staff Conduct Operational procedure

Received by: Date: Log. No.:_____

DISTRIBUTION -- Parolee, Community Supervision Case Folder, Community Supervision Central Files

EXHIBIT-L

(2) Two clear baggies containing black vials with white crystalized substance inside - PO Campbell

(3) Clear baggie containing two red cellophane balls with white substance wrapped inside - PO Campbell

(4) Black bag with clear bag of white powdered substance - PO Campbell

(5) 3 plates (2 white, 1 blackish in color) with residue on all - PO Myers

(6) Razor blade - PO Myers

D may be linked to investigation in Maine.

Purpose of the search = random parole search. Received information from Detective in Maine that D may have narcotics. No one asked parole to do a search.

Other resident = Kenneth James Burtis DOB 

EXHIBIT-M

N-0849-2023

## SEARCH WARRANT

CRIMINAL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK
TO ANY POLICE OFFICER OF THE CITY OF NEW YORK

Proof by affidavit having been made this day before me by Police Officer Ricardo Salinas, Shield # 29581, of the Housing Bureau PSA 6 of the New York City Police Department, that there is reasonable cause to believe that certain property, to wit:

a.   crack/cocaine and any and all items that are capable of holding, containing, packaging and/or dispensing crack/cocaine, including, but not limited to, bottles, jars, cans, vials, capsules, clear plastic bags, paper bags, glassine envelopes, paper envelopes, plastic wrap and foils;

b.   any and all paraphernalia used to unlawfully mix, compound, prepare, manufacture, package, dispense and/or sell crack/cocaine, including, but not limited to, diluents, dilutants, adulterants, precursors of a controlled substance, chemical reagents, solvents, laboratory equipment, scales and balances, mortars and pestles, strainers, presses, plates, bowls, cookware and utensils;

c.   any and all items that are capable of introducing and/or administering crack/cocaine, into the human body, including, but not limited to, syringes, needles, pipes, stems, straws, rubber tubing, tourniquets, and belts;

d.   currency and other evidence of proceeds from the possession, preparation, manufacturing, dispensing, distribution and/or sale of crack/cocaine including, but not limited to, financial documents and/or records, whether handwritten, typed or computer generated, tending to demonstrate cash transactions or financial transfers derived from the possession of currency, money orders, bank receipts, stocks, bonds, bills and receipts for goods and services, and other documents and/or records, whether handwritten, typed or computer generated, relating to real estate holdings, title or registration to motor vehicles and other tangible property, safety deposit boxes and other financial receipts and records;

e.   any and all writings, whether handwritten, typed or computer generated, evidencing the possession, preparation, manufacturing, packaging, dispensing, distribution and/or sale of crack/cocaine, including, but not limited to, notebooks, ledgers, pads, pieces of paper, and prescriptions;

f.   any and all images, photographs, and/or videotapes evidencing the possession, preparation, manufacturing, packaging, dispensing, distribution and/or sale of crack/cocaine;

g.   any and all computers as defined in Penal Law § 156.00(1) or electronic storage devices capable of storing any of the above-described property as well as their components and accessories, including, but not limited to, cords, monitors, keyboards, software, programs,

disks, zip drives, flash drives, thumb drives, and/or hard drives;

h.   any and all books, manuals, guides or other documents containing information about the operation and ownership of a computer, cellular telephone, camera, video recorder, video game console or other electronic storage device present in the target location, including, but not limited to, computer, cellular telephone and software user manuals;

i.   any and all firearms; ammunition, whether live or spent; firearm accessories, including ammunition magazines, spare parts, holsters, cleaning kits, and silencers; and any and all receipts, invoices, or documentation relating to the purchase or sale of firearms, ammunition, and/or firearm accessories;

j.   any and all cellular telephones, cameras, video-recorders, and other electronic devices and/or equipment capable of storing data, information and images, and their components and accessories, including, but not limited to, wires, cords, monitors, software, hard drives and chargers;

k.   any and all containers capable of holding and storing any of the above-described items, including, but not limited to, safes and lock boxes;

l.   evidence of ownership and use of the target premises or the use of property located therein by any person, including, but not limited to, keys, telephone bills, utility bills, bank statements, leases, deeds, or rent receipts related to the target premises or other real property, mail addressed to or from the target premises or other documents bearing the address of the target premises, identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal papers, drivers licenses, vehicle registration, vehicle insurance documents, vehicle repair documents, tooth and hair brushes, videotapes and photographs of persons, fingerprints, handprints, footprints, shoe impressions, hairs and fibers, swabs and/or samples of DNA and other forensic and trace evidence;

may be found in the common areas of, and the bedroom located down the hall to the right of the apartment entrance, through the last door on the left side of the hallway, of the apartment at 20 West 115th Street, Apt 2B, New York, NY 10026, ("the target premises"); and that said property constitutes evidence or tends to demonstrate that an offense was committed, or that a particular person participated in the commission of said offense;

YOU ARE THEREFORE COMMANDED, between 6:00 a.m. and 9:00 p.m., to enter and to search the target premises, for the above described property, and if you find such property or any part thereof to bring it before the Court without unnecessary delay.

FURTHER, this Court authorizes law enforcement personnel to videotape and photograph the interior of the target premises, to process the target premises for fingerprints and to analyze, test, and in any way scientifically process the target premises and all items seized

FURTHER, this Court authorizes the seizure of computers, cellular telephones, and/or other electronic storage devices, cellular telephones, as described above, for the purpose of conducting an off-site search for the evidence described, and authorizes that the above-described data, information, and images, may be retrieved and printed or otherwise reproduced by converting or copying the data,

information and images into storage in another device;

FURTHER, with respect to the seizure and search of computers, cellular telephones, cameras, video recorders, video game consoles and other electronic devices and/or equipment capable of storing property sought by this warrant, this Court authorizes the search of these devices for said property and for:

e.   any and all data, information, or images which evidence ownership and use of the device, including, but not limited to, calendar entries, email account addresses, stored telephone numbers and names, nicknames, and/or labels assigned to said numbers, photographs, videos, bank account documents, bills and invoices, recorded voice memos, text messages, instant messenger messages and letters and voice mails stored on any seized device;

f.   Communications, records, internet history, audio files, videos, images, screenshots or other images of communications, or other data which evidence or tend to show the commission of, or tend to connect a person to, the Subject Crimes, including:

iii.  Communications, records, images or other evidence of contact or association with others involved in the planning, commission or concealment of the Subject Crimes from November 1, 2023 to November 29, 2023;
        iv.  Statements, including texts, emails or other communications, and internet searches or other indications of an intent, motive or desire of committing, or of having committed, the Subject Crimes from November 1, 2023 to November 29, 2023;

g.   any and all data, information, or images evidencing passwords which may be used to unlock or decrypt data, information or images stored on the device, which may or may not be stored in a locked or encrypted fashion, whether said passwords are letters, numbers, characters, words, or data strings (sequence of characters);

h.   any and all data, information, or images evidencing or revealing the unauthorized use of the device by a person other than an owner or authorized user, through the use of viruses, Trojan horses or other malicious software or infiltration methods;

FURTHER, this Court authorizes that, with respect to any computers, cellular telephones, and other electronic storage devices, as described above, for purposes of the requirement that a search warrant be executed within ten days as mandated by C.P.L. Section 690.30(1), this warrant will be deemed executed at the time that said devices are seized and removed from the target premises, and that the search of said devices may continue thereafter for whatever reasonable time is necessary to complete a thorough search pursuant to the warrant;

FURTHER, this Court authorizes a search of all files and data stored in computers, cellular telephones, and other electronic storage devices, as described above, irrespective of how the data is filed, labeled, designated, encrypted, hidden, disguised or otherwise stored;

FURTHER, this Court authorizes forensic computer analysts assigned to the New York County District Attorney's Office Cyber Crime and Identity Theft Unit and/or the New York City Police Department Computer Crimes Squad to assist, as deemed necessary by law enforcement

officials, in accessing, downloading, retrieving, printing, copying and otherwise seizing data, information and images from computers, cellular telephones and other seized electronic storage devices as described above.

IT IS FURTHER ORDERED that the affidavit and any transcript of any accompanying sworn testimony in support of the application for this warrant is sealed, except that a copy of any such sworn testimony may be obtained by an assistant district attorney in the New York County District Attorney's Office and the affidavit or any such sworn testimony may be disclosed by an assistant district attorney in the New York County District Attorney's Office in the course of the lawful discharge of his or her duties pursuant to a criminal investigation and/or prosecution, or upon written order of the Court.

This warrant must be executed within 10 days of the date of issuance.


HON. **RACHEL S. PAULEY**

Judge of the Criminal Court

Dated:  New York, New York

11/29/2023

5:29 pm

EXHIBIT-N

**Phone #: HOME:** 212-666-2995 **CELL:** - - **BUSINESS:** - - **BEEPER:** - - **E-MAIL:**

**N.Y.C.H.A. Resident:** YES **N.Y.C. Housing Employee:** NO **On Duty:** NO
**Development:**       **N.Y.C. Transit Employee:** NO

**Weapons:**

| #1 | | | |
|---|---|---|---|
| **Physical Force/Weapon:** POSSESSED | | **Firearm Recovered:** YES | **Serial Number Defaced:** NO |
| **Physical Force/Weapon Type:** GUN / FIREARM | | **Discharged:** NO | **Serial Number:** BMFT107 |
| **Physical Force/Weapon Sub Type:** HANDGUN | | **Make:** GLOCK | |
| **Specific Physical Force/Weapon Type:** PISTOL , SEMI-AUTOMATIC | | **Color:** BLACK | |
| **Other Weapon Description:** | | **Caliber:** 9MM | |

**Used Transit System:**
**Station Entered:**
**Time Entered:**
**Metro Card Type:**
**Metro Card Used/Poses:**
**Card #:**

| CRIME DATA | DETAILS |
|---|---|
| STATEMENTS MADE | UNKNOWN |
| METHOD OF FLIGHT | NONE |
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | CPW/CPCS |
| CLOTHING | ACCESSORIES -JEANS -BLACK |
| CLOTHING | OUTERWEAR -SWEATER OR VEST -BLACK |
| CLOTHING | FOOTWEAR -SNEAKERS -BLACK |
| CLOTHING | HEADGEAR -UNK -UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | ARM -TATTOO WITH WORDS AND PICTURE -DESCRIBE:TRIPLE 1 / HEARTS/ MONEY CHASER |
| IMPERSONATION | UNKNOWN |

| *WANTED: # 2 of 3* | **Name:** BURTS, JAMES K | **Complaint#:** 2023-028-005839 | **Arrested:** YES |
|---|---|---|---|

| | | |
|---|---|---|
| **Nick/AKA/Maiden:** | **Height:** 6FT0IN | **Order Of Protection:** NO |
| **Sex:** MALE | **Weight:** 200 | **Issuing Court:** |
| **Race:** BLACK | **Eye Color:** BROWN | **Docket #:** |
| **Age:** 52 | **Hair Color:** UNKNWN | **Expiration Date:** |
| **Date Of Birth:** 09/19/1971 | **Hair Length:** BALD | **Order of Protection Violated?** NO |
| **U.S. Citizen:** YES | **Hair Style:** BALD (PARTIAL) | **Does Suspect abuse Drugs / Alcohol?** NO |
| **Place Of Birth:** | **Skin Tone:** LIGHT | |
| **Is this person not Proficient in English?:** NO | **Complexion:** CLEAR | **Suspect threatened /attempted suicide?** NO |
| | **Offender Condition:** APPARENTLY NORMAL | **Is the suspect Parole / Probation?** NO |
| **If Yes, Indicate Language:** | | **Relation to Victim:** NO RELATIONSHIP |
| **Accent:** NO | **S.S. #:** 0 | **Living together:** NO |
| | | **Can be identified:** NO |

**Suspected Gang Member:** NO
**Name:**
**Reason for Suspected Gang Member Designation:**

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM | HOW LONG? | RES. PCT |
|---|---|---|---|---|---|---|---|
| HOME-PERMANENT | 24 WEST 117 STREET | NEW YORK | | | | | 028 |

**Phone #: HOME:** - - **CELL:** - - **BUSINESS:** - - **BEEPER:** - - **E-MAIL:**

**N.Y.C.H.A. Resident:** NO **N.Y.C. Housing Employee:** **On Duty:**
**Development:**      **N.Y.C. Transit Employee:**

**Weapons:**

| #1 | | | |
|---|---|---|---|
| **Physical Force/Weapon:** POSSESSED | | **Firearm Recovered:** YES | **Serial Number Defaced:** NO |
| **Physical Force/Weapon Type:** GUN / FIREARM | | **Discharged:** NO | **Serial Number:** BMFT170 |
| **Physical Force/Weapon Sub Type:** HANDGUN | | **Make:** GLOCK | |
| **Specific Physical Force/Weapon Type:** PISTOL , SEMI-AUTOMATIC | | **Color:** BLACK | |
| **Other Weapon Description:** | | **Caliber:** 9MM | |

EXHIBIT-O

Salinas

1    part of the investigation.  I learned from

2    parole officers when they went to do the parole

3    visit early, they were actually, in fact, in

4    the bedroom at the same time.

5              We can't point fingers and point it

6    at one person.  Since they were both in the

7    bedroom, this is why they were both arrested.

8              (ADA AND GRAND JUROR CONFER)

9              (ADA AND GRAND JUROR CONFER)

10             (ADA AND GRAND JUROR CONFER)

11             GRAND JUROR:  Right here, please.

12             (ADA AND GRAND JUROR CONFER)

13             MS. MOVIUS:  Just a few follow-ups.

14        Q.    So, when you initially responded to

15   the apartment in the morning, Mr. Greathouse

16   was there.  You also mentioned there were two

17   other individuals.  Who was the third

18   individual, who was not Mr. Greathouse or Ms.

19   Johnson?

20        A.    The individual was named James

21   Burts, B-U-R-T-S.

22        Q.    What was Mr. Burts relation to the

23   apartment?

24        A.    He also resided in the apartment.

25        Q.    Okay.  Can you describe the layout

AA

EXHIBIT-P

CRIMINAL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE MATTER OF AN APPLICATION FOR A

WARRANT TO SEARCH

THE COMMON AREAS, AND THE BEDROOM LOCATED DOWN THE HALL TO

THE RIGHT OF THE APARTMENT ENTRANCE, THROUGH THE LAST DOOR ON

THE LEFT SIDE OF THE HALLWAY, OF THE APARTMENT AT 20 WEST 115TH

STREET, APT 2B, NEW YORK, NY, 10026 ("THE TARGET PREMISES"), AND ANY

ELECTRONIC DEVICES FOUND THEREIN

SEARCH WARRANT

Alvin L. Bragg, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

N-0849-2023

## SEARCH WARRANT

CRIMINAL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK
TO ANY POLICE OFFICER OF THE CITY OF NEW YORK

      Proof by affidavit having been made this day before me by Police Officer Ricardo Salinas, Shield # 29581, of the Housing Bureau PSA 6 of the New York City Police Department, that there is reasonable cause to believe that certain property, to wit:

    a.  crack/cocaine and any and all items that are capable of holding, containing, packaging and/or dispensing crack/cocaine, including, but not limited to, bottles, jars, cans, vials, capsules, clear plastic bags, paper bags, glassine envelopes, paper envelopes, plastic wrap and foils;

    b.  any and all paraphernalia used to unlawfully mix, compound, prepare, manufacture, package, dispense and/or sell crack/cocaine, including, but not limited to, diluents, dilutants, adulterants, precursors of a controlled substance, chemical reagents, solvents, laboratory equipment, scales and balances, mortars and pestles, strainers, presses, plates, bowls, cookware and utensils;

    c.  any and all items that are capable of introducing and/or administering crack/cocaine, into the human body, including, but not limited to, syringes, needles, pipes, stems, straws, rubber tubing, tourniquets, and belts;

    d.  currency and other evidence of proceeds from the possession, preparation, manufacturing, dispensing, distribution and/or sale of crack/cocaine including, but not limited to, financial documents and/or records, whether handwritten, typed or computer generated, tending to demonstrate cash transactions or financial transfers derived from the possession of currency, money orders, bank receipts, stocks, bonds, bills and receipts for goods and services, and other documents and/or records, whether handwritten, typed or computer generated, relating to real estate holdings, title or registration to motor vehicles and other tangible property, safety deposit boxes and other financial receipts and records;

    e.  any and all writings, whether handwritten, typed or computer generated, evidencing the possession, preparation, manufacturing, packaging, dispensing, distribution and/or sale of crack/cocaine, including, but not limited to, notebooks, ledgers, pads, pieces of paper, and prescriptions;

    f.  any and all images, photographs, and/or videotapes evidencing the possession, preparation, manufacturing, packaging, dispensing, distribution and/or sale of crack/cocaine;

    g.  any and all computers as defined in Penal Law § 156.00(1) or electronic storage devices capable of storing any of the above-described property as well as their components and accessories, including, but not limited to, cords, monitors, keyboards, software, programs,

disks, zip drives, flash drives, thumb drives, and/or hard drives;

h.  any and all books, manuals, guides or other documents containing information about the operation and ownership of a computer, cellular telephone, camera, video recorder, video game console or other electronic storage device present in the target location, including, but not limited to, computer, cellular telephone and software user manuals;

i.  any and all firearms; ammunition, whether live or spent; firearm accessories, including ammunition magazines, spare parts, holsters, cleaning kits, and silencers; and any and all receipts, invoices, or documentation relating to the purchase or sale of firearms, ammunition, and/or firearm accessories;

j.  any and all cellular telephones, cameras, video-recorders, and other electronic devices and/or equipment capable of storing data, information and images, and their components and accessories, including, but not limited to, wires, cords, monitors, software, hard drives and chargers;

k.  any and all containers capable of holding and storing any of the above-described items, including, but not limited to, safes and lock boxes;

l.  evidence of ownership and use of the target premises or the use of property located therein by any person, including, but not limited to, keys, telephone bills, utility bills, bank statements, leases, deeds, or rent receipts related to the target premises or other real property, mail addressed to or from the target premises or other documents bearing the address of the target premises, identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal papers, drivers licenses, vehicle registration, vehicle insurance documents, vehicle repair documents, tooth and hair brushes, videotapes and photographs of persons, fingerprints, handprints, footprints, shoe impressions, hairs and fibers, swabs and/or samples of DNA and other forensic and trace evidence;

may be found in the common areas of, and the bedroom located down the hall to the right of the apartment entrance, through the last door on the left side of the hallway, of the apartment at 20 West 115th Street, Apt 2B, New York, NY 10026, ("the target premises"); and that said property constitutes evidence or tends to demonstrate that an offense was committed, or that a particular person participated in the commission of said offense;

YOU ARE THEREFORE COMMANDED, between 6:00 a.m. and 9:00 p.m., to enter and to search the target premises, for the above described property, and if you find such property or any part thereof to bring it before the Court without unnecessary delay.

FURTHER, this Court authorizes law enforcement personnel to videotape and photograph the interior of the target premises, to process the target premises for fingerprints and to analyze, test, and in any way scientifically process the target premises and all items seized

FURTHER, this Court authorizes the seizure of computers, cellular telephones, and/or other electronic storage devices, cellular telephones, as described above, for the purpose of conducting an off-site search for the evidence described, and authorizes that the above-described data, information, and images, may be retrieved and printed or otherwise reproduced by converting or copying the data,

information and images into storage in another device;

FURTHER, with respect to the seizure and search of computers, cellular telephones, cameras, video recorders, video game consoles and other electronic devices and/or equipment capable of storing property sought by this warrant, this Court authorizes the search of these devices for said property and for:

e.   any and all data, information, or images which evidence ownership and use of the device, including, but not limited to, calendar entries, email account addresses, stored telephone numbers and names, nicknames, and/or labels assigned to said numbers, photographs, videos, bank account documents, bills and invoices, recorded voice memos, text messages, instant messenger messages and letters and voice mails stored on any seized device;

f.   Communications, records, internet history, audio files, videos, images, screenshots or other images of communications, or other data which evidence or tend to show the commission of, or tend to connect a person to, the Subject Crimes, including:

iii.   Communications, records, images or other evidence of contact or association with others involved in the planning, commission or concealment of the Subject Crimes from November 1, 2023 to November 29, 2023;

iv.   Statements, including texts, emails or other communications, and internet searches or other indications of an intent, motive or desire of committing, or of having committed, the Subject Crimes from November 1, 2023 to November 29, 2023;

g.   any and all data, information, or images evidencing passwords which may be used to unlock or decrypt data, information or images stored on the device, which may or may not be stored in a locked or encrypted fashion, whether said passwords are letters, numbers, characters, words, or data strings (sequence of characters);

h.   any and all data, information, or images evidencing or revealing the unauthorized use of the device by a person other than an owner or authorized user, through the use of viruses, Trojan horses or other malicious software or infiltration methods;

FURTHER, this Court authorizes that, with respect to any computers, cellular telephones, and other electronic storage devices, as described above, for purposes of the requirement that a search warrant be executed within ten days as mandated by C.P.L. Section 690.30(1), this warrant will be deemed executed at the time that said devices are seized and removed from the target premises, and that the search of said devices may continue thereafter for whatever reasonable time is necessary to complete a thorough search pursuant to the warrant;

FURTHER, this Court authorizes a search of all files and data stored in computers, cellular telephones, and other electronic storage devices, as described above, irrespective of how the data is filed, labeled, designated, encrypted, hidden, disguised or otherwise stored;

FURTHER, this Court authorizes forensic computer analysts assigned to the New York County District Attorney's Office Cyber Crime and Identity Theft Unit and/or the New York City Police Department Computer Crimes Squad to assist, as deemed necessary by law enforcement

officials, in accessing, downloading, retrieving, printing, copying and otherwise seizing data, information and images from computers, cellular telephones and other seized electronic storage devices as described above.

IT IS FURTHER ORDERED that the affidavit and any transcript of any accompanying sworn testimony in support of the application for this warrant is sealed, except that a copy of any such sworn testimony may be obtained by an assistant district attorney in the New York County District Attorney's Office and the affidavit or any such sworn testimony may be disclosed by an assistant district attorney in the New York County District Attorney's Office in the course of the lawful discharge of his or her duties pursuant to a criminal investigation and/or prosecution, or upon written order of the Court.

This warrant must be executed within 10 days of the date of issuance.

HON. RACHEL S. PAULEY

Judge of the Criminal Court

Dated: New York, New York

11/29/2023

5:29 PM

93842894

CRIMINAL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE MATTER OF AN APPLICATION FOR A

WARRANT TO SEARCH

THE COMMON AREAS, AND THE BEDROOM LOCATED DOWN THE HALL TO

THE RIGHT OF THE APARTMENT ENTRANCE, THROUGH THE LAST DOOR ON

THE LEFT SIDE OF THE HALLWAY, OF THE APARTMENT AT 20 WEST 115TH

STREET, APT 2B, NEW YORK, NY, 10026 ("THE TARGET PREMISES"), AND ANY

ELECTRONIC DEVICES FOUND THEREIN

**SEARCH WARRANT**

Alvin L. Bragg, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

N 0849-2023

CRIMINAL COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE MATTER OF AN APPLICATION FOR A

WARRANT TO SEARCH THE COMMON AREAS, AND THE

BEDROOM LOCATED DOWN THE HALL TO THE RIGHT OF

THE APARTMENT ENTRANCE, THROUGH THE LAST DOOR

ON THE LEFT SIDE OF THE HALLWAY, OF THE APARTMENT

AT 20 WEST 115TH STREET, APT 2B, NEW YORK, NY, 10026

("THE TARGET PREMISES"), AND ANY ELECTRONIC

DEVICES FOUND THEREIN

## AFFIDAVIT IN SUPPORT OF
## SEARCH WARRANT

Police Officer Ricardo Salinas Shield # 29581, of the Housing Bureau PSA 6 of the New York City Police Department ("NYPD"), being duly sworn, deposes and says:

1.      I have been a member of the NYPD for approximately four years and ten months, and as such I am a public servant of the kind specified in CPL 690.05(1). I have made approximately 60 arrests as an officer in the NYPD, including approximately 20 narcotics related and 3-4 firearms related incidents, and have assisted in numerous others arrests.

2.      This affidavit is submitted in support of an application for a warrant to search the common areas of, and the bedroom located down the hall to the right of the apartment entrance, through the last door on the left side of the hallway, of the apartment at 20 West 115th Street, Apt 2B, New York, NY 10026, ("the target premises"), where there is reasonable cause to believe that evidence of the sale and possession of crack/cocaine, criminal possession of a weapon in the second degree (the "subject crimes"), and conspiracy to commit those crimes, will be found, including but not limited to:

a.      crack/cocaine and any and all items that are capable of holding, containing, packaging and/or dispensing crack/cocaine, including, but not limited to, bottles, jars, cans, vials, capsules, clear plastic bags, paper bags, glassine envelopes, paper envelopes, plastic wrap and foils;

b.      any and all paraphernalia used to unlawfully mix, compound, prepare, manufacture,

the device by a person other than an owner or authorized user, through the use of viruses, Trojan horses or other malicious software or infiltration methods;

4.      It is also requested for evidentiary purposes that this Court grant authorization for law enforcement personnel to videotape and photograph the interior of the target premises, to process the target premises for fingerprints and to analyze, test, and in any way scientifically process the target premises and all items seized.

5.      With respect to the stored electronic data, information and images contained in computers and other electronic devices described above and/or their components and accessories, it is also requested that this Court grant permission to retrieve the above-described data, information, and images, and print them or otherwise reproduce them by converting them or copying them into storage in another device.

6.      As set forth below, there is reasonable cause to believe that the above-described property is located in the target premises; moreover, as set forth below, there is reasonable cause to believe that this property constitutes evidence or tends to demonstrate that an offense was committed, or that a particular person participated in the commission of said offense.

7.      My basis for knowing that evidence of crack/cocaine being unlawfully sold and possessed, and a firearm being unlawfully possessed, at the target location is as follows:

a.      I am informed by Parole Officer Kimberlee Myers-Washington, Shield #708 of the Department of Corrections & Community Supervision, that on November 29, 2023, she visited the target premises to conduct a parole search of the residence of Leon Greathouse ("the target individual").

b.      I am further informed by Officer Myers-Washington that she visited the target premises on November 29, 2023 with Parole Officer Michele Chambers, Shield #1490, and Parole Officer Sharabia Campbell Mickinney, Shield #688, of the Department of Corrections & Community Supervision.

c.      I am further informed by Officer Myers-Washington that she knows the target individual resides at the target premises because the target individual reported the target premises as his residence to the Department of Corrections & Community Supervision.

d.      I am further informed by Officer Myers-Washington that an individual by the name of Kenneth James Burtis let Officer Myers-Washington into the apartment and directed her down a hallway to the right of the apartment entrance, to the last door on the left side of the hallway. I am further informed by Officer Myers-Washington that the target individual opened the door and stated in substance to Officer Myers-Washington that that was his bedroom. I am informed by Officer Myers-Washington that she knows the target individual because she was previously his supervisory parole officer for approximately one year.

e.      I am further informed by Officer Myers-Washington that she observed three plates with a white powdered residue, a razor blade, and a black grocery bag containing empty clear vials inside of the top dresser drawer in the above-described bedroom.

f.      I am informed by Officer Campbell-Mickinney that she observed two clear bags containing

package, dispense and/or sell crack/cocaine, including, but not limited to, diluents, dilutants, adulterants, precursors of a controlled substance, chemical reagents, solvents, laboratory equipment, scales and balances, mortars and pestles, strainers, presses, plates, bowls, cookware and utensils;

c.   any and all items that are capable of introducing and/or administering crack/cocaine, into the human body, including, but not limited to, syringes, needles, pipes, stems, straws, rubber tubing, tourniquets, and belts;

d.   currency and other evidence of proceeds from the possession, preparation, manufacturing, dispensing, distribution and/or sale of crack/cocaine including, but not limited to, financial documents and/or records, whether handwritten, typed or computer generated, tending to demonstrate cash transactions or financial transfers derived from the possession of currency, money orders, bank receipts, stocks, bonds, bills and receipts for goods and services, and other documents and/or records, whether handwritten, typed or computer generated, relating to real estate holdings, title or registration to motor vehicles and other tangible property, safety deposit boxes and other financial receipts and records;

e.   any and all writings, whether handwritten, typed or computer generated, evidencing the possession, preparation, manufacturing, packaging, dispensing, distribution and/or sale of crack/cocaine, including, but not limited to, notebooks, ledgers, pads, pieces of paper, and prescriptions;

f.   any and all images, photographs, and/or videotapes evidencing the possession, preparation, manufacturing, packaging, dispensing, distribution and/or sale of crack/cocaine;

g.   any and all computers as defined in Penal Law § 156.00(1)[1] or electronic storage devices capable of storing any of the above-described property as well as their components and accessories, including, but not limited to, cords, monitors, keyboards, software, programs, disks, zip drives, flash drives, thumb drives, and/or hard drives;

h.   any and all books, manuals, guides or other documents containing information about the operation and ownership of a computer, cellular telephone, camera, video recorder, video game console or other electronic storage device present in the target location, including, but not limited to, computer, cellular telephone and software user manuals;

i.   any and all firearms, ammunition, whether live or spent; firearm accessories, including ammunition magazines, spare parts, holsters, cleaning kits, and silencers; and any and all receipts, invoices, or documentation relating to the purchase or sale of firearms, ammunition, and/or firearm accessories;

---

[1] Penal Law § 156.00(1) states: "Computer" means a device or group of devices which, by manipulation of electronic, magnetic, optical or electrochemical impulses, pursuant to a computer program, can automatically perform arithmetic, logical, storage or retrieval operations with or on computer data, and includes any connected or directly related device, equipment or facility which enables such computer to store, retrieve or communicate to or from a person, another computer or another device the results of computer operations, computer programs or computer data.

j.   any and all cellular telephones, cameras, video-recorders, and other electronic devices and/or equipment capable of storing data, information and images, and their components and accessories, including, but not limited to, wires, cords, monitors, software, hard drives and chargers;

k.   any and all containers capable of holding and storing any of the above-described items, including, but not limited to, safes and lock boxes;

l.   evidence of ownership and use of the target premises or the use of property located therein by any person, including, but not limited to, keys, telephone bills, utility bills, bank statements, leases, deeds, or rent receipts related to the target premises or other real property, mail addressed to or from the target premises or other documents bearing the address of the target premises, identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, personal papers, drivers licenses, vehicle registration, vehicle insurance documents, vehicle repair documents, tooth and hair brushes, videotapes and photographs of persons, fingerprints, handprints, footprints, shoe impressions, hairs and fibers, swabs and/or samples of DNA and other forensic and trace evidence;

3.    With respect to the seizure and search of computers, electronic storage devices, cellular telephones, cameras, video recorders, and other electronic devices and/or equipment capable of storing the above described property in addition to searching for the items described above in Paragraph 2, that authorization be granted to search these devices for:

a.   any and all data, information, or images which evidence ownership and use of the device, including, but not limited to, calendar entries, email account addresses, stored telephone numbers and names, nicknames, and/or labels assigned to said numbers, photographs, videos, bank account documents, bills and invoices, recorded voice memos, text messages, instant messenger messages and letters and voice mails stored on any seized device;

b.   Communications, records, internet history, audio files, videos, images, screenshots or other images of communications, or other data which evidence or tend to show the commission of, or tend to connect a person to, the Subject Crimes, including:

i.   Communications, records, images or other evidence of contact or association with others involved in the planning, commission or concealment of the Subject Crimes from November 1, 2023 to November 29, 2023;
    ii.   Statements, including texts, emails or other communications, and internet searches or other indications of an intent, motive or desire of committing, or of having committed, the Subject Crimes from November 1, 2023 to November 29, 2023;

c.   any and all data, information, or images evidencing passwords which may be used to unlock or decrypt data, information or images stored on the device, which may or may not be stored in a locked or encrypted fashion, whether said passwords are letters, numbers, characters, words, or data strings (sequence of characters);

d.   any and all data, information, or images evidencing or revealing the unauthorized use of

black vials full of a white crystalline substance; a clear bag containing two balls of a white crystalline substance wrapped in red cellophane; and a third bag containing white crystalline/powdered substance inside of the same top dresser drawer in the above-described bedroom.

g.  I am informed by Officer Chambers that she observed a black duffle bag containing a firearm, three magazines, and ammunition next to the bed in the above-described bedroom. I am further informed by Officer Chambers that she observed two bags containing black vials full of a white crystalline substance under the mattress in above-described bedroom.

h.  I have examined the substance described above as crack/cocaine and have determined that it is in fact crack/cocaine. This determination is based on my professional training as a police officer in the identification of drugs, my prior experience as a police officer making drug arrests, and my observation of the packaging and the substance, which consisted of white crystalline powder inside of various colored containers and bags and is characteristic of crack/cocaine.

i.  I am further informed by Officer Myers-Washington that the target premises is a two-bedroom apartment. I am further informed by Officer Myers-Washington that the bedroom of the target individual is down a hallway to the right of the apartment entrance and is the last door on the left side of the hallway. I am informed by Mr. Burtis that he resides in second bedroom in the target premises.

j.  On November 29, 2023, I entered the building in which the target premises is located. I then proceeded from the main entrance of the building to a stairwell on the left side of the entryway. I took the stairwell to the second floor and turned right when exiting the staircase. The target premises is approximately two doors down the hallway, on the left-hand side. The target premises is marked with the number "2B" on the door to the apartment.

k.  Police Officers from Housing Bureau PSA 6 have been safeguarding the target premises since the above-described items were found.

8.      As indicated above, I am seeking to seize and remove from the target premises any computers as defined in Penal Law Section 156.00(1), as well as cellular telephones, cameras, videos-recorders, video console games and other electronic devices capable of storing data, information and images.

a) Based on my training and experience in participating in narcotics arrests and investigations, I am aware that individuals who possess, prepare, manufacture, and sell narcotics frequently use electronic storage devices including, but not limited to, computers and cellular phones, as instrumentalities of these crimes. Because such devices are readily capable of storing data, information and images, including but not limited to, writings that evidence possession, preparation, manufacture and sale of narcotics, as well as images of buyers, suppliers, co-conspirators, narcotics locations and narcotic substances, is it reasonable to believe that any such devices located in the target premises are instrumentalities and evidence of the crimes under investigation, and may contain evidence of the crime under investigation and sought by this warrant application. Neither I, nor my fellow officers assigned to my unit, have the training and expertise in forensic computer analysis to conduct a thorough and complete forensic search of computers, cellular telephones

and/or other electronic storage devices located in the target premises. I am therefore requesting that the Court authorize the New York County District Attorney's Office Cyber Crime and Identity Theft Unit and/or the New York City Police Department Computer Crimes Squad to assist me in accessing, downloading, retrieving, printing, copying or otherwise seizing the computerized and electronic evidence described above from any devices seized in the target location.

b) Based on my training and experience, I am also aware that searching and seizing information from computers, cellular telephones and other electronic storage devices often requires searching officers to seize the devices (along with related equipment such as cords, monitors, software and manuals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. I am also aware that it can take weeks or months to conduct a thorough and complete search of such a device, depending on the volume of data stored. It would, therefore, be impractical to attempt this kind of a search of a computer, cellular telephone or other electronic storage device on-site. As indicated above, because any such devices located in the target premises are likely instrumentalities and evidence of the crimes under investigation, and may likely contain evidence of such crimes, I am seeking authorization to seize any such devices and remove them from the location for the purpose of conducting a thorough and complete off-site search by members of the New York County District Attorney's Office Cyber Crime and Identity Theft Unit and/or the New York City Police Department Computer Crimes Squad.

WHEREFORE, deponent respectfully requests that the court issue a warrant and order of seizure in the form annexed authorizing a search of the target premises, for the above described property, and directing that if such evidence is found, it be brought before the Court.

It is requested that this affidavit and any transcript of any accompanying sworn testimony in support of this application be sealed, except that permission be granted for an assistant district attorney in the New York County District Attorney's Office to obtain a copy of any such sworn testimony and that permission be granted for an assistant district attorney in the New York County District Attorney's office to disclose the affidavit and/or accompanying sworn testimony in the course of the lawful discharge of his or her duties pursuant to a criminal investigation and/or prosecution, or upon written order of the Court.

It is also requested for evidentiary purposes that this Court grant authorization for law enforcement personnel to videotape and photograph the interior of the target premises, to process the target premises for fingerprints and to analyze, test, and in any way scientifically process the target premises and all items seized.

It is also requested that the Court authorize the seizure of computers, cellular telephones, and/or other electronic storage devices as described above for the purpose of conducting an off-site search for the evidence described. In addition, it is also requested that this Court grant permission to retrieve the above-described data, information, and images, and print them or otherwise reproduce them by converting them or copying them into storage in another device.

It is also requested that the Court authorize that, for purposes of the requirement that a search warrant be executed within ten days as mandated by C.P.L. Section 690.30(1), that with respect to any computers, cellular telephones, and other electronic storage devices, the warrant be deemed executed at

the time that said devices are seized and removed from the target premises, and that the search of said devices may continue thereafter for whatever reasonable time is necessary to complete a thorough search pursuant to this warrant. Once said computers and other devices are seized pursuant to the warrant, the data, information and images contained therein will not change, and thus no greater intrusion will result from a thorough search being conducted within a reasonable time.

It is also requested that the Court authorize a search of all files and data stored in computers, cellular telephones, and other electronic storage devices, irrespective of how the data is filed, labeled, designated, encrypted, hidden, disguised or otherwise stored.

It is also requested that the Court authorize forensic computer analysts assigned to the New York County District Attorney's Office Cyber Crime and Identity Theft Unit and/or the New York City Police Department Computer Crimes Squad to assist me, as deemed necessary by law enforcement officials, in accessing, downloading, retrieving, printing, copying and otherwise seizing the computerized information and electronic evidence described above from any devices seized in the target location.

No previous application has been made in this matter to any other Judge, Justice, or Magistrate.

PO _____
Police Officer Ricardo Salinas

_____
Rachel Movius
APPROVED:  Assistant District Attorney

Sworn to before me this
November 29, 2023

_____
Judge
HON. RACHEL R. PAULEY

Erika Olsson
Court Reporter
_____
Name of Court Reporter

93842897

EXHIBIT-Q

FILED: NEW YORK SUPREME COURT - CRIMINAL TERM (EDDS) 01/14/2021 01:21 PM
Case No. 3335/2001

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

LEON GREATHOUSE,

Defendant.

PEOPLE'S RESPONSE TO DEFENDANT'S MOTION FOR RESENTENCING
PURSUANT TO C.P.L. §440.46

IND. NO. 3335/2001

Cyrus R. Vance, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

Jung Park
Assistant District Attorney
Of Counsel

SUPREME COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: PART 39

THE PEOPLE OF THE STATE OF NEW YORK

-against-

LEON GREATHOUSE,

Defendant.

AFFIRMATION IN RESPONSE
TO DEFENDANT'S MOTION TO
VACATE SENTENCE
PURSUANT TO CPL § 440.20
AND PETITION FOR
RESENTENCING

Indictment No.     3335/2001

Ayn Ducao, an attorney admitted to practice before the Courts of this State, affirms under penalty of perjury that:

1. I am an Assistant District Attorney in the New York County District Attorney's Office and am assigned to the prosecution of the above-captioned case. I base this Affirmation upon information and belief, the sources of said information and belief being a review of the case files of the Manhattan District Attorney's Office; the minutes of the Grand Jury proceedings, hearings, and trials held in connection with the case; conversations with personnel in the New York State Division of Parole; arrest paperwork on several of the defendant's prior cases; and a review of the defendant's corrections records. All factual statements made herein are made on information and belief derived from these sources.

2. This affirmation is made in response to the defendant's pro se "Motion to Set Aside Sentence CPL 440.20" dated October 14, 2008. While the caption of the defendant's motion appears to style the motion as one to vacate the defendant's sentence pursuant to CPL § 440.20, in the body of the motion, the defendant claims that he is entitled to resentencing pursuant to the Drug Law Reform Act of 2005, which the defendant attaches in part to his motion as Exhibit C.

1

See L. 2005, ch. 643 (hereafter the "2005 DLRA"). More specifically, the defendant claims that his current sentence of three years to life for his 2001 class A-II felony should be set aside and that he should be sentenced retroactively under the new sentencing rules governing class A-II narcotics felonies.

## PRELIMINARY STATEMENT

3. After a complete review of the facts and circumstances of this case, as set forth below, the People do not consent to the defendant's petition for resentencing under the 2005 DLRA because, according to the Court of Appeals in People v. Mills, 11 N.Y.3d 527 (2008), since the defendant was released on parole in 2005 for this case, the defendant is ineligible to be resentenced under the 2005 DLRA.

4. However, should this Court disagree and find that the defendant is eligible for sentencing under the 2005 DLRA, the People recommend that the court resentence the defendant to a determinate term of six years imprisonment, to be followed by a period of five years post-release supervision.

## FACTUAL AND PROCEDURAL HISTORY OF THE INSTANT CASE

5. On May 31, 2001, an undercover police officer was approached by a female who asked the undercover officer what he was looking for. Upon hearing that the undercover officer was looking for crack cocaine, the female led the undercover officer to Apartment B on the first floor of 508 West 151st Street. At said apartment, the undercover officer and the female were greeted by co-defendant Vivian Hardy. The undercover officer indicated that he wanted $100 worth of crack cocaine and was invited inside the apartment. Once inside the apartment, the undercover officer smelled the odor of chemicals used in the "cooking" or processing of crack cocaine.

2

12. On June 11, 2000, the defendant was arrested and later arraigned on the charge of intentional Murder in the Second Degree (Penal Law § 125.25[1]). While the defendant has not been indicted, the case is still pending and the defendant cannot be cleared as a suspect in the case, in large part because the defendant has refused to cooperate with the investigation conducted by the New York County District Attorney's Office.

### DEFENDANT'S INCARCERATION HISTORY

13. The defendant was admitted to the Downstate Correctional Facility in connection with the instant case on May 22, 2002 and on March 14, 2005, the defendant was released to parole.

14. On May 29, 2008, the defendant was violated by parole on the instant case. On the same day, the defendant was admitted to Clinton Correctional Facility and will not be eligible for parole until 2012.[1]

### ARGUMENT

## I. DEFENDANT IS NOT ENTITLED TO RESENTENCING UNDER THE 2005 DLRA

15. The Court of Appeals has made clear that "in order to qualify for resentencing under the 2005 DLRA, class A-II felony drug offenders must not be eligible for parole within three years of their resentencing applications." People v. Mills, 11 N.Y.3d 527, 534 (2008). More specifically, "in order to be eligible for resentencing, an inmate must be more than three years from parole eligibility for the *same* class A-II drug felony for which resentencing is sought." Id. at 537 (emphasis in original).

---

[1] See inmate information regarding the defendant obtained from the Department of Corrections website (attached as Exhibit A).

EXHIBIT-R

CS3010 (Rev. 07/2020)                                                                 Page 1 of 2
GREATHOUSE, LEON 19R1258

*Applicable to releases to Community Supervision on or after July 8, 2020*

## STATE OF NEW YORK
## DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (DOCCS)
## CERTIFICATE OF RELEASE TO COMMUNITY SUPERVISION

SENTENCE:   **Determinate**

RELEASE TYPE: **Initial - Parole Board**

INMATE RELEASE FUNDS: **$40.00** RESTITUTION/SURCHARGES: **$0.00**

NYSID: 08465767L DIN: 19R1258

GREATHOUSE, LEON, now confined in Mohawk Correctional Facility who was convicted and/or adjudicated of:

| CRIME/COUNTS | SENTENCE | COUNTY | COURT | SENTENCING DATE | JUDGE |
|---|---|---|---|---|---|
| CRIM POSS CONTR SUBSTANCE 3RD (B) | 0-0-0/2-0-0 | New York | Supreme | 6/21/19 | Statsinger |
| CRIM POSS CONTR SUBSTANCE 3RD (B) | 0-0-0/2-0-0 (CC) | New York | Supreme | 6/21/19 | Statsinger |

has agreed to abide by the conditions to which they have signed their name below, and is hereby granted release, by virtue of the authority conferred by New York State Law.

Maximum Expiration Date: **LIFE**     PRS Maximum Expiration Date: **LIFE**

Post-Release Supervision Period (years/months/days): **02-06-03**

It is hereby directed that **GREATHOUSE, LEON** be released and placed under legal jurisdiction of the Department of Corrections and Community Supervision until the Community Supervision End Date of **LIFE**.

Date of Release: **Wednesday, January 27, 2021**          Parole Eligibility Date: **Monday, January 04, 2021**

Board of Parole:  **Commissioners Alexander and Lee**      Board Decision Date: **Tuesday, September 08, 2020**

Approved Residence Address: 527 W 151st. St. Apt. 7
City/State/Zip:  New York, NY 10031

I, GREATHOUSE, LEON, understand I will be subject to Community Supervision. I fully understand that my person, residence and property are subject to search and inspection. I understand that Community Supervision is defined by these Conditions of Release and all other conditions that may be imposed upon me by the Board of Parole or an authorized representative of the Department of Corrections and Community Supervision. I understand that my violation of these conditions may result in the revocation of my release.

## CONDITIONS OF RELEASE

1. I will proceed directly to the area to which I have been released and, within twenty-four hours or by the next available business day after my release, make my arrival report to the Community Supervision Office indicated below. I will make office and/or other reports thereafter as directed by my Parole Officer.

Assigned Bureau: MANHATTAN III
Assigned Bureau Address: 314 W. 40th St.
City/State/Zip: Manhattan, NY 10018
Bureau Phone Number: 212-239-6355
Assigned Parole Officer: M. Flores
Assigned Senior Parole Officer: M. Lovgren
Emergency/After Office Hours & Weekends, contact the Community Supervision Operations Center (CSOC) (212) 239-6159

□ ORIGINAL TO CENTRAL FILES □ INMATE COPY

□ COMMUNITY SUPERVISION FOLDER (GREY FOLDER) □ COPY TO FACILITY IRC

CS3010 (Rev. 07/2020)                                                                                                    Page 2 of 2
GREATHOUSE, LEON 19R1258

**Applicable to releases to Community Supervision on or after July 8, 2020**

2. I will not leave the State of New York or any other state to which I am released or transferred, or any area defined in writing by my Parole Officer without permission.

3. I will not abscond, which means intentionally avoiding supervision by failing to maintain contact with my Parole Officer and failing to reside at my approved residence.

4. I will permit my Parole Officer to visit me at my residence, will permit the search and inspection of my person, residence and property, and will discuss any proposed changes in my residence, employment or program status with my Parole Office.

5. I will reply promptly, fully and truthfully to any inquiry of, or communication by, my Parole Officer or other representative of the Department of Corrections and Community Supervision.

6. I will notify my Parole Officer any time I am in contact with, or arrested by, law enforcement. I understand, like every member of the public, I have a right to seek the assistance of law enforcement at anytime.

7. I will not act in concert with a person I know to be engaged in illegal activity.

8. I will not behave in such a manner as to violate the provisions of any law to which I am subject which provides for a penalty of imprisonment, nor will my behavior threaten the health and safety of myself or others.

9. I will not own, possess, or purchase a shotgun, rifle, or firearm of any type including any imitation firearm. I will not own, possess or purchase any deadly weapon or use any dangerous instrument, as those terms are defined under Article 10 of the Penal Law. Further, I will not possess a dangerous knife or razor without the permission of my Parole Officer.

10. In the event that I leave the jurisdiction of the State of New York, I hereby waive my right to contest extradition to the State of New York from any state in the Union and from any territory or country outside the United States. This waiver shall be in full force and effect until I am discharged from community supervision. I fully understand that I have the right under the Constitution of the United States and under law to contest an effort to extradite me from another state and return me to New York, and I freely and knowingly waive this right as a condition of my community supervision.

11. I will not use or possess any drug paraphernalia or use or possess any controlled substance without proper medical authorization.

12. I will fully comply with the instructions of my Parole Officer.

13. I will fully comply with those special conditions set by my Parole Officer, a Member of the Board of Parole or an authorized representative of the Board or the Department of Corrections and Community Supervision. I understand that special conditions are additional conditions, set on an individualized basis, meant to be reasonably tailored to my circumstances and aimed toward my rehabilitation. I will fully comply with the following special conditions:

SC1      I will seek, obtain, and maintain employment and/or an academic/vocational program.

SC2      I will submit to Substance Abuse Testing, as directed by the PAROLE OFFICER.

SC5      I will NOT consume alcoholic beverages.

SC6      I will NOT frequent any establishment where alcohol is sold or served as its main business without the permission of the PAROLE OFFICER.

SC8      I will abide by a curfew established by the PAROLE OFFICER.

SC16     I will NOT associate in any way or communicate by any means with associate(s) STEVEN ILDEFONSO, ANTHONY DEVITO, PETER FAUSTIN, AKBAR SCOTT, VINCENT HANEMANN, JUAN HARRIS, DANNY SANTANA, JULIO DELACRUZ OR JOSE ROSA without the permission of the PAROLE OFFICER.

SC20     I will comply with all court orders including those ordering fines, surcharges, and/or restitution.

SC27     OTHER: I will abide by geographic restrictions as directed by the PAROLE OFFICER.

I fully understand that a violation of any condition of release in an important respect may result in the revocation of my period of Community Supervision. I hereby certify that I understand and have received my Certificate of Release to Community Supervision.

Signed the _22nd_ day of _January_ 20_21_

Released: _____

Witness Signature: _____

Witness Name: _____ J Vanderwood _____

Witness Title: _____ ORC _____

☐ ORIGINAL TO CENTRAL FILES ☐ INMATE COPY

☐ COMMUNITY SUPERVISION FOLDER (GREY FOLDER) ☐ COPY TO FACILITY IRC

EXHIBIT-S

## *9 NYCRR § 8000.1*

This document reflects those changes received from the NY Bill Drafting Commission through August 8, 2025

*NY - New York Codes, Rules and Regulations    >    TITLE 9. EXECUTIVE DEPARTMENT    >    SUBTITLE CC. DIVISION OF PAROLE    >    PART 8000. GENERAL PROVISIONS*

# § 8000.1 Applicability

The rules and regulations set forth in this Subtitle implement and govern the functions, powers and duties of the Division of Parole in the Executive Department and of the Board of Parole.

(a) Regulations of the Division of Parole shall be promulgated by the chairman of the Board of Parole and shall govern the responsibility of the division to:

(1) collect information and maintain records with regard to each inmate and with regard to each person released on parole or conditional release;

(2) supervise all persons released on parole or conditional release, and any other persons as required by statute;

(3) investigate alleged violations of parole or conditional release and, when necessary, accomplish the revocation of such release;

(4) prepare reports and other data required by the board in the exercise of its functions; and

(5) assist inmates eligible for parole or conditional release and inmates on parole or conditional release to secure employment, educational or vocational training, and encourage apprenticeship training of such persons through the assistance and cooperation of industrial, commercial and labor organizations.

(b) Regulations of the Board of Parole shall be enacted by the Board of Parole and shall govern the conduct of the Board of Parole and its responsibility to:

(1) determine what inmates serving indeterminate or reformatory sentences of imprisonment may be released on parole, and when and under what conditions;

(2) determine what inmates serving a definite sentence of imprisonment may be released on parole, and when and under what conditions;

(3) determine the conditions of release of a person who may be conditionally released under an indeterminate or reformatory sentence of imprisonment;

(4) establish minimum periods of imprisonment in cases where the court has not done so;

(5) study or cause to be studied the inmates confined in institutions over which the board has jurisdiction, so as to determine their ultimate fitness to be paroled;

(6) revoke parole or conditional release of any person and authorize the issuance of a warrant for the retaking of such persons;

(7) determine the need for further investigation of the background of each inmate as he is received by the Department of Correctional Services, and cause such investigation to be made;

(8) establish and maintain written guidelines for its use in making parole decisions as required by law;

EXHIBIT-T



**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF STATE COUNSEL
LITIGATION BUREAU

<u>By ECF</u>                                                                                                    May 24, 2024
The Honorable Dale E. Ho
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re: <u>Greathouse v. NYS DOCCS</u>, 23-Civ-6192 (DEH)(GS)

Dear Judge Ho:

      This Office has appeared as an interested party that may potentially represent Defendant New York State Department of Corrections and Community Supervision (DOCCS) in this pro se civil rights lawsuit. Following Plaintiff's failure to appear for a March 28, 2024, status conference to discuss service issues, on March 29, 2024, the Court issued an Order to Show Cause directing by Plaintiff to submit a letter by April 29, 2024, explaining why the action should not be dismissed for failure to prosecute, and specifically explaining how he intended to effectuate service. Plaintiff having failed to respond to the Order to Show Cause, on May 2, 2024, the Court sua sponte extended Plaintiff's time to respond until May 10, 2024. Plaintiff has still not responded and that deadline is now two weeks in the past. Accordingly, it is respectfully requested, pursuant to the Orders of March 29 and May 2, 2024, that the Court dismiss the action without prejudice for failure to prosecute pursuant to Fed. R. Civ. P. 41(b).

      Respectfully submitted,

      <u>/s/ Steven Schulman</u>
      Steven N. Schulman
      Assistant Attorney General
      (212) 416-8654
      <u>steven.schulman@ag.ny.gov</u>

cc:    Leon Greathouse, Jr. (By Mail)
       114 West 137th Street, Apt. 5C
       New York, NY 10039

       Co-Defendant Counsel of Record (by ECF)