EXHIBIT-U

```
1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF NEW YORK: CRIMINAL TERM:     PART 71
     --------------------------------------------X
3    THE PEOPLE OF THE STATE OF NEW YORK,

4
              -against-                    Indictment No.:
5                                          75963-23
     LEON GREATHOUSE,
6    LUCRISTIA JOHNSON,

7                                          Defendant.
     --------------------------------------------X
8

9                        111 Centre Street
                         New York, New York 10013
10                       February 26, 2025

11   B E F O R E:

12   THE HONORABLE LAURA WARD, JUSTICE

13
     A P P E A R A N C E S:
14   FOR THE PEOPLE:

15   CYRUS R. VANCE, JR.,
     District Attorney - New York County
16   Attorneys for the People
     One Hogan Place
17   New York, New York 10013
     BY: RACHEL MOVIUS, ESQ., ADA
18       ERIN CHANG, ESQ., ADA

19
     FOR THE DEFENDANT:
20
     ASSIGNED COUNSEL PLAN (18B)
21   Attorneys for Defendant Greathouse
     BY: DAVID TURCHI, ESQ.
22
     Attorneys for Defendant Johnson
23   BY: HOWARD SIMMONS, ESQ.

24

25           JOANNA COGLIANO and ERIN GRAY,
                 Senior Court Reporters
```

PROCEEDINGS

1          THE CLERK:  Calling number 1 and number 3

2     on the Part 71 calendar, Leon Greathouse and

3     Lucristia Johnson; Indictment 75963 of 23.

4          Appearances, please.

5          MR. SIMMONS:  Howard Simmons for Lucristia

6     Johnson.

7          Good morning, your Honor.

8          MS. MOVIUS:  On behalf of the People, ADA

9     Rachel Movius,

10          MS. CHANG:  For the People, ADA Erin

11     Chang.

12          MR. TURCHI:  For Mr. Greathouse, David

13     Turchi, T-U-R-C-H-I.

14          THE COURT:  Tell me when you are ready,

15     Mr. Simmons.

16          MR. SIMMONS:  Judge, there's been a change

17     in circumstance.

18          I'm sorry to interrupt, but there's been a

19     change in circumstance regarding the evidence

20     in the case.

21          THE COURT:  Can I just do something first?

22          MR. SIMMONS:  Sure.  Of course.

23          THE COURT:  So Mr. Greathouse, Ms.

24     Johnson, I just wanted to tell you that I'm

25     Judge Ward.

PROCEEDINGS

1          I'll be the judge presiding over the

2     hearing.  You have the right to be present.  I

3     know there might be a change.

4          You have the right to be present

5     throughout the entire hearing.  If you change

6     your mind, and you don't want to be here,

7     Mr. Greathouse can go back in, Ms. Johnson can

8     leave, but you have to realize you have to

9     comport yourself appropriately.

10          If you get out of hand, I will also excuse

11     you, and proceed without you, which means

12     listen to the witnesses, render a decision, and

13     depending on how the decision goes, set it out

14     for trial at a later date, or see if there's

15     going to be a disposition.

16          That being said, has there been an offer

17     or recommendation for either side?

18          MS. MOVIUS:  Yes, your Honor.

19          For Mr. Greathouse the recommendation on a

20     plea to count one is seven years prison, with

21     five years post release supervision.

22          There has been no formal offer that's been

23     conveyed to Ms. Johnson as of yet.  Mr. Simmons

24     and I just spoke about a possible offer in the

25     case.  I do need to get that approved by my

PROCEEDINGS

1     supervisor.  It sounds like she may be

2     interested in it this morning.

3          We can have a final answer within a few

4     minutes for you.

5          THE COURT:  What's the offer?

6          MS. MOVIUS:  I would like to not put it on

7     the record at this point, because it's an

8     unapproved offer.

9          THE COURT:  Okay.  Well, we might as well

10    start.

11         MR. SIMMONS:  I will say it, Judge; if you

12    want.

13         THE COURT:  I'm sorry.

14         MR. SIMMONS:  I will say it; if you want.

15         THE COURT:  Yes.

16         MR. SIMMONS:  E.  An E and probation.

17    Plead guilty to possession of a weapon.

18         Reason that it's happening at the last

19    minute here is there's been some new evidence

20    presented in the case.

21         THE COURT:  The DNA.

22         MR. SIMMONS:  Exactly.

23         Only in the last few days, Judge.

24         THE COURT:  We can at least start, okay?

25         MS. MOVIUS:  Understood.

PROCEEDINGS

1    THE COURT:  How many witnesses do you

2    have?

3    MS. MOVIUS:  Three, your Honor.

4    THE COURT:  Would you call your first

5    witness, please.

6    MS. MOVIUS:  Yes.

7    The People -- I do have a brief discovery

8    record; if I may.

9    THE COURT:  Okay.

10    MS. MOVIUS:  Regarding the DNA, some

11    additional materials from OCME as well as

12    attached to the detective case files were

13    turned over to both counsels on February 25th,

14    yesterday.

15    I am filing and serving supplemental

16    Certificates of Compliances, and discovery

17    lists today.

18    Our first witness is Parole Officer

19    Kimberlee Myers Washington.

20    THE COURT:  So we're getting Parole

21    Officer Kimberlee Myers Washington.

22    MS. MOVIUS:  Yes.

23    (Witness entering the courtroom.)

24    THE COURT OFFICER:  Remain standing in

25    front of the chair, hand on the Bible, raise

PROCEEDINGS

1    your right hand, and face the clerk to your

2    right.

3        THE CLERK:  Do you swear or affirm that

4    the testimony you are about to give is the

5    truth, the whole truth, and nothing but the

6    truth?

7        MS. MYERS WASHINGTON:  Yes.

8        THE CLERK:  Thank you.

9        Be seated.

10        THE COURT OFFICER:  Bring your chair

11    forward.

12        In a loud, clear voice state your full

13    name, spelling your last name.

14        MS. MYERS WASHINGTON:  Kimberlee,

15    K-I-M-B-E-R-L-E-E, last name Myers, M-Y-E-R-S,

16    Washington like the state.

17        THE COURT OFFICER:  Shield number, present

18    command.

19        MS. MYERS WASHINGTON:  Shield number is

20    709, 314 West 40th Street.

21        THE COURT:  Officer, I am going to tell

22    you what I tell every witness.

23        Please keep your voice up, so everyone is

24    able to hear you, because it's a big courtroom.

25        If you don't understand a question you can

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          ask to have it rephrased.  If you need to take

2          a break, just tell me, and please wait until

3          the questioner is finished the question before

4          you respond, so we have a clean record, okay?

5                    MS. MYERS WASHINGTON:  Yes.

6                    THE COURT:  You may proceed.

7                    MS. MOVIUS:  Thank you, your Honor.

8     K I M B E R L E E  M Y E R S  W A S H I N G T O N,

9     having been duly called as a witness on behalf of

10    the People of the State of New York, first having

11    been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MS. MOVIUS:

14         Q    Good morning, Officer Myers.

15         A    Good morning.

16         Q    How long have you been a parole officer

17    for?

18         A    A little over almost six years.

19         Q    What are some of your duties and

20    responsibilities as a parole officer?

21         A    My duties are home visits, interoffice

22    visits, employment visits, a lot.

23         Q    What is a home visit?

24         A    A home visit is when I go to visit

25    someone's home to see if the home is liveable, and

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    in a clean environment, safety for myself, for the

2    parolee and the people in the community.

3        Q    What about an interoffice visit?

4        A    An interoffice visit is when they come to

5    tell me how their day, what's going on, bring

6    employment records, medical records, anything that

7    is requested, or required.

8        Q    In general, what's the function of DOCCS,

9    Department of Corrections and Community Supervision?

10       A    It's to supervise someone who is newly

11   released to make sure they do not recidivism, go

12   back into prison.

13       Q    Approximately how many parolees have you

14   supervised during your tenure; if you were to guess?

15       A    Well over a hundred.

16       Q    Approximately how many home visits would

17   you estimate you've done?

18       A    Well over a hundred.

19       Q    How many searches have you been apart of

20   as a parole officer?

21       A    A lot.

22       Q    Can you guess a number, estimate a number?

23       A    Six years, maybe about a hundred or more.

24       Q    Do you know an individual by the name of

25   Leon Greathouse?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    A    Yes.

2    Q    How do you know Mr. Greathouse?

3    A    I was supervising Mr. Greathouse.

4    Q    When were you supervising him for?

5    A    In 2022, I was supervising him because his

6 covering parole officer at the time was out.

7    Q    What did your supervision of Mr.

8 Greathouse entail during that time?

9    A    To get employment verification, to make

10 sure where he was living was suitable, coming, any

11 records that he had of his employment, asked him to

12 bring them in.

13    Q    Would you recognize Mr. Greathouse if you

14 were to see him again today?

15    A    Yes.

16    Q    Please take a look around the room, if you

17 see Mr. Greathouse point where he is sitting, and

18 identify him by an article of clothing.

19    A    Mr. Greathouse is to the right of me, he

20 has on a beige shirt.

21    THE COURT:  Let the record reflect the

22 witness identified the defendant.

23    Q    Now, directing your attention specifically

24 to November 29, 2023.

25    I know that's a while ago, but were

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1  you working on that day?

2  A  Yes.

3  Q  At about 7:00 a.m., is that approximately

4  the time you started your shift?

5  A  No, my shift started earlier than that.

6  Q  What time did it start that day?

7  A  5:00 a.m.

8  Q  What did your shift or assignment comprise

9  of that day?

10  A  That day we were doing searches, community

11  searches, home safety searches, that's what we were

12  doing that day.

13  Q  Were you alone or with a team?

14  A  I was with a team.

15  Q  Who were the other members of your team?

16  A  P.O. Chambers, P.O. Stevenson, P.O.

17  Flores, P.O. Campbell Mckinney, P.O. Santiago, P.O.

18  McLoughlin, and part of NYPD.

19  Q  How did you and your team get assigned to

20  do searches on November 29th of 2023?

21  A  Our supervisors go through, it's random.

22  It's nothing set in stone; it's

23  random.

24  Q  Did you have any decision making process

25  as to who was on the list that day to conduct the

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1   searches for?

2        A    No.

3        Q    Did anyone else on your team have a

4   decision making process at least as far as you know?

5        A    No.

6        Q    Now, you said that there was partly an

7   NYPD section as well that you were working with that

8   day?

9        A    Yes.

10       Q    Can you describe that?

11       A    They're apart of New York City Housing, so

12  sometimes if we have to go into the New York City

13  Housing Development sometimes they're escorted with

14  us, because of high crime rate, whatever the case

15  maybe.

16       Q    So who from PSA 6 was with you on the

17  morning of November 29th?

18            THE COURT:  Actually, thank you for

19       testifying.  She didn't say PSA 6.

20            MS. MOVIUS:  Apologies, your Honor.

21       Q    Was there a member of the NYPD from that

22  same patrol borough in public housing with you?

23       A    They were with us, then they were called

24  back.

25       Q    Can you describe that?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          What do you mean by that?

2     A     As we were going to go into the projects

3 they had something else to do, and we were going to

4 do a search.  We told them if they were needed we

5 would call them back.

6     Q     Do you recall who was with you that day

7 from the NYPD?

8     A     Officer Salinas, if I'm saying his name

9 correct, because he was the lead officer that day.

10          THE COURT:  Did you say Simmons?

11          MS. MYERS WASHINGTON:  Salinas, if I said

12     it correct.

13     Q     Was it just Officer Salinas or was there

14 anyone else there?

15     A     His team.

16     Q     So how did your day start that morning?

17     A     Very tired. I was up early.

18          My day started, went to work, when I

19 got to work the information was needed, a list of

20 people were on there, and we went to do searches.

21     Q     At some point did you conduct a search,

22 and home visit of the apartment at 20 West 115th

23 Street, Number 2B?

24     A     Yes.  That was the last -- that was our

25 last search of that day.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1       Q       Who was the assumed resident of that

2   apartment?

3       A       Mr. Leon Greathouse.

4       Q       Was that location in New York County?

5       A       Yes.

6       Q       Before you arrived at Mr. Greathouse's

7   apartment that morning, how many other searches did

8   you do with your team?

9       A       Around maybe three or four.

10      Q       So approximately what time did you arrive

11  to Mr. Greathouse's apartment?

12      A       Around 10:00 a.m.

13      Q       Now you mentioned that those members of

14  the NYPD, they left at some point; is that correct?

15      A       Correct.

16      Q       What point was that?

17      A       Maybe around 9:30, quarter to 10:00.

18              I'm not sure actually, but before we

19  did --- after we did -- before we did Mr. Greathouse

20  they left us.

21      Q       Why were they not present when you

22  conducted the visit at Mr. Greathouse's apartment?

23      A       They were called to do something that was

24  more relevant for -- then we needed them for.

25      Q       Can you take us through what happened when

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1   you got to Mr. Greathouse's apartment that morning?

2       A   Well, when we got to Mr. Greathouse's

3   apartment, because I was familiar with Mr.

4   Greathouse, I knocked on the door.  Gentleman

5   answered the door.  I asked was Mr. Greathouse

6   there; he said yes.  I asked him if I could come in.

7               He let me in.  He led me to Mr.

8   Greathouse's room.  He knocked on the door.  He

9   informed him I was there.  Mr. Greathouse took a

10  little time to come.

11              When he opened the door me and P.O.

12  Chambers informed him we was there to do a search.

13  We handcuffed him.  We led him into the room.

14      Q   Just to break that down a little bit.

15              Who was the person who let you into

16  the apartment?

17      A   A gentleman that lived in the apartment

18  along with Mr. Greathouse, roommate.

19      Q   Did he give his name?

20      A   Yes, but I'm not a -- I have a lot of

21  people.

22              I can't remember his name off the

23  top.

24      Q   What led you to believe that he was also

25  residing in the apartment?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1       A    Because he went into another room that was

2    next to Mr. Greathouse's room.

3       Q    You said he directed you towards where Mr.

4    Greathouse was?

5       A    He led us to the back to where Mr.

6    Greathouse was.

7       Q    Can you describe the direction within the

8    apartment that he directed you to?

9       A    To the right.

10      Q    Where was the room in relation to the

11   front entrance; can you just describe the layout of

12   the apartment?

13      A    Okay.  Got off the elevator, the door is

14   to the left.  The door open this way, the kitchen,

15   the living room, go to the back, the bathroom, a

16   room, and Mr. Greathouse's room was straight.

17         MS. MOVIUS:  Just so the record is clear,

18         the witness was using her right hand to

19         indicate that she was turning to the right side

20         of the apartment when she described Mr.

21         Greathouse's room.

22      Q    What happened when you got to Mr.

23   Greathouse's room?

24      A    Knocked on the door, the gentleman

25   informed Mr. Greathouse that his parole officer --

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          THE COURT:  You knocked on the door or the

2     man?

3          MS. MYERS WASHINGTON:  The man.

4          The gentleman knocked on the door, let him

5     know; called his name, let him know that his

6     parole officer was there.

7          Mr. Greathouse took a little while to come

8     out the room.  When he came out the room he

9     spoke, me and P.O. Chambers let him know we

10    were there to do a safety search.

11         He was handcuffed, and we led him back

12    into the room, we sat him in the chair.

13    Q    About how long did it take Mr. Greathouse

14    to leave his room?

15    A    Somewhere between two and a half to three

16    minutes for him to come out the room.

17    Q    When you entered the room, can you

18    describe what you observed?

19    A    When you enter the room behind the door

20    there's a closet, it's a little way before you can

21    see the bed, a night stand.  His partner was in the

22    bed.

23         We did ask her to leave the room.

24    She got up, so it was the bed, the headboard --

25    well, it wasn't no headboard.  The bed faced this

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1   wall, when you walk in there was a dresser, another

2   dresser, a TV, a window, a window.

3       Q    Now, you said the defendant's partner was

4   in the room?

5       A    Yes.

6       Q    Did you come to learn the name of that

7   individual?

8       A    Yes, but I cannot pronounce it.  I'm so

9   sorry.

10      Q    Would you recognize her if you were to see

11  her again today?

12      A    Yes.

13      Q    Please take a look around the room, if you

14  do see that individual if you could point her out,

15  and identify an article of clothing she's wearing.

16      A    It's the young lady with the glasses,

17  beige and black shirt.

18           THE COURT:  Let the record reflect the

19           witness identified the defendant.

20      Q    At the time you first entered the room and

21  spoke with Mr. Greathouse, what, if anything, did he

22  say?

23      A    They was just eating.  They had eaten fish

24  and grits, just came back from breakfast.  Said

25  everything was fine.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1      We asked him was we going to find

2  anything that shouldn't be in the room.  He said no.

3  Like I said, we sat him in the middle of the room,

4  so he can see the search.

5      Q    What happened to the female who was in the

6  room?

7      A    She was escorted out.

8      Q    So can you take us through what happened

9  in the search?

10     A    Mr. Greathouse was handcuffed.  He sat in

11  the chair, so he can see everything.

12              As we proceeded P.O. Chambers

13  searched the bed, I searched the dresser, P.O.

14  Campbell searched another dresser.

15     Q    Why did you search those areas of the

16  room?

17     A    Because that is his room, anything that is

18  in the room belongs to him, everything in the room

19  needs to be searched.

20     Q    Were you looking for anything

21  specifically?

22     A    No, we were there to do a safety search,

23  there was nothing specifically we were looking for.

24     Q    Did you ultimately find anything in the

25  room, you or your fellow parole officers?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1     A     Yes.

2     Q     Can you describe that?

3     A     In the duffel bag there was a gun with

4  ammunition.

5           MR. TURCHI:  Objection.

6           Basis of knowledge, your Honor.

7           THE COURT:  Overruled.

8     Q     You can go ahead.

9     A     In the duffel bag on the side of the bed

10  there was a gun, ammunition.  In the top of the

11  dresser was drugs, a razor, and stuff to purchase.

12          THE COURT:  What type of drugs?

13          MS. MYERS WASHINGTON:  At that time I

14     wouldn't know what type of drugs there were

15     until a lab came back.

16          THE COURT:  What did you learn them to be?

17          MS. MYERS WASHINGTON:  Crack cocaine.

18    Q     What item was found first?

19    A     The drugs were found.  I noticed the drugs

20  first.

21    Q     About how long into the search did you

22  find those drugs?

23    A     Maybe within 30 or 45 minutes -- no, I'm

24  sorry.

25          30 to 45 seconds within the search.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    Q    How about the firearm, when was that found

2    in relation to when you found the drugs?

3    A    It was like almost simultaneously as I was

4    looking into the top of the dresser, P.O. Chambers

5    was already behind the bed.

6    Q    So would you say that was also within

7    approximately a minute or so of starting your

8    search?

9    A    Yes.

10    THE COURT:  P.O. Chambers found the gun

11    and ammo?

12    MS. MYERS WASHINGTON:  Yes.

13    THE COURT:  How did you learn that she had

14    found the gun and ammo?

15    MS. MYERS WASHINGTON:  She used the code

16    word water to let us know there was a firearm

17    found.

18    Q    Did you, yourself, observe where the

19    firearm was found in the room?

20    A    Yes.

21    Q    Can you describe what it looked like, and

22    where it was found?

23    A    It was found in a duffel bag.  It was

24    black.

25    My -- so this is the bed here, the

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    window not that far, when she went to the side she

2    pulled up the black duffel bag, she looked in the

3    duffel bag, she said water. She said water.

4              She pulled up the bag before she

5    proceeded to remove it. I looked in the bag, and

6    she took the bag, and sat it in the hallway.

7       Q    When you looked in the bag, what did you

8    see?

9       A    A firearm, ammunition.

10             MR. SIMMONS: Judge, I'm sorry to

11        interrupt. I missed the part, the person that

12        was looking in the bag said, what was that

13        person's name?

14             MS. MYERS WASHINGTON: P.O. Chambers.

15             MR. SIMMONS: Police Officer Chambers.

16             MS. MYERS WASHINGTON: P.O. Chambers.

17             THE COURT: Parole Officer.

18             MS. MYERS WASHINGTON: Parole Officer

19    Chambers.

20             MR. SIMMONS: Thank you.

21             MS. MOVIUS: So I am handing up, showing

22    defense counsel, and then handing up a few

23    photographs.

24             THE COURT: People's Exhibit what?

25             MS. MOVIUS: People's Exhibit 1A through

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1      D.

2      Q     Take a look through those photos, Officer

3   Myers.

4                Do you recognize those photos?

5      A     Yes.

6      Q     What do you recognize what's in your hand

7   and what's been premarked for identification as

8   People's Exhibit 1A through D to be?

9      A     What I seen in the duffel bag; the gun,

10  the ammo.

11               What was recovered in the duffel bag.

12     Q     Do those four photographs fairly and

13  accurately portray the duffel bag, and it's contents

14  as you saw it inside of Mr. Greathouse's apartment

15  on November 29th of 2023?

16     A     Yes.

17           MS. MOVIUS:  At this point, the People

18        offer People's 1A though D into evidence.

19           THE COURT:  Any voir dire or objection,

20        Mr. Turchi?

21           MR. TURCHI:  No.

22           THE COURT:  Mr. Simmons.

23           MR. SIMMONS:  Briefly, Judge.

24           You said that you recovered -- withdrawn.

25           You said that you observed that gun yourself

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    inside the duffel bag, correct?

2         MS. MYERS WASHINGTON:  Yes, I seen it

3    inside the duffel bag; yes.

4         MR. SIMMONS:  Did you take photos of the

5    gun?

6         MS. MYERS WASHINGTON:  No, I did not, sir.

7         MR. SIMMONS:  Do you know who took those

8    photos?

9         MS. MYERS WASHINGTON:  P.O. Chambers, P.O.

10   Campbell, they used their phones to take

11   pictures.

12        MR. SIMMONS:  You are identifying People's

13   1A as the gun that you observed in the duffel

14   bag, correct?

15        MS. MYERS WASHINGTON:  Yes, gun and ammo.

16        MR. SIMMONS:  As you sit here today, what

17   is it about that gun that tells you it's the

18   one you saw in the duffel bag?

19        Is there anything significant about that

20   gun that would tell you that?

21        MS. MYERS WASHINGTON:  This is the gun and

22   the ammo that is on my colleague's phone that

23   they took pictures with, sir.

24        MR. SIMMONS:  Were you present when the

25   pictures were taken?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1        MS. MYERS WASHINGTON:  Yes, I was, sir.

2        MR. SIMMONS:  Which colleague of yours

3    took the photos?

4        MS. MYERS WASHINGTON:  P.O. Campbell and

5    P.O. Chambers.

6        MR. SIMMONS:  Objection to those coming in

7    through this witness.

8        THE COURT:  Objection is overruled.

9        She said they fairly and accurately depict

10   what was there that morning, so People's

11   Exhibit 1A, B, C, D are in evidence.

12       I am going to ask the court reporter to

13   mark them.

14       (People's Exhibit 1A, 1B, 1C, 1D; Received

15   into evidence.)

16       MS. MOVIUS:  Permission to publish once

17   they're marked.

18       THE COURT:  This is which one?

19       MS. MOVIUS:  This is People's 1A.

20   Q    Can you tell us what we're looking at

21   here, Officer Myers?

22   A    We're looking, there's a glove, there is

23   ammunition, and the end of a gun.

24   Q    When you are saying ammunition, can you

25   approach the screen, and show us what you are

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    referring to?

2              THE COURT:  I'll give you a pointer.

3       A    This is a magazine with ammunition,

4    bullet, with a bullet inside.

5                   This is another magazine, and this is

6    the butt of a gun, with this go into there to load.

7              THE COURT:  Do you want to make a record

8         as to what she's pointing to since you asked?

9         MS. MOVIUS:  Yes, your Honor.

10         Let the record reflect, the witness

11         pointed to the object in the middle left of the

12         photograph, which shows a magazine and a bullet

13         protruding from the top of it as the first

14         magazine she described.

15         There is an object in the middle of the

16         photograph, to the right of that object, which

17         looks like the rear of a second magazine, which

18         is the second magazine she described; and then

19         the handle of the firearm she described as the

20         top or middle right side of the photograph.

21       Q    I am publishing People's 1B.

22                   Can you tell us what we're looking at

23    in this photo?

24       A    This is the gun.  This is the magazine.

25    This is the ammunition, bullet.  This is the other

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    magazine.  This is another bullet, ammo.

2         MS. MOVIUS:  Let the record reflect that

3         the witness identified the gun that's in the

4         middle of the photograph, to the left of the

5         gun there's a magazine, which she pointed as

6         the first magazine.  There's a bullet at the

7         top of that magazine, which the witness

8         identified as ammunition.

9              There's a second magazine to the left of

10        that magazine on the far left side of the

11        screen, slash, photograph, and another round of

12        a bullet that she also described as ammunition

13        at the top of that magazine.

14   Q    Moving onto 1C.

15             Can you show us, can you explain what

16   this is, Officer Myers?

17   A    This appears to be gloves.  This appears

18   to be a magazine.  This appears to be a magazine

19   with a bullet, which is ammo.

20             This appears to be -- let me see.

21   Another magazine, looks like another magazine right

22   here.

23        MS. MOVIUS:  Let the record reflect the

24        witness identified the three long shaped

25        objects in the middle of the photograph that

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1      appear to be magazines, as the magazine, and a

2      glove as the cloth like item with fingers

3      underneath the magazine.

4      Q      Lastly, People's 1D.

5             What is this item?

6      A      This appears to be a box of live ammo with

7      50 rounds, which will be bullets to load the

8      magazine.

9      Q      This was also represent in the duffel bag?

10     A      Yes, it was.

11            MS. MOVIUS:  So I would like to hand up

12     what's been premarked for identification as

13     People's 2A though D.

14            First showing counsel.

15     Q      Take a look at those images, Officer

16     Myers.

17            Do you recognize what's been marked

18     as People's 2A, B, C, D?

19     A      Yes.

20     Q      What is depicted in those photographs?

21     A      It is depicted a fanny pack with money and

22     ID of the defendant.

23     Q      Which defendant?

24     A      The lady, Ms. Johnson.

25     Q      Do you recall where those photographs were

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    taken?

2         A     Inside -- oh, inside of the room.

3                    Mr. Greathouse's room.

4         Q     Was that item also found during the search

5    of the defendant's room?

6         A     Yes.

7         Q     Do you know where it was found?

8         A     No.

9         Q     Do you know who found it?

10        A     Yes, P.O. Chambers and P.O. Campbell

11   Mckinney.

12        Q     Did you see the bag in person, and what's

13   depicted in those photographs after it was located

14   by Officer Chambers?

15        A     Can you start -- can you say it again,

16   please?

17        Q     Did you see the fanny pack, and what's in

18   those photos after it was found by Officer Chambers?

19        A     Yes.

20        Q     Do those photos fairly and accurately

21   depict how that fanny pack, and it's contents,

22   looked while it was inside of the apartment on

23   November 29th of 2023?

24        A     Yes.

25                   MS. MOVIUS:  At this time, the People

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    would move People's 2A through D into evidence.

2           THE COURT:  Any voir dire or objection,

3    Mr. Turchi.

4           MR. TURCHI:  No.

5           MR. SIMMONS:  I have another objection.

6    Same.

7           Did you recover that fanny pack yourself

8    from the apartment?

9           MS. MYERS WASHINGTON:  No, I did not.

10           MR. SIMMONS:  Did you ever see that fanny

11    pack in the apartment?

12           MS. MYERS WASHINGTON:  Yes, after it was

13    found.

14           MR. SIMMONS:  By Chambers, correct.

15           MS. MYERS WASHINGTON:  P.O. Chambers; yes,

16    sir.

17           MR. SIMMONS:  Then it was brought out and

18    shown to you?

19           MS. MYERS WASHINGTON:  It was left.  Yes.

20           It wasn't brought out.  I was still in the

21    room.

22           MR. SIMMONS:  You were still present in

23    the bedroom when it is found?

24           MS. MYERS WASHINGTON:  Yes.

25

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    MR. SIMMONS:  Did you open the bag, and

2    observe what was in it?

3    MS. MYERS WASHINGTON:  I did not open the

4    bag, sir; because I did not find the bag.

5    MR. SIMMONS:  Is there anything in that

6    photograph, those photographs, 2A through D,

7    that are marked in any way that would show you

8    that is the waist pack or cash that was

9    discovered, and taken out of the apartment that

10   day; is there anything on there that you

11   recognize, any marks?

12   MS. MYERS WASHINGTON:  Repeat that, sir,

13   please.

14   MR. SIMMONS:  I'll withdraw that.

15   Is there anything in that waist pack and

16   those photographs or the cash in that waist

17   pack that is marked in any way that would tell

18   you that is what you observed in the apartment

19   that day?

20   MS. MYERS WASHINGTON:  Everything in the

21   picture is what I observed that day, sir.

22   Nothing has changed from these photos when

23   this bag was found.

24   MR. SIMMONS:  What is the color of the

25   bag?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          MS. MYERS WASHINGTON:  The bag is black.

2          MR. SIMMONS:  Judge, that's the same

3     objection.

4          I ask that there be another witness to

5     establish chain of custody here.

6          THE COURT:  Objection is overruled.

7          The People's Exhibit 2A, B, C, and D are

8     in evidence.  I am asking the court reporter to

9     mark them.

10         (People's Exhibit 2A, 2B, 2C, and 2D;

11    Received into evidence.)

12         MS. MOVIUS:  Permission to publish, your

13    Honor?

14         THE COURT:  Yes.

15    Q    I am publishing People's 2A, can you

16    describe what we're looking at here?

17         THE COURT:  You can just tell us.

18         MS. MYERS WASHINGTON:  Okay.  I'm sorry.

19         THE COURT:  That's okay.

20    A    Right now you're looking at a fanny pack

21    that was discovered, there's some cash, there's a

22    wallet.

23    Q    2B, what are we looking at in this

24    photograph?

25    A    We are looking at the inside of the fanny

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    pack, which you have money, which is bandaged in a

2    rubber band.

3        Q    I am also publishing 2C.

4        A    Currency, money, that's folded up, that

5    look like it's already been counted, so it's in a

6    band.  End of a key, and something yellow.

7        Q    Now, for this photograph, did you observe

8    the contents of this bag with the mony banded as

9    it's depicted in the photograph?

10        A    Yes.

11        Q    Is this the way the money looked

12    originally when you saw it in the fanny pack during

13    the search?

14        A    Yes.

15        Q    What, if anything, did parole officer do

16    with that money?

17        A    They --

18        MR. SIMMONS:  Objection.

19        THE COURT:  Sustained.

20        Q    Did you observe anything happen with that

21    money?

22        MR. SIMMONS:  Objection.  Same objection,

23    Judge.

24        THE COURT:  Overruled.

25        A    After my colleague, the other parole

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    officers located, and went through the search, the

2    money was counted.

3        Q    Was it taken out of this banded form when

4    it was counted?

5        A    Yes, it was.  Yeah, to be counted it has

6    to be taken out.

7        Q    Now publishing 2D.

8            What is this a photograph of?

9        A    The wallet that was located in the fanny

10    pack.

11        Q    Now, you said you also found drugs, can

12    you remind us where you found those in the

13    apartment?

14        A    I found them in the dresser draw, in the

15    top.  It was on a white, green, and pink plate,

16    flowers.

17            THE COURT:  You said in the dresser draw?

18            MS. MYERS WASHINGTON:  Yes, top dresser

19        drawers.

20        Q    Did you find narcotics or any other

21    materials in other draws besides that top draw?

22        A    P.O. Campbell -- in that top draw; no,

23    just drugs and stuff in that draw that I found.

24        Q    Just in the top draw?

25        A    That I looked in, yes.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    Q    Did you look in the other draws?

2    A    P.O. Campbell looked in the other draw.

3    Q    Do you know if drugs were found in any of

4    the other draws?

5    A    There were other drugs that were found.

6         MS. MOVIUS:  So I am showing defense

7         counsel, and then passing up what's been

8         premarked for identification as People's 3A

9         through 3G.

10    Q    Take a look through those photos.  Take

11   your time, because there's a few there.

12         Do you recognize what's in your hand

13   that's been marked as People's 3A through G?

14    A    Yes.

15    Q    What is depicted in those photos?

16    A    It's a plate, plastic bag, a razor,

17   substance, plastic bag, capsules, substance, GLAD

18   bag, substance, storage bag with substance.  Another

19   GLAD bag, part of a razor, capsules.

20    Q    Did you recover those items?

21    A    People's Exhibit 3A, 3B, and 3C is what I

22   found in the top dresser draw.

23    Q    Nevertheless, do you recognize all of

24   those items that are depicted in the photographs?

25    A    Correct; yes.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    Q    Do you know where the rest of the items

2   were recovered from within the apartment?

3    A    In the other draws.

4    Q    Do you know who recovered the other items?

5    A    P.O. Campbell.

6    Q    Do those photographs fairly and accurately

7   depict the various narcotics, plates, razor, and

8   other paraphernalia that were recovered within the

9   dresser draw of the defendant's apartment on

10  November 29, 2023?

11   A    Yes.

12       MS. MOVIUS:  At this time, People would

13       move People's 3A through 3G into evidence.

14       THE COURT:  Any voir dire, objection, Mr.

15       Turchi?

16       MR. TURCHI:  No.

17       MR. SIMMONS:  Judge, may I see it again

18       quickly; if you don't mind.

19       THE COURT:  Yes.

20       I'll have the court reporter mark these

21       later.

22       MR. SIMMONS:  May I ask a question, your

23       Honor, about one of those photos?

24       THE COURT:  Which one?

25       MR. SIMMONS:  3F.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1       THE COURT:  3F like Frank.

2       MR. SIMMONS:  Correct.

3       Officer, looking at the photo 3F, what is

4   depicted in that photo?

5       MS. MYERS WASHINGTON:  In this photo, it's

6   the plate, half of a razor, GLAD bag, plastic

7   bag.

8       MR. SIMMONS:  There's a reddish object in

9   that bag as well?

10       MS. MYERS WASHINGTON:  The reddish.

11       MR. SIMMONS:  Object in the bag, do you

12   see that?

13       MS. MYERS WASHINGTON:  I don't see nothing

14   red in the bag, sir.

15       There's nothing red in the bag.

16       MR. SIMMONS:  What is in the bag that you

17   see?

18       MS. MYERS WASHINGTON:  In this bag you see

19   baggies, you see little crumbs.

20       I don't see nothing red in the bag, sir.

21       MR. SIMMONS:  Judge, the same objection.

22       They need another witness to put these

23   photographs in.

24       THE COURT:  Overruled.

25       We'll mark those later today.  They're all

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1      in evidence A through G.

2            MS. MOVIUS:  Permission to publish these.

3            THE COURT:  Yes.

4      Q    Starting with 3A.

5      A    Yes.

6      Q    What are we looking at here?

7      A    We're looking at a plate and a black

8      plastic bag, blue glove.

9      Q    Whose glove is that?

10     A    That is my glove.

11     Q    3B.

12     A    3B, you are looking at a plate with a

13     razor, a black plastic bag, a white bag, and white

14     residue on the plate.

15     Q    3C.

16     A    3C, you see a white bag with purple,

17     something yellow, a black bag with half of a razor.

18     Q    3D.

19     A    3D, you see a white bag, you see a baggie

20     with substance, little viles in that bag.

21     Q    3E.

22     A    3E, you see two batteries, you see a

23     plate, what appears to be substance, underneath, and

24     a black bag.

25     Q    There's a hand here as well, right?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1      A    Yes.

2      Q    Do you know whose hand that is?

3      A    P.O. Campbell, I know the gloves.

4      Q    And publishing 3F.

5      A    3F, that's it, okay, so I was looking at

6   the wrong thing then.

7                In this there's a white bag with

8   pink, red.  What appears to be narcotic ---

9                THE COURT:  Excuse me, there was something

10   red in 3F?

11                MS. MYERS WASHINGTON:  That wasn't the one

12   I was looking at.

13                MS. MOVIUS:  My apologies, I realize that

14   there's two 3Fs, so I will change the one that

15   is not 3F.

16                MS. MYERS WASHINGTON:  That wasn't the 3F

17   I was looking at.

18                MS. MOVIUS:  It will now be 3H.

19                THE COURT:  3, what?

20                MS. MOVIUS:  3H.

21                THE COURT:  So you are putting in A

22   through H?

23                MS. MOVIUS:  3A through H, my apologies,

24   your Honor.

25                THE COURT:  Same objection for H, right?

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          MR. SIMMONS:  Yes, Judge.

2          That's the one I was directing the

3     question.

4          MS. MOVIUS:  That's still F.  This one is

5     H now.

6          MR. SIMMONS:  So it was F I was directing.

7          MS. MYERS WASHINGTON:  That one, had --

8     this one.

9          THE COURT:  There's no question.

10          MS. MYERS WASHINGTON:  Sorry.

11          MS. MOVIUS:  I'll clarify.

12     Q    What's on the screen now, the photograph

13     that Mr. Simmons voir dire on with the two reddish

14     color baggies depicted in the middle of the photo

15     that is still 3F.

16     A    Okay.

17     Q    3H, I am publishing here, what does 3H

18     show?

19     A    A plate, half after of a razor, baggies,

20     what appears to be substance, clear bag with purple

21     on it, in the back plastic bag.

22     Q    3G, lastly?

23     A    3G is the black bag with white baggies,

24     what appears to be where you can put paraphernalia

25     in that.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    Q    At a certain point in time during this

2  search, was NYPD notified?

3    A    Yes.

4    Q    Why?

5    A    Because we found a gun, and ammunition in

6  the house, and drugs.

7    Q    How was NYPD notified?

8    A    NYPD was notified two ways.  One was

9  through the radio, and one was through the phone.

10    Q    Was there a time when members of the NYPD

11  responded to that same apartment?

12    A    Yes.

13    Q    Do you know if those officers were wearing

14  their body worn cameras?

15    A    Yes, they were.

16    Q    How do you know they were wearing their

17  body worn camera?

18    A    Because they mentioned it.  They stated

19  they were going live.

20    Q    What did you interpret going live to mean?

21    A    That their body camera was going to be on

22  to record everything.

23        MS. MOVIUS:  Let the record reflect, the

24        witness indicated a location near her chest

25        when she made that statement.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1              So I am passing up what's been premarked

2       as Exhibit 11.  I'm showing counsel.

3       Q    Do you recognize this USB?

4       A    Yes.

5       Q    How do you recognize it?

6       A    It has my initials on it.

7       Q    Did you view the contents of the USB

8    before testifying today?

9       A    Yes.

10      Q    Is what's on that USB, body worn camera

11   footage from one of the responding NYPD members?

12      A    Yes.

13      Q    Does it fairly and accurately portray the

14   events that occurred once those NYPD officers

15   arrived on scene?

16      A    Yes.

17      Q    Does it fairly and accurately portray the

18   way Mr. Greathouse's room looked on November 29,

19   2023, at the time the NYPD arrived?

20      A    Yes.

21      Q    Are you, yourself, on that body worn

22   camera video?

23      A    Yes.

24              MS. MOVIUS:  At this point, I would move

25          People's 11 into evidence.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1        THE COURT:  Any voir dire or objection.

2        MR. TURCHI:  One question.

3        Approximately what time did the police

4    arrive?

5        MS. MYERS WASHINGTON:  I wasn't looking at

6    my watch, so I can't be sure exactly what time

7    they got there, but they got there within --

8    within 45 minutes of us being there.

9        MR. TURCHI:  What time did you arrive?

10        -- MS. MYERS WASHINGTON:  I got to the house

11    at 10 o'clock a.m., in the morning.

12        MR. TURCHI:  Okay.  No objection to the

13    body worn camera footage.

14        MR. SIMMONS:  Some questions, please.

15        That drive that you are holding in your

16    hand, did you look at the contents of that

17    yourself?

18        MS. MYERS WASHINGTON:  Yes, I viewed it

19    before.

20        MR. SIMMONS:  Today.

21        MS. MYERS WASHINGTON:  Yes.

22        MR. SIMMONS:  You viewed it before you

23    came in to testify today?

24        MS. MYERS WASHINGTON:  I viewed it today,

25    and the day when I was suppose to testify like

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    two weeks ago, I believe.

2         MR. SIMMONS:  Your testimony is that the

3    body camera of the arresting officers, or the

4    officers that came for the gun, their body cam

5    footage, is on that drive, correct?

6         MS. MYERS WASHINGTON:  Yes.

7         MR. SIMMONS:  Did you hand the gun to the

8    officers yourself?

9         MS. MYERS WASHINGTON:  No, I did not.

10        MR. SIMMONS:  Were you present when they

11   took possession of it?

12        MS. MYERS WASHINGTON:  I was present, yes.

13        MR. SIMMONS:  I object to this coming in

14   through this witness.

15        THE COURT:  Overruled.

16        People's Exhibit 11 is in evidence.

17        Would you mark that?

18        (People's Exhibit 11; Received in

19   evidence.)

20        MS. MOVIUS:  Permission to publish, your

21   Honor.

22        THE COURT:  Do you know which officers

23   body worn camera this is?

24        MS. MYERS WASHINGTON:  No, I do not.

25        MS. MOVIUS:  For the record, this file is

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1     titled with a bunch of numbers then it bears

2     the name Marquez, M-A-R-Q-U-E-Z.

3          MR. TURCHI:  What exhibit number is that?

4          MS. MOVIUS:  This is 11.

5          All right, so I am skipping ahead a bit in

6     the video until time stamp 9:46:45, and I will

7     press play.

8          (Whereupon, a video was played.)

9          MS. MOVIUS:  Pausing at time stamp

10    9:47:08.

11         Q    Who is depicted in that still image here,

12    Officer Myers?

13         A    P.O. McLoughlin.

14         Q    Which officer is she; can you describe

15    what she's wearing?

16         A    She has on a red shirt underneath her

17    vest.

18         Q    Who else is in the still image?

19         A    P.O. Santiago has on a scarf, she's on the

20    phone.

21              This is one of the officers, and that

22    is me at the door.

23         MS. MOVIUS:  Resuming play.

24         (Whereupon, a video was played.)

25         MS. MOVIUS:  Pausing at time stamp

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1        9:47:31.

2        Q    It appears that people in the video are

3    looking towards the ground there, per your memory of

4    this time, what is on the ground outside of the

5    defendant's apartment?

6        A    The duffel bag with the gun.

7        Q    Why was it brought outside of the

8    apartment?

9        A    For safety.

10            MS. MOVIUS:  Resuming play.

11            (Whereupon, a video was played.)

12        Q    Pausing at time stamp 9:48:31; who is the

13    female officer depicted in the section of the body

14    worn camera?

15        A    P.O. Chambers.

16            MS. MOVIUS:  Resuming play.

17            (Whereupon, a video was played.)

18        Q    Pausing again at 9:48:45; what room are we

19    looking at on the left-hand side of this screen?

20        A    Mr. Greathouse's room.

21        Q    Who is depicted in this still image?

22        A    Mr. Greathouse is in the chair, P.O.

23    Flores is on the side, and that is P.O. Campbell.

24        Q    Where is P.O. Campbell?

25        A    Right here.  This is P.O. Campbell.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1        MS. MOVIUS:  Let the record reflect, the

2    witness indicated the hands that are located on

3    the very far bottom left of the screen.

4            Resuming play.

5            (Whereupon, a video was played.)

6        MS. MOVIUS:  All right, so I am pausing

7    9:47:32 and exiting People's Exhibit 11.

8        Q    Now earlier you mentioned that you also --

9    or parole officer also contacted PD by phone?

10       A    Yes.

11       Q    Do you know who specifically was

12   contacted?

13       A    Officer Salinas was contacted.

14       Q    Who contacted Officer Salinas?

15       A    I can't -- I called and another parole

16   officer called.

17       Q    Why was Officer Salinas called?

18       A    Because his team was the team that was

19   with us during our searches that day.

20       Q    Did Officer Salinas eventually respond to

21   the same location as the other NYPD officers?

22       A    Yes.

23       Q    Do you know if his body worn camera was

24   on?

25       A    I am not aware.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1      Q    I am handing up what's been premarked for

2   identification as People's Exhibit 8.

3                Do you recognize this USB?

4      A    Yes.

5      Q    How do you recognize this USB?

6      A    It has my initials on it.

7      Q    Did you view what's on this USB before

8   testifying today?

9      A    Yes.

10     Q    What is on the USB?

11     A    I believe I'm on that one, too, and other

12  officers and what they observed when they came to

13  the scene.

14     Q    Does it fairly and accurately depict what

15  the apartment looked like at the time that NYPD

16  officers arrived on November 29th of 2023?

17     A    Yes.

18          THE COURT:  Do you know whose body worn

19     camera this is?

20          MS. MYERS WASHINGTON:  No, it was a lot of

21     officers that responded that day.

22          MS. MOVIUS:  At this time I will move

23     People's 8 into evidence.

24          THE COURT:  No objection?

25          MR. SIMMONS:  I object, Judge.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          This was not the witness's body cam.

2          Did you viewed the content of this?

3          THE COURT:  She said she did.

4          MR. SIMMONS:  -- before you came in here

5     today?

6          MS. MYERS WASHINGTON:  Yes.

7          MR. SIMMONS:  It's not your body cam?

8          MS. MYERS WASHINGTON:  We don't wear body

9     cams.

10          MR. SIMMONS:  As the Judge asked you, you

11     don't know who was the officer whose body cam

12     that was, correct?

13          MS. MYERS WASHINGTON:  It was a lot of

14     officers that were there.

15          THE COURT:  That's not answering the

16     question.

17          MS. MYERS WASHINGTON:  No.

18          MR. SIMMONS:  Sorry to ask the question

19     again.

20          I object.

21          THE COURT:  Objection is overruled.

22          She testified that it fairly and

23     accurately depicts what occurred that day.

24          Would the court reporter please mark it.

25          (People's Exhibit 8; Received in

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    evidence.)

2        MS. MOVIUS:  Permission to publish, your

3    Honor.

4        THE COURT:  Yes.

5        MS. MOVIUS:  I am publishing Exhibit 8.

6    This is a video file that bears the name

7    Salinas, S-A-L-I-N-A-S.

8        Court's indulgence, your Honor.

9        MR. TURCHI:  Judge, I'm sorry, is there a

10   time stamp on this body cam footage?

11       This is a question to the DA, but I don't

12   want to question her directly, but I do need to

13   make a record.

14       I see it.

15       MS. MOVIUS:  It was briefly zoomed in.

16       Now, it's no longer zoomed in.

17       MR. TURCHI:  I see it.  9:55 it says.

18       MS. MOVIUS:  Yes.

19       MR. TURCHI:  Thank you.

20       MS. MOVIUS:  I'm skipping ahead to 9:55:42

21   and pressing play.

22       (Whereupon, a video was played.)

23       MS. MOVIUS:  I'm pausing at time stamp

24   9:57:00.

25   Q    What room is depicted at this point in the

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1    video?

2        A    Mr. Greathouse's room.

3        Q    With the pointer, can you point out for

4    the Court where the duffel bag was found by Officer

5    Chambers?

6        A    In between the window and the bed, over

7    here.

8            MS. MOVIUS:  Let the record reflect, the

9            witness indicated the position between the

10           window and the bed on the body worn camera,

11           which is middle left of the video.

12           Resuming play.

13           (Whereupon, a video was played.)

14       Q    Now I am pausing at 9:57:24; what is

15    depicted in this still image?

16       A    The window, the dresser, the top dresser

17    where I located drugs at, Mr. Greathouse, and the

18    TV, and another dresser on the side.

19       Q    Can you point to the draw that you just

20    said is the location you found the drugs in?

21       A    The top draw.

22       Q    The top draw.

23           Is that the one that's open on the

24    still image?

25       A    Yes, the one that's open.

DIRECT EXAMINATION/MYERS WASHINGTON/PEOPLE

1          MS. MOVIUS:  Pausing at time stamp

2     9:57:57, and exiting the video.

3     Q    Approximately how long would you say the

4     total time was that you were in Mr. Greathouse's

5     apartment on November 29th of 2023?

6     A    Maybe about two hours or more.

7     Q    About what time did you leave the

8     apartment?

9     A    It was after 10:00.

10          I don't know.  I didn't look at my

11    watch.

12    Q    How did you know that your job was done,

13    or that it was your time to leave?

14    A    When NYPD took over.

15    Q    Why was that?

16    A    Because there was a gun, live ammunition,

17    money, and drugs found in the apartment.

18    Q    Did you have any further involvement with

19    the NYPD relating to the arrest of either defendant

20    after you vacated the premises?

21    A    No.

22          MS. MOVIUS:  I have no further questions

23    for this witness.

24          Thank you.

25          THE COURT:  Do you want to do cross, or do

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1      you want to take a break?

2              MR. TURCHI:  I am ready to go, Judge.

3              THE COURT:  Are you all right?

4              MS. MYERS WASHINGTON:  I am okay.

5    CROSS EXAMINATION

6    BY MR. TURCHI:

7        Q    Good morning, Ms. Myers Washington.

8        A    Good morning.

9        Q    My name is David Turchi.

10              I represent Leon Greathouse. I am

11    going to be asking you some questions.  I ask that

12    you please keep your voice up, all right?

13       A    Yes.

14       Q    And if you don't understand a question

15    please tell me, I'll rephrase, okay?

16       A    Okay.

17       Q    All right.

18              On the date of this search, who were

19    the parole officers that were present?

20       A    Myself, P.O. Campbell, P.O. Chambers, P.O.

21    Santiago, P.O. McLoughlin, P.O. Flores.

22              THE COURT:  All women?

23              MS. MYERS WASHINGTON:  All women.

24       Q    Anyone else?

25       A    I think I said P.O. Stevenson.

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1      Q    Anyone else?

2      A    Those were the women that were present.

3                 You said parole --

4      Q    Parole officers present.

5      A    Those were us.

6      Q    No one else from parole was present?

7      A    No.

8      Q    All right.  Now, you, yourself, have

9    supervised Mr. Greathouse, correct?

10     A    Correct.

11     Q    That was in 2022?

12     A    Correct.

13     Q    That also extended into March of 2023; is

14   that correct?

15     A    I supervised, yes, I've supervised a lot;

16   yes.

17     Q    Do you have access to your parole

18   paperwork with you today?

19     A    No, I do not.

20     Q    Okay.  If at some point I ask you a

21   question, and you want to refer to it, please tell

22   me, all right?

23     A    Okay.

24     Q    Now, what date was the search again?

25     A    November 29th.

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    Q    On November 29th --

2         THE COURT:  What year?

3         MS. MYERS WASHINGTON:  Of 2023.

4    Q    On November 29, 2023, you had indicated no

5    one from parole had decided that Mr. Greathouse

6    would be -- his apartment would be searched that

7    day?

8         MS. MOVIUS:  Objection.

9    Q    Is that correct?

10        THE COURT:  It's a question.

11        She can correct him, if he's wrong.

12   A    No one from my team that went out decided

13   if he would be on there.

14   Q    Okay.  Who decided he would be on the list

15   of parolee's whose home would be searched?

16   A    That came from higher up, our supervisors.

17   Q    Do you know specifically who?

18   A    I can tell you which two supervisors

19   worked, but I'm not sure which one put him on the

20   list.

21   Q    What were their names and titles at the

22   time?

23   A    S.P.O. Dolly Vega.

24   Q    Spell it, please.

25   A    V-E-G-A, Vega.

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    Q    And who is the other?

2    A    S.P.O. Sass, S-A-S-S.

3    Q    First name, please?

4    A    Dolly, D-O-L-L-Y.

5    Q    For Sass or Vega.

6    A    That's for Vega.

7    Q    And Sass?

8    A    Jennifer.  Common spelling.

9    Q    Thank you.

10              What other parolee's homes were

11   searched that day?

12   A    I would have to see.  I would have to go

13   back.

14   Q    But it was -- how many were searched

15   before Mr. Greathouse residence?

16   A    Approximately maybe three.

17   Q    Okay.  All right.

18              Now you had mentioned community

19   searches, is that different from a home search?

20   A    That's entitled to one community within

21   the community, the home is within the community.

22   Q    All right.  So a community search involves

23   multiple home searches, correct?

24   A    Correct.

25   Q    As you stated, that involved making sure

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    the parolee has suitability living arrangements,

2    correct?

3         A    Correct.

4         Q    Now, you also mentioned that day you were

5    working with the police officers, do you typically

6    work with an NYPD team during community searches?

7         A    No, not all the time.

8         Q    Why on this day were you working with an

9    NYPD team?

10        A    Because the areas that we were going in

11   were deemed to be more dangerous than others.

12        Q    Do you know what precinct or unit Officer

13   Salinas was with?

14        A    PSA 6.

15        Q    Was PSA 5 also involved?

16        A    PSA 5 did come.

17        Q    Were there any other NYPD units or

18   precincts involved on that day?

19        A    Yes.

20        Q    Which ones?

21        A    The one that covers that area.

22             I can't be sure at this -- I would

23   have to be -- look at the zip code to tell you

24   exactly.

25        Q    All right.  Now, you indicated at some

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    point Salinas had been there earlier during your

2    shift, but had left; did I hear you correct?

3         A    Yes.

4         Q    You don't recall why he left?

5         A    They had something else, they were called

6    to do something else.

7                   I'm not sure what they were called to

8    do.

9         Q    Approximately what time did the NYPD leave

10   you prior to your search of Mr. Greathouse's

11   apartment?

12        A    We got a call, so it had to be

13   approximately maybe 15, 20 minutes prior to us

14   getting to Mr. Greathouse.

15        Q    All right.  Now, these three people whose

16   homes you searched before my client's, before Mr.

17   Greathouse, where were their homes located,

18   approximately?

19        A    They were located throughout Manhattan.

20                   I would have to look at our list.

21        Q    The list is regularly kept by parole?

22        A    The list, yeah.

23        Q    It's parole paperwork, correct?

24        A    It's parole paperwork.

25        Q    It's the habit of parole to -- it's the

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    practice of parole to make these lists?

2        A    Yes, to give us the address and stuff,

3    where we're going.

4        Q    To keep these lists as well, correct?

5        A    They should be, yes.

6        MR. TURCHI:   Okay.  I am just going to ask

7    the People to make a diligent inquiry into

8    parole.

9        THE COURT:   I don't see how the addresses

10    of the other searches are relevant, and

11    therefore, I don't see how that would be part

12    of the discovery.

13        MR. TURCHI:   I'll get to that.

14        I believe it will be, but let me explain

15    myself by asking more questions.

16        Q    Officer, where any of these other --

17        THE COURT:   I don't know why the People

18    haven't objected to the request of the other

19    searches.

20        MR. TURCHI:   Let me finish making the

21    record, then I will make the request.

22        I can make it after we excuse the witness

23    perhaps.

24        Q    Officer, were any of the prior parolees

25    arrested --

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1         MS. MOVIUS:  Objection.

2     Q    -- that day?

3         THE COURT:  Sustained.

4     Q    In the course of home searches you've

5    previously made arrests besides Mr. Greathouse?

6     A    Yes.

7     Q    Typically if an arrest occurs it takes

8    several hours; is that correct?

9     A    Yes.

10     Q    Your shift that morning started at

11    approximately 5:00 a.m., correct?

12     A    Yes.

13     Q    When did the community search begin that

14    day?

15     A    5:15 we left the building.

16     Q    Okay.

17         THE COURT:  You mean you left parole?

18         MS. MYERS WASHINGTON:  We left parole;

19    yes.

20     Q    Then you arrived to -- you started the

21    search of my client's home at approximately 10:00

22    a.m. you testified?

23     A    That's what I said, yes.  That's what I

24    said, yes.

25     Q    Now, you just looked at two body camera

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    footage, correct?

2        A    Yes.

3        Q    That was People's Exhibit 8 as well as

4    People's Exhibit 11, correct?

5        A    Yes.

6        Q    Those indicate a time of 9:55 a.m.,

7    correct?

8        A    That's what they said.

9        Q    Okay.  Do you believe those times to be

10    accurate?

11        A    That's -- I'm not aware, sir.  That's what

12    it says.

13        Q    The answer is I don't know.

14        A    I don't know.

15        Q    Who is the gentleman that opened the door

16    for Mr. Greathouse residence?

17        A    As I said earlier, I don't remember his

18    name.

19            THE COURT:  Is there any piece of paper

20        that would refresh your recollection?

21            MS. MYERS WASHINGTON:  Yes, if I see my

22        notes.  If I see my stuff, yes, because it was

23        written.

24            THE COURT:  Do you want to have her

25        recollection refreshed?

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1          MR. TURCHI:  Not yet.

2     Q    What happened with that individual?

3     A    That individual was left in the house.

4               He was still in the house when we

5     left.

6     Q    Okay.  Did the person indicate whether he

7     lived there?

8     A    Yes, he said he lived there.

9     Q    Did he indicate whether he was the prime

10    tenant of the apartment?

11    A    He said that he lived there so, that's

12    what he said, sir.

13    Q    Okay.  Did he say he owned the apartment?

14    A    Not to my recollection.

15    Q    Did he say he was Mr. Greathouse's

16    landlord?

17    A    No, he did not.

18    Q    Okay.  Did he indicate where in the

19    apartment he resided?

20    A    When he took -- escorted us to the room he

21    pointed to where he actually stayed at, in his room,

22    he pointed to his room.

23    Q    Okay.  Now, at the moment that Officer

24    Chambers said water, your attention was focused on

25    the dresser, correct?

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1       A       That's correct.

2       Q       So your back was to Chambers at that time,

3  correct?

4       A       That's correct.

5       Q       Okay.  When did you first observe the

6  duffel bag?

7       A       When she said water, and I turned around,

8  and she picked up the duffel bag.

9       Q       Was the duffel bag in her hands when you

10  turned around?

11      A       The duffel bag; yes, sir.

12      Q       Where was she standing at the time?

13      A       Between the bed and the window.

14      Q       Okay.  Was her body actually between the

15  bed and the window?

16      A       Yes, sir.

17      Q       Okay.  Who recovered the fanny bag?

18      A       P.O. Chambers.

19      Q       Did you witness her actually recover it?

20      A       It was in the duffel bag, sir.

21      Q       Okay. I understand.

22              Did you see her remove it from the

23  duffel bag?

24      A       I did not see her remove it from the

25  duffel bag.

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1      Q      How do you know it was in the duffel bag?

2      A      Because she opened the duffel bag.  The

3   gun, everything was there; she proceeded, and she

4   left items on the bed.

5      Q      Did you see her place items on the bed?

6      A      She took the fanny -- she took things out

7   the bag.

8      Q      Okay.  She took the fanny bag out of the

9   bag, and put it on the bed?

10     A      I'm not -- she took items out of the bag,

11   sir.

12     Q      Okay.  All right.

13            Now, did you observe your colleagues

14   actually take the pictures of the duffel bag?

15     A      Yes.

16     Q      Where was the duffel bag when the photos

17   were taken?

18     A      The duffel bag was -- the pictures was

19   taken prior to the bag being removed from the room.

20     Q      Right, but the duffel bag was already

21   removed from it's original location between the bed

22   and the window?

23     A      It was in the window, pictures were taken,

24   the bag was, for safety, taken outside of the room.

25            THE COURT:  Were pictures taken when the

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    bag was still where it was originally placed,

2    or were the pictures taken after the bag was

3    moved?

4         MS. MYERS WASHINGTON:  There was pictures

5    taken prior to the bag being removed, and after

6    the bag being removed.

7         Q    Again, there's removal.  I know it was

8    removed outside of the apartment, but it was also

9    removed between where you say Chambers originally

10   saw it between the bed and window.

11             My question is, were they taking

12   pictures of the duffel bag while the duffel bag was

13   still in the room, or was it actually still by the

14   window, or if you know?

15        A    There were pictures taken inside of the

16   room before the bag was removed from the room.

17        Q    Okay.  Was the bag still next to the

18   window when the pictures were taken?

19        A    I am not aware, sir.

20        Q    Okay.

21        A    I know they were taken.

22        Q    Who handled the duffel bag?

23        A    P.O. Chambers.

24        Q    Did anyone else handle the duffel bag

25   until it was taken outside of the apartment?

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1      A    No.

2      Q    Were you physically with Officer Chambers

3  when she transported the duffel bag into the hallway

4  outside of the apartment?

5      A    No, I was still with Mr. Greathouse.

6      Q    Were you present when the fanny bag was

7  photographed?

8      A    No, I was not.

9      Q    Did you witness Officer Campbell's

10  discovery of the alleged drugs in the other dresser?

11     A    Yes.

12     Q    Parole officers don't use body cam; is

13  that correct?

14     A    Yes.  We don't.  You said we don't.

15     Q    Okay.  So there's no live action video of

16  the parole search, correct?

17     A    Correct.  There's none.

18     Q    You had worked with Mr. Greathouse as his

19  supervisor for little over a year; is that correct?

20     A    Yes.

21     Q    You had many opportunities during that

22  time to interact with him, correct?

23     A    That's correct.

24     Q    It was your understanding he was on

25  lifetime parole, correct?

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1      A      Correct.

2      Q      He was trying to get that downgraded

3    during the time you were supervising, correct?

4      A      Correct.

5              MS. MOVIUS:  Objection.

6              THE COURT:  Sustained.

7              MR. TURCHI:  Judge, this goes to the crux

8    of the defense in this case.

9              THE COURT:  Would you step down, please.

10             (Witness exiting the court room.)

11             THE COURT:  Just trying to determine

12   relevance here.

13             MR. TURCHI:  Judge, I understand.

14             It is the defense position, if you want me

15   to re-subpoena the officers for my defense

16   case, I will do that.

17             THE COURT:  I don't want to waste that

18   time.  I want to hear what's the relevancy.

19             MR. TURCHI:  It is the defense position

20   that parole and Mr. Greathouse have had a

21   strained relationship over the years, and that

22   this and the other parole officer have

23   specifically engaged in an ongoing pattern of

24   harassment against Mr. Greathouse.

25             THE COURT:  That's not relevant to the

CROSS EXAMINATION/MYERS WASHINGTON/DEFENSE

1    Judge.

2         THE COURT:  I am listening.  I am going to

3    pull the case after you give me the site.

4         MR. TURCHI:  People v. Hill —— you don't

5    have LEXUS, correct?

6         THE COURT:  Don't you have ——

7         MR. TURCHI:  I have LEXUS, if you bear

8    with me.

9         THE COURT:  Are you going to print it out

10   for me?  I am just trying to figure out, you

11   know.

12        MR. TURCHI:  If you give me access.

13        THE COURT:  I can't do that, so if you

14   want to hand me the cases.

15        MR. TURCHI:  I can email them.

16        *              *              *.

17        (People's Exhibit 3A, 3B, 3C, 3D, 3E, 3F,

18   3G, 3H; Received into evidence.)

19        (Continued on next page by Erin Gray.)

20

21

22

23

24

25

PROCEEDINGS                                    70

1    (Continued from previous page.)

2                MR. TURCHI:  Judge, I'm going to e-mail this to the

3    Prosecution as well as to you or the part?

4                THE COURT:  You can e-mail me.

5                MR. TURCHI:  LWARD.

6                THE COURT:  Yeah, @NYCOURTS.

7                In the meantime, you can take Mr. Greathouse.

8                Let me read these and you can step into the

9    audience, okay.

10               Have we heard anything with regard to the offer?

11               MS. MOVIUS:  I'll conference with my supervisor

12   briefly.

13               (Whereupon, there's a brief pause in the

14   proceedings.)

15               THE CLERK: Recalling indictment 75963 of 2023, Leon

16   Greathouse and Lucristia Johnson.

17               THE COURT:  All the parties are present.

18               So, we broke so I could read the cases that you

19   claim support a line of questioning that you can ask about

20   this particular officer's, for lack of a better term, animus

21   towards your client.

22               MR. TURCHI:  Yes.

23               THE COURT:  I read the cases.  I'm trying figure

24   out what I missed.  I don't see that supporting conclusion.

25               MR. TURCHI:  Judge, I'm going to make an offer of

Erin E. Gray, RPR

PROCEEDINGS                                                71

1      proof.

2              THE COURT:  It's not the offer of proof.  What

3      gives you the right to do this?

4              I read the cases and I don't see ---

5              MR. TURCHI:  Bias is always an issue, Judge.  The

6      cases deal with improper conduct by the parole officers.

7      Any kind of animus towards my client is absolutely relevant

8      to their motivation, to their credibility.

9              I believe I can establish these officers were, you

10     know, had this animus against Mr. Greathouse based on a

11     prior successful lawsuit that he against of the City of New

12     York that they were aware of.  He made them aware of it.

13     Based on the fact he made grievances against these officers,

14     including this witness, that they were not permitting him to

15     downgrade of his parole status.  I have evidence that he

16     hired his own attorneys ---

17             THE COURT:  So, where does --- point me in the

18     decisions that you handed up where the biased comes in.

19     Because I read these.  These were general decisions about

20     the breadth of a parole search and unless I missed it,

21     that's fine, I like to learn all the time, I like to learn,

22     so, you show me where in the decisions ---

23             MR. TURCHI:  All right.  Both Turner and Sampson

24     U.S. District Court and U.S. Supreme Court respectively have

25     specifically held that parole officers cannot conduct a

PROCEEDINGS                                72

1       search for arbitrary, capricious or harassing reasons.

2       Those quotes are specifically from those --

3                  THE COURT:  Okay.

4                  MR. TURCHI:  -- cases.

5                  THE COURT:  You haven't laid, so far, I'll let you

6       go into the reasons for the search, but I'm not going to let

7       you go into their attitude towards him unless that comes

8       out.  Because if she gives you valid reasons for the search,

9       which she already has, quite frankly, that it was arbitrary

10      from supervisors, that's sufficient to go forward.  But I'll

11      give you some latitude.

12                  But let me hear from the People.

13                  MS. MOVIUS:  Yes, your Honor.  We would also object

14      to it.  This witness in particular clearly testified on

15      direct that she had no say in the fact that Mr. Greathouse's

16      residence was searched that day.  I don't believe that any

17      of the line of questioning that the Defense seems to be

18      wanting to ask here would be relevant to her testimony.

19                  And I'll also point out that I don't believe that

20      any of the these cases that the Defense pointed out to the

21      Court actually have any facts that deal where parole

22      officers might have been biased.  Most of them that I read

23      indicated that there was some possible improper law

24      enforcement interaction with parole officers, but there was

25      nothing in the case law themselves that suggest anything

1    more specific than this one principle that's articulated

2    here.

3            THE COURT:  Okay.  I'm going to give you a little

4    latitude here, but not very much because I really agree with

5    the People on this one that this is beyond the scope.  But

6    if you could lay A foundation that this particular witness

7    decided to do this search on your client, that's fine.

8            But let's get the witness back in here, please.

9            I'm going to hand this back to the Defense.

10           MR. TURCHI:  Judge, I ask that the memo be part ---

11   be made part of the record, please.

12           THE COURT:  I didn't read it.

13           MR. TURCHI:  Well ---

14           THE COURT:  Have you submitted it to anybody?

15           MR. TURCHI:  I served it to the People and I

16   submitted it to you just now before the --

17           THE COURT:  I didn't know that you were submitting

18   it as a memo for me.

19           MR. TURCHI:  I always submits these things, Judge.

20   And you told me to give you the specific cases which I also

21   did.

22           THE COURT:  I asked for the specific cases.  I

23   didn't ask for the memo.  You want the memo?

24           MR. TURCHI:  The memo is going to be -- is going to

25   be --- it references the cases I gave you, but it's broader

1    than that and goes to the overall argument.  I can submit it

2    later or we're probably going to ask for time to submit a

3    more formal memo.

4            THE COURT:  Why don't you do it at that time.

5            Let's bring the witness in.

6            THE COURT OFFICER:  Witness entering.

7            (Whereupon, the witness enters the courtroom at

8    this time.)

9            THE COURT:  Ms. Myers Washington, as you're walking

10   up I remind you you're still under oath.

11           THE COURT: Mr. Turchi.

12   CONTINUED CROSS-EXAMINATION

13   BY MR. TURCHI:

14       Q    While you were supervising Mr. Greathouse he was

15   attempting to downgrade his parole status, correct?

16           MS. MOVIUS:  Objection.

17           THE COURT:  Sustained.

18       Q    During the time you supervised Mr. Greathouse, he

19   commenced a grievance against you?

20           MS. MOVIUS:  Objection.

21           THE COURT:  Sustained.  You haven't laid a basis

22   yet as to why you can get into this and the basis would be

23   her involvement in the decision.

24       Q    You previously conducted home visits of Mr. Greathouse?

25       A    Yes.

                        **Erin E. Gray, RPR**

1       Q       Okay.  And at one point you've been to his prior

2    residences --

3                       MS. MOVIUS:  Objection.

4       Q       -- as well, correct?

5                       THE COURT:  Let me hear the whole question, okay.

6    I didn't hear the question.

7       Q       Okay.  The question was, you had conducted home visits

8    of Mr. Greathouse on prior -- when he lived at other addresses,

9    correct?

10      A       Yes.

11      Q       And his residence before the current residence involved

12   a Paul Hill as a landlord?

13                      MS. MOVIUS:  Objection.

14                      THE COURT:  Sustained.  This is just to this

15   search.

16                      MR. TURCHI:  Again, I submit it goes to an overall

17   pattern, but i acknowledge the Court's ruling.

18                      THE COURT:  You need to set a basis.

19      Q       Did you ever communicate with Officer Vega or Officer

20   Staff about why they requested this search on November 29th of

21   Mr. Greathouse?

22      A       No.

23                      MR. TURCHI:  I have nothing further.

24                      THE COURT:  Any cross?

25                      MR. SIMMONS:  Yeah, Judge, few questions, please.

1    CROSS-EXAMINATION

2    BY MR. SIMMONS.

3        Q    You had testified that this was not the first community

4    supervised visit that you had done that day, correct?

5        A    Correct.

6        A    Yes.

7        Q    Okay.  And that was November 29th of 23.  How many

8    visits had you partake -- had you accomplished before you came

9    to 20 West 115th Street?

10                   MS. MOVIUS:  Objection, asked and answered, your

11       Honor.

12                   THE COURT:  On direct.  Not on his cross.

13       Overruled.

14                   How many searches?

15                   THE WITNESS:  Around three, maybe four.

16       Q    You testified that the decision or order to go to 20

17   West 115th Street came not from you directly but from

18   supervisors, correct?

19       A    Correct, yes.

20       Q    Had you had specific information that there were any

21   people who were residing in the apartment at 20 West 115th

22   Street?

23       A    Can you repeat that?

24       Q    All right, I'll rephrase it specifically as to my

25   client.

1          Ms. Johnson, had you obtained any information that my

2    client, Ms. Johnson, was residing in the apartment with Mr.

3    Greathouse at 20 West 115th Street?

4          A    No.

5          Q    Did you have any information or knowledge of any

6    interaction between my client and Mr. Greathouse?

7          A    When.

8          Q    At any time?

9          A    No.

10         Q    Did you know if my client, Ms. Johnson, did you know if

11   she even existed before November 29, 2023?

12         A    No.

13         Q    She just happened to be in the apartment when you got

14   there, correct?

15         A    Yes.

16         Q    You testified about the waist pack that was recovered

17   and that you observed it after it had been removed from the

18   duffle bag, correct?

19         A    Yes.

20         Q    Do you know or did you see that waist pack any place in

21   that bedroom before it was shown to you?

22         A    No.

23         Q    You had no knowledge that that waist pack had any

24   connection with my client, correct?

25         A    No.

1     Q     Salinas is a detective or a police officer?

2     A     He's an officer.

3     Q     Police Officer Salinas.  You said that he came to the

4  apartment twice that day, correct?

5     A     No, I did not.

6     Q     How many times did he come to the apartment?

7     A     Once.

8     Q     And that was after he obtained a search warrant?

9     A     After he, um, repeat that.

10    Q     Was that after he obtained a search warrant?

11    A     No, not to my knowledge.  He was -- he came to the

12  apartment when we called him.

13    Q     Were you in possession of a search warrant when you

14  went to the apartment?

15    A     No, I was not.

16    Q     Did you ever see Salinas in possession of a search

17  warrant?

18    A     No, I did not.

19    Q     So, he came to the apartment after you notified NYPD

20  that a firearm had been recovered in the apartment, correct?

21    A     Yes.

22    Q     You never saw that firearm in possession of my client

23  at any time, did you?

24    A     No, I did not.

25    Q     And you testified that you personally observed that

1    firearm in the bedroom, correct?

2        A    Yes.

3        Q    And you saw it in a duffle bag, right?

4        A    Yes.

5        Q    You know what kind of gun it was?

6             THE COURT:   I'm sorry?

7        Q    Do you know what kind of gun it was?

8        A    No, sir.

9        Q    Do you yourself carry a firearm when you're on duty?

10       A    Yes, I do, sir.

11       Q    And you are familiar with what a firearm looks like,

12   correct?

13       A    Yes.

14       Q    Was this firearm loaded when you saw it?

15       A    I did not examine the firearm, sir, no, I don't know.

16       Q    I'm sorry.  What was the answer?

17       A    I did not examine.  I don't know.

18       Q    Well, you looked at the photographs and you testified

19   that that was the firearm recovered, but you cannot testify

20   whether the firearm was loaded, correct?

21       A    Correct.

22       Q    And you testified that in that photograph as well there

23   were two loaded magazines, correct?

24       A    Yes.

25       Q    And a box of ammunition?

1    A    Yes.

2    Q    Was that 9 millimeter ammunition, if you know?

3    A    I'm not sure, sir.

4    Q    Did you participate in any way in the apprehension of

5  my client, Ms. Johnson?

6    A    I was there, sir.

7    Q    I'm sorry?

8    A    I was at the home.

9    Q    Did you prepare any documentation or paperwork with

10  regards to the apprehension of my client?

11    A    No, I did not.

12    Q    Did you observe her being handcuffed?

13    A    No, I did not.

14    Q    Did you observe her in the bedroom?

15    A    Yes.

16    Q    Did you enter the bedroom, as well?

17    A    Yes, I did.

18    Q    And who were you with?

19    A    PO Chambers, PO Campbell, myself, and PO Flores (ph).

20    Q    Were you given entry into the bedroom by Mr. Greathouse

21  or did you walk into the bedroom yourself?

22    A    We escorted Mr. Greathouse into the bedroom.

23    Q    Where was the first time you saw him in the apartment?

24    A    When he came out of the bedroom.

25    Q    So, after you entered the apartment Mr. Greathouse

1    exited the bedroom and you walked into the bedroom with him,

2    correct?

3        A    Mr. Greathouse was notified we was there, knocked on

4    the door, he came out.  And we told him what we were there for

5    then we escorted him back into the bedroom.

6        Q    Do you recall a person by the name of James Burts in

7    the apartment?

8        A    Yes.

9        Q    And was he the person who told you that he was the

10   lease holder in the apartment, if you know?

11       A    He told us that Mr. Greathouse was there.

12       Q    He told you that he was there?

13       A    Yes.

14       Q    Did you have a conversation with Mr. Burts in the

15   apartment?

16       A    I cannot recall, sir.

17       Q    Did you meet with Mr. Burts outside of the building and

18   call up to the apartment with him?

19       A    No.

20       Q    But Mr. Burts was present in the apartment when you

21   were there, correct?

22       A    He let me in, sir.

23       Q    He opened the door and let you in, okay.

24            After he let you in, you then saw Mr. Greathouse exit

25   the bedroom, right?

CROSS-MYERS WASHINGTON-DEFENSE/SIMMONS                82

1      A      Yes.

2      Q      And you didn't see my client until you again entered

3   the bedroom, correct?

4      A      Yes.

5      Q      Where was she in the bedroom when you saw her?

6      A      She was in the bed putting on clothing.

7      Q      She was in the bed, I'm sorry?

8      A      She was in the bed, putting on clothing.

9      Q      But she was not putting on the waist pack, was she?

10     A      No.

11     Q      Or putting the firearm in a duffle bag, was she?

12     A      No.

13     Q      And you recovered drugs in the bedroom, but you never

14   recovered any drugs in the possession of my client, correct?

15     A      Correct.

16     Q      Did you have conversations with my client in the

17   bedroom?

18     A      She was just asked to leave the bedroom.

19     Q      If you know, when was she placed under arrest?

20     A      I do not know, sir.

21     Q      Did you ever observe her in handcuffs?

22     A      No.

23     Q      And lastly, again, you were not a participant in any

24   discussions with supervisors or anybody else about whether you

25   should target or go to Mr. Greathouse's apartment that day,

1    correct?

2        A    Correct.

3        Q    It was just part of your duties to do community

4    searches that you went to that apartment?

5        A    Correct.

6        Q    You testified a few minutes ago that you had some

7    indication that there may be some danger with going to that

8    apartment, correct?

9                MR. TURCHI:  Objection.  Wasn't the testimony.

10               THE COURT:  She can answer the question.

11                Overruled.

12               MR. SIMMONS:  I'll rephrase.

13       Q    Did you go to that apartment with any New York City

14   police officers?

15       A    No.

16       Q    And you had visited Mr. Greathouse on previous

17   occasions, correct?

18       A    Yes.

19               MR. SIMMONS:  Thank you, Judge.

20               THE COURT:  You don't have any re-direct, do you?

21               MS. MOVIUS:  Very, very briefly.

22               THE COURT:  Go ahead.

23   RE-DIRECT EXAMINATION

24   BY MS. MOVIUS:

25       Q    So, earlier on cross with Mr. Turchi you talked about

1   who saw the gun and when you saw the gun versus when Officer
2   Chambers recovered it.
3           So, just so I'm clear on the timeline, how long into
4   the search again did you find the narcotics?
5       A   Between like approximately like five, ten seconds when
6   we started.
7       Q   When did you hear Officer Chambers say, "water", with
8   respect to when you found the narcotics?
9       A   About couple seconds.
10      Q   And that was before or after you found the narcotics?
11      A   After I found the narcotics.
12      Q   After she said, "water", how long did it take you to
13  turn and see what she was doing?
14      A   Like that.
15          MS. MONOVIUS:   Let the record reflect the witness
16      snapped her fingers.
17      A   I mean real fast.  I'm sorry.
18          THE COURT:  That's okay.
19      Q   And so, what did you see when you turned to look at
20  her?
21      A   The bag, pointing, what's in, picked up, looked.
22      Q   What was the purpose of having Mr. Greathouse in the
23  room when you did the safety search?
24      A   So he can see everything that is being done so nothing
25  can say that we did anything wrong.

1          MS. MOVIUS:  No further questions.

2          THE COURT:  Any re-cross?

3          Okay.  Step down.  Thank you very much.

4          (Whereupon, the witness exits the courtroom at this

5    time.)

6          THE COURT:  Call your next witness, please.

7          MS. MOVIUS:  Yes, your Honor.  The People call

8    Police Officer Ricardo Salinas.

9          MS. MOVIUS:  Your Honor, I believe People's 3 A

10   through H has to still be marked.

11         THE COURT:  Yeah, she can do it when you're done.

12         It's actually the other court reporter.

13         MS. MOVIUS:  Okay.

14         THE COURT OFFICER:  Witness entering.

15         (Whereupon, the witness enters the courtroom at

16   this time.)

17         R I C A R D O          S A L I N A S, a

18   witness called by and on behalf of the People, having been

19   first duly sworn, was examined and testified as follows:

20         THE COURT OFFICER:  Remain standing, left hand on

21   the bible, raise your right hand, face the clerk.

22         THE CLERK:  Do you solemnly swear or affirm that

23   the testimony you're about to give before this Court shall

24   be the truth, the whole truth, and nothing but the truth; do

25   you so swear or affirm?

1          THE WITNESS:  I do.

2          THE CLERK:  Thank you.  Be seated.

3          THE COURT OFFICER:  Bring the chair forward.  In a

4    loud and clear voice, state your full name with the spelling

5    of your last name.

6          THE WITNESS:  Sure.  My name Ricardo Salinas,

7    spelling is S-A-L-I-N-A-S.

8          THE COURT OFFICER:  Shield number, present command.

9          THE WITNESS:  Shield number is 2981 and I'm

10   assigned to Intel.

11         THE COURT:  Officer, I'm going to ask you to keep

12   your voice up.  Please wait till the questioner finishes his

13   or her questions before you respond so you're not talking

14   over one another and we have a clean record.

15         If you don't understand a question, just ask to

16   have it rephrased and if you need to take a break just ask,

17   okay.

18         THE WITNESS:  Thank you.

19         THE COURT:  Thank you.

20         You may proceed.

21         MS. MOVIUS:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MS. MOVIUS:

24   Q    Good afternoon, Officer Salinas.

25   A    Good afternoon.

1      Q      How long have you been with Intelligence?

2      A      I guess I got assigned to intel last year of May, but I

3   was working at PSA 6 as a Field Intelligence Officer for like

4   two, two and a half years now.

5      Q      And what's the total amount of time that you've been a

6   police officer for?

7      A      Approximately six years.

8      Q      Before you were with PSA 6 Intel, where were you?

9      A      At PSA 6.

10     Q      So you were there until you moved to the Intelligence

11  Section itself?

12     A      Correct.

13     Q      Can you describe what some of your duties as a Field

14  Intelligence Officer with PSA 6 were?

15     A      We compile, analyze and disseminate important

16  information.  We work in conjunction with precincts, detective

17  squads, we help in the execution of search warrants.  We work

18  with Parole and Probation.

19     Q      During your career as a police officer, approximately

20  how many arrests would you say you've made?

21     A      Approximately 70.

22     Q      And approximately how many have you assisted in?

23     A      Well over a hundred.

24     Q      How many of those involve firearms?

25     A      Approximately 10 to 15.

                          Erin E. Gray, RPR

1      Q      Back in November of 2023, what command were you

2  stationed with?

3      A      PSA 6.

4      Q      And on November 29th of 2023, specifically, do you

5  recall if you were working that day?

6      A      Yes.

7      Q      What was your assignment that day?

8      A      Field Intelligence Officer.

9      Q      And what time did you start your tour?

10     A      I started my tour I believe approximately five in the

11 morning.

12     Q      Can you take us through how your day began?

13     A      Yeah.  I started my tour at PSA 6.  Soon thereafter we

14 had a scheduled visit with Parole for an individual in Grant

15 Houses.

16     Q      And so what occurred with this scheduled visit?

17     A      We met at the location and the visit was conducted.

18     Q      And after the visit, what did you do?

19     A      I continued my duty.

20     Q      Did you continue with the parole team?

21     A      No.

22     Q      Why not?

23     A      I was performing my duties as a Field Intelligence

24 Officer.  That was the only scheduled visit that we had at the

25 time.

1      Q      And so after you left the visit at the Grant Houses,

2  where did you go?

3      A      I was still around the vicinity of Grant Houses.

4      Q      And about what time did that home visit end?

5      A      I would say about 9:00 a.m.

6      Q      So directing your attention to about an hour later,

7  about 10:00 a.m., what, if anything, occurred at that time on

8  November 29th of 2023?

9      A      I responded to the location of 20 West 115th Street,

10  apartment 2 boy.

11      Q      And is that location in Manhattan?

12      A      Yes.

13      Q      Why did you respond that location?

14      A      I received a call from one of the parole officers

15  saying that they needed assistance, they had recovered a firearm

16  during a parole visit.

17      Q      Once you got that call, did you yourself respond to the

18  location?

19      A      Yes.

20      Q      Can you take us through what happened once you got

21  there?

22      A      Once I got there I entered the building through the

23  front door entrance.  I utilized the staircase and I took it to

24  the second floor.  I made a right when I exit that staircase and

25  I was greeted by other NYPD officers on scene and parole

1   officers on scene.

2       Q    What command were those other police officers who were

3   there?

4       A    PSA 5.

5       Q    And you said you're from PSA 6, correct?

6       A    Correct.

7       Q    Were why PSA 5 officers there?

8       A    That was like their jurisdiction.  Those are the

9   developments that they cover.

10      Q    And why were you there being from PSA 6?

11      A    Like I said, I received a call from the parole

12  officers.  We were working together earlier that morning.  I am

13  NYPD police officer and I have jurisdiction throughout the whole

14  city.

15      Q    So, you responded, you observed the parole officers and

16  other officers there, what did you do once you got to the

17  apartment and made those observations?

18      A    Um, once I entered the apartment I made the

19  observations.  Soon thereafter the individual Leon Greathouse he

20  was already handcuffed.  He was sitting in a chair.  The parole

21  officers advised me as to where the evidence that they recovered

22  was found.  Mr. Greathouse was taken back to PSA 6 -- sorry PSA

23  5.  And the firearm that was recovered was also taken back to

24  PSA 5.

25      Q    Were you the arresting officer for Mr. Greathouse?

1   A    Yes.

2   Q    Would you recognize him if you saw him today?

3   A    Yes.

4   Q    Please take a look around the room and if you see Mr.

5   Greathouse point him out and identify an article of clothing

6   this he is wearing?

7   A    Sure.  He's sitting in this table right here, he's

8   wearing the tan sweater.

9        THE COURT:  Let the record reflect the witness has

10       identified the defendant Greathouse.

11   Q    Now, ultimately there was a female who was arrested in

12   connection with this incident as well, correct?

13   A    Correct.

14   Q    What was the name of that individual?

15   A    Her name was Lucristia Johnson.

16   Q    And would you recognize Ms. Johnson if you were to see

17   her today as well?

18   A    Yes.

19   Q    Again, please take a look around the room and if you

20   see Ms. Johnson, point her out and identify an article of

21   clothing she's wearing?

22   A    I do not see her.

23       THE COURT:  You don't see her?

24       THE WITNESS:  No.

25       THE COURT:  Okay.

Erin E. Gray, RPR

1           THE WITNESS:  Oh, I do.  I recognize her.

2     Q    Okay.  Can you point her out?

3     A    Yes, she's sitting at this table here.  She's got short

4 hair and black and tan shirt.

5           THE COURT:  Let the record reflect the witness has

6     identified the defendant Johnson.

7     Q    Was there a certain point when you proceeded to the

8 room where Mr. Greathouse was sitting in the apartment?

9     A    Can you repeat that?  I'm sorry.

10     Q    Did you go to the room in the apartment at 20

11 West 115th Street where you observed Mr. Greathouse sitting?

12     A    Yes.

13     Q    And can you describe for us what you saw inside that

14 room?

15     A    When I entered there was, like I said, Mr. Greathouse

16 was handcuffed sitting on a chair.  There was a mattress, there

17 was dressers, there was clothing, sneakers.

18     Q    Did you observe any contraband inside of the room?

19     A    Yes.

20     Q    What sort of items did you observe?

21     A    I observed crack, alleged crack cocaine.

22     Q    Where did you observe that?

23     A    In the drawer and the mattress.

24     Q    Are there any other items you observed that you recall

25 at this point in time?

1       A     There was a bag on the mattress that contained money

2   and also contained a wallet that belonged to Lucristia Johnson.

3       Q     Was your body-worn camera on when you responded to the

4   location?

5       A     Yes.

6       Q     So, I'm handing up what's already in evidence as

7   People's 8.

8                    (Handed to the witness.)

9       Q     Do you recognize that USB?

10      A     Yes.

11      Q     How do you recognize it?

12      A     My initials.

13      Q     Did you view what's on that USB before testifying

14  today?

15      A     Yes.

16      Q     And is that in fact your body-worn camera from when you

17  responded to the location in the morning of November 29, 2023?

18      A     Yes.

19      Q     And by location specifically Mr. Greathouse' apartment

20  at 20 West 115th Street, apartment 2 boy?

21      A     Correct.

22      Q     So, I'm not going to re-publish that, but you've

23  watched the contents of that video, correct?

24      A     Yes.

25      Q     That video is lengthy.  What happened when you were on

1    scene after you arrived?  Summarize for us the rest of your

2    interactions, please?

3        A    Yes.  So I got there, I was greeted by the parole

4    officers and other NYPD officers on scene.  We, me and the

5    parole officers, spoke about the circumstance, um, where the

6    evidence was recovered, what was recovered.  Soon thereafter,

7    like I said, Mr. Greathouse was taken back to PSA 5.

8             I contacted my supervisor, let him know all the details

9    that I had at the time.  Soon thereafter I learned I was going

10   to be the arresting officer.  I left the location.  There was

11   two officers that I left there, Officer Sharma and Officer

12   Winston.  Ms. Lucristia Johnson was placed in the living room

13   along with another individual.  His name was James Burts.  There

14   were -- they had no access to any other bedroom.  The only

15   access that they had was to stay in the living room.  And I

16   instructed the officers that they did not have access to go

17   anywhere else until pending further investigation.

18       Q    And what was the purpose of keeping Ms. Johnson and

19   then the other individual in the living room space?

20       A    My goal was to obtain a search warrant for the whole

21   entire apartment.

22       Q    And did officers safeguard the apartment as well?

23       A    Yes.

24       Q    And are those the officers you just mentioned?

25       A    Correct.

DIRECT-SALINAS-PEOPLE                    95

1    Q    Can you give us their names again?

2    A    Officer Sharma and officer Winston.

3    Q    Later in the day, on November 29th of 2023, did you

4    obtain a search warrant signed by a judge authorizing you to

5    search the bedroom and common areas of 20 West 115th Street

6    apartment 2 boy?

7              THE COURT:   Did you say bedrooms?

8              MS. MOVIUS:   Mr. Greathouse's bedroom.

9              THE COURT:   One bedroom?

10             MS. MOVIUS:   One bedroom.

11   A    Yes.

12   Q    And at about 8:30 p.m. that night did you participate

13   in the execution of that warrant?

14   A    Yes.

15   Q    Between the time you left the apartment and returned

16   with the warrant, was anyone permitted to access the bedroom

17   where the narcotics and firearm were initially observed?

18             MR. SIMMONS:   Objection.  To the form of the

19   question.

20             THE COURT:   If he knows.

21   Q    If you know?

22   A    No.

23             THE COURT:   No, you don't know or --

24             THE WITNESS:   No as to, sorry, no as to no one was

25   able to access the bedroom.

Erin E. Gray, RPR

1  Q Did you record the fruits of the items that you

2 recovered during your search warrant?

3  A Yes.

4  Q In fact, did you take photographs of those items?

5  A Yes.

6   MS. MOVIUS: So, I'm showing Defense Counsel and

7 then we'll pass to the witness what has been premarked for

8 identification as People's Exhibits A through --- 9 A

9 through 9 M as in Mary.

10   (Handed to the witness.)

11  Q So, take a look through those photographs.  Do you

12 recognize what's been premarked as People's Exhibit 9 A

13 through 9 M?

14  A Yes, I do.

15  Q What do you recognize these photographs to be?

16  A This is evidence that was collected.

17  Q Collected when?

18  A During the -- on that day of November 29, 2023.

19  Q And collected in reference to what?

20  A The search warrant.

21  Q And do those photographs fairly and accurately depict

22 the way the evidence collected from the search warrant appeared

23 at the time it was processed inside of the precinct on

24 November 29th of 2023?

25  A Yes.

1              MS. MOVIUS:  I will now offer Exhibits 9 A through

2    9 M into evidence.

3              MR. TURCHI:  Voir dire?

4              THE COURT:  Okay.

5              MR. TURCHI:  Thank you.

6    VOIR DIRE

7    BY MR. TURCHI:

8         Q    Officer, did you take these photographs?

9         A    Yes.

10        Q    These photographs were taken at the precinct; is that

11   correct?

12        A    Yes.

13        Q    They were not taken at the scene?

14        A    No.

15        Q    Okay.  And not all of this evidence was recovered that

16   evening, correct?

17        A    All this evidence, the firearm had already been

18   recovered, okay.

19        Q    Everything else was recovered after the search warrant?

20        A    Correct.

21             MR. TURCHI:  No objection, Judge.

22             MR. SIMMONS: No objection.

23             THE COURT:  So, People's Exhibits 9 A through M are

24   in evidence.  I'm.

25             Going to ask to you mark these, because there's so

1    many, later.

2              MS. MOVIUS:   Permission to publish, your Honor?

3              THE COURT:   Yes.

4    Q    So let's start with 9 A.  Can you describe what we're

5    looking at here, what's depicted in this photo?

6              (Displayed.)

7    A    Yeah, to the right it's going to be the narcotics.  In

8    the middle section you see a box of ammunition.  You have three

9    black magazines with another fair amount of live cartridges.

10   You see the firearm.  And to the left you see U.S. currency.

11   Q    Nine B.

12             (Displayed.)

13   A    This is firearm and the magazine.

14   Q    Nine C.

15             (Displayed.)

16   A    This is two black magazines and live cartridge.

17   Q    And publishing 9 D, what is this?

18             (Displayed.)

19   A    This is speed loader.

20   Q    And what's a speed loader?

21   A    Speed loader is like it's a firearm accessory that's

22   used to speed up the process in reloading a firearm.

23   Q    Publishing 9 E.

24             (Displayed.)

25   A    This is a box of ammunition.

1    Q    Nine F?

2         (Displayed.)

3    A    It's a little blurry on my screen.

4    Q    One moment.  Taking a second.

5         MS. MOVIUS:  Court's indulgence.

6         THE COURT:  You can do it the old fashioned way.

7    You can hand it to him.

8         MS. MOVIUS:  Looks like it's back up.

9    Q    I'm just going to hand you the rest of them, 9 F

10   through 9 M.  And if you could just go through these photographs

11   and tell us what's in them and show them to the Court and the

12   defendants.

13        (Handed to the witness.)

14        THE COURT:  Hold them up.

15   A    This is Exhibit 9 F, this is U.S. currency.

16        This is Exhibit 9 G, alleged narcotics.

17        This is Exhibit 9 H, alleged narcotics.

18        This is Exhibit 9 I, drug packaging.

19        This is a small bag that contains the wallet and the

20   U.S. currency.

21   Q    And what number was that?

22   A    Sorry, that was Exhibit 9 J.

23   Q    Thank you.

24   A    You're welcome.

25        This is Exhibit 9 K.  It's the same bag.

1          This is Exhibit 9 L, it's a receipt and the name of the

2     invoice is Leon Greathouse.

3          And Exhibit 9 M shows a NYCHA resident lease agreement.

4               THE COURT:  Sorry, Exhibit M shows what?

5               THE WITNESS:  A NYCHA resident lease agreement.

6               THE COURT:  In whose name?

7               THE WITNESS:  There's two names on it.  There's

8     James Burts and Leon Greathouse, Jr.

9          Q    Is there an apartment listed on that?

10         A    Yes, apartment location listed 20 West 115th Street

11    apartment 2B, as in boy.

12              MS. MOVIUS:  I can take those photos back.  Thank

13    you.

14         Q    During Mr. Greathouse's arrest did you take his

15    pedigree information or was his pedigree information taken?

16         A    Yes, it was

17         Q    Did Mr. Greathouse give an address?

18         A    Yes.

19         Q    What address did he give?

20         A    20 West 115th Street, apartment 2 boy.

21         Q    And did he give a date of birth?

22         A    Yes.

23         Q    And did he also give a NYSID or did you find -- did you

24    identify Mr. Greathouse's NYSID number?

25         A    Yes.

1    Q    How did you do that?

2    A    When I entered his information for computer checks.

3    Q    Do you recall either Mr. Greathouse's date of birth or

4    NYSID?

5    A    I do not.

6    Q    Would reviewing Mr. Greathouse's rap sheet refresh your

7    memory?

8    A    Yes.

9         THE COURT:  So you're going to look at it see if it

10    refreshes your recollection.  You're not going to read from

11    it.  If it doesn't refresh your recollection then it just

12    doesn't.

13         THE WITNESS:  Okay.

14         (Handed to the witness. )

15    Q    Whenever you're done you can look at me.

16    A    Okay.

17    Q    Does that refresh your memory as to what Mr.

18    Greathouse's date of birth is?

19    A    Yes.

20    Q    What is his date of birth?

21    A    May 30, 1980.

22    Q    And how about his NYSID?

23    A    NYSID I won't be able to recall.

24    Q    Okay.  That's no problem.  I can take the documents

25    back.

1          MS. MOVIUS:  I have no further questions for

2    Officer Salinas, thank you.

3          THE COURT:  Any cross?

4          MR. TURCHI:  Yes.

5          THE COURT:  Just so we all know, we're going to

6    break at 5 of 1 and then we're going to resume at 2:15,

7    okay.

8          MS. MOVIUS:  Thank you.

9          THE COURT:  Go ahead.

10   CROSS-EXAMINATION

11   MR. TURCHI:

12         MR. TURCHI:  Good afternoon Officer Salinas, my

13   name is David Turchi.  I represent Mr. Greathouse.

14         A few instructions.  Please keep your voice up at

15   all times.  And second, if you don't understand a question,

16   please tell me and I will rephrase.  Do you understand?

17         THE WITNESS:  Yes.

18   Q     Okay.  On November 29, 2023, had you interacted with

19   this group of parole officers before they called you to Mr.

20   Greathouse?

21   A     Yes.

22   Q     Okay.  And when did you first interact with them on

23   that day?

24   A     I would say around 8:45 in the morning.

25   Q     And what was that for?

1          A      It was for a visit of another parolee.

2          Q      Okay.  And how many other parolees did you visit with

3     these parole officers prior to being called to Mr. Greathouse's

4     apartment?

5          A      Just one.

6          Q      Okay.  And were all these addresses and parolees at the

7     Grant Houses?

8          A      Just one of them.

9          Q      Okay.  Was that the one you accompanied the officer,

10    the parole officers to?

11         A      The first one, yes, in Grant Houses.

12         Q      There came a time where you left those parole officers

13    but before they called you to Mr. Greathouse's apartment?

14         A      Correct.

15         Q      And about when were you -- when did you leave them?

16         A      The parole visit at Grant Houses ended at approximately

17    9 in the morning.  Soon thereafter they left and I stayed in the

18    vicinity of Grant Houses.

19         Q      Is there any reason that you remained?

20         A      No.  That, like I said before, that was the only

21    scheduled visit that we had with them at the time.

22         Q      Who was the parole officer that contacted you directly

23    to return --

24         A      I was making --

25               THE COURT:  To return?

                        Erin E. Gray, RPR

1      Q      To go to Mr. Greathouse, excuse me, I misspoke.  Who

2    was the parole officer who called you to come to Mr.

3    Greathouse's apartment?

4      A      If I remember correctly, I was in contact with two

5    people that morning.  There was Parole Officer Myers and Parole

6    Officer Chambers.

7      Q      Okay.  Now, you indicated the area of Mr. Greathouse's

8    apartment was PSA 5, right?

9      A      Correct.

10     Q      But you were PSA 6 at the time?

11     A      Correct.

12     Q      Why would you be called?

13     A      They called me they needed assistance and so I

14   responded.

15     Q      Why couldn't they just call PSA 5?

16              MS. MOVIUS:  Objection.

17              MR. TURCHI:  Well --

18              THE COURT:  Sustained as to what they would have

19      done because he's not in their minds

20     Q      Does PSA 6 typically respond to PSA 5 patrol calls?

21     A      No.

22     Q      Do you know why that would have been the case here?

23     A      Well, like I said, the parole officers contacted me.

24   We were already contacted during that morning.  They needed

25   assistance.  I responded.  There was also -- they also reached

1    out to 9-1-1 and officers that's why there was PSA 5 officers on

2    scene.

3         Q    Now, the scope of the warrant was the entirety of this

4    apartment, correct?

5              MS. MOVIUS:  Objection.

6              THE COURT:  He can answer the question.  I

7         understand that it's --

8              MS. MOVIUS:  It's already been litigated in the

9         motions.

10             THE COURT:  Oh, okay.

11             MR. TURCHI:  Well, I find it's foundational, Judge.

12        I want to know where he looked, what he got, when.  I think

13        it's a fair question.

14        Q    The scope of the search warrant was for the entirety of

15   this apartment, correct?

16        A    Not the whole apartment.

17        Q    Okay.  It was the room that you were told Mr.

18   Greathouse was in and the common areas?

19        A    Correct.

20        Q    Anything else?

21        A    No.

22        Q    Okay.  What what did the common areas include?

23        A    That's the bathroom, the kitchen, the living room,

24   closets.

25        Q    Did you recover anything from any of these other areas,

1    any of the common areas?

2         A    I believe it was like a cellphone.

3         Q    Okay.  Whose cellphone?

4         A    That was for investigation.

5         Q    Do you know who the cellphone belonged to?

6         A    I do not.

7         Q    All right.  In Mr. Greathouse's room did you recover a

8    USB chip?

9         A    I recovered a couple of electronics, yes.

10        Q    Okay.  Were those marked safekeeping or were they

11   marked as evidence?

12        A    I do not recall that.

13        Q    I believe you indicated Mr. Greathouse --- withdrawn.

14             About what time did you get the call from parole?

15        A    I would say around 9:35 in the morning.

16        Q    All right.

17             THE COURT:  To return?

18        Q    Again, withdrawn.  Let me rephrase.

19             When did you get the call to go to Mr. Greathouse's

20   apartment?

21        A    I would say approximately 9:35 in the morning.

22             MR. TURCHI:  Okay, thank you, your Honor.

23        Q    And you reviewed your body-cam footage before your

24   testimony today?

25        A    Yes.

1.      Q      Did you happen to also review Exhibit 11, which is the

2    body camera footage of Officer Marques?

3       A      No.

4       Q      Okay.  Looking at your body-cam, when you look at it on

5    the top right there's a timestamp, correct?

6       A      Yes.

7       Q      And that timestamp is accurate?

8       A      Correct.

9       Q      Okay.  And all body-cams have this timestamp on the top

10   right, correct?

11      A      To my knowledge, yes.

12      Q      Okay.  Very good.  Just a moment.

13             (Conferring).

14      Q      The cellphone that you recovered, did you go into it at

15   all?

16      A      I did not.

17      Q      You vouchered the evidence in this case?

18      A      Yes.

19      Q      Was it the same day or the next day?

20      A      It was the -- it was a long process.  So, was like the

21   whole tour.

22      Q      When did you tour -- what was your tour that day?

23      A      I started at five in the morning and I went all around

24   till seven in the morning the following day.

25      Q      So, roughly 12 hours -- sorry, roughly 26 hours?

1     A    Yeah, I would say so.

2     Q    Okay. And you were not present for the parole search,

3   correct?

4     A    Which parole search?

5     Q    Sorry.  You were not present for the initial parole

6   search?

7               THE COURT:  Of which place?  He was ---

8               MR. TURCHI:  Of course.

9     Q    You were not present for the initial parole search of

10  Mr. Greathouse's apartment by the parole officers on November

11  29th, correct?

12    A    Correct, I was not.

13    Q    Who was James Burts?

14    A    Um, he was another individual that resided at that

15  apartment.

16    Q    Besides Mr. Burts, Ms. Johnson and Mr. Greathouse, was

17  anyone else present in the apartment besides you and the other

18  police officers and the parole officers?

19    A    No.

20    Q    In connection with this incident, was Mr. Burts

21  arrested?

22    A    Yes.

23    Q    All right.  And as part of that --- and that was because

24  he resided at that location?

25    A    Correct.

1    Q    All right.  And as part of the arrest, did he not give

2    a different home address when you processed him?

3                THE COURT:  Who is the he?

4                MR. TURCHI:  Sorry.

5    Q    Did Mr. Burts not give you a different home address

6    when you processed him?

7    A    Um, that I do not recall.  I wasn't the officer that

8    took the initial pedigree.

9                MR. TURCHI:  Just a moment.

10   Q    Did you take pedigree information from Mr. Greathouse?

11   A    Yes.

12   Q    Where did do that?

13   A    At PSA 6.

14   Q    Was Mr. Greathouse in handcuffs at the time?

15   A    Yes.

16   Q    Was he in a cell at the time?

17   A    No.

18   Q    And what part of PSA 6 was this interview?

19   A    In front of the desk.

20   Q    Is that captured on body-cam?

21   A    Yes, I believe so.

22   Q    What address did he — residence address did he give?

23   A    20 West 115th Street, apartment 2 boy.

24   Q    Was Officer Scalice of PSA 5 with you —

25                THE COURT:  This is — go ahead, I'm sorry, go

1    ahead.

2        Q    Are are familiar with Officer Scalice of PSA 5?

3        A    I am not.

4             (Conferring).

5        Q    How do you know Mr. Burts lived?

6             THE COURT:  I'm sorry?

7             MR. TURCHI:  Withdrawn.

8        Q    How do you know that Mr. Burts resided at that

9    apartment, 2B?

10       A    He told me so.

11       Q    Did he provide a different address to NYPD as well?

12       A    Not that I can recall.

13       Q    In applying for your search warrant you relied

14   exclusively on what the parole officers advised you, yes?

15       A    Yes, and based on when I responded and what I saw.

16       Q    Okay.

17            MR. TURCHI:  Just a moment.

18            (Conferring).

19       Q    Did you observe drug paraphernalia at apartment 2B that

20   day?

21       A    Yes.

22       Q    What kind of drug paraphernalia?

23       A    It was alleged crack cocaine and ---

24       Q    That's drugs.  I'm asking paraphernalia?

25       A    Paraphernalia.

1     Q    Yeah?

2     A    Yes.

3     Q    What kind of paraphernalia?

4     A    It was like small bottles that are usually used to

5  package narcotics.

6     Q    Where was that?

7     A    That I don't recall.

8     Q    Okay.

9          (Conferring).

10         MR. TURCHI:  Just a moment, Judge.

11    Q    When was the search warrant executed, approximately?

12    A    Approximately 2030 hours.

13         THE COURT:  What's that in my time?

14         THE WITNESS:  8:30 p.m.

15         (Conferring).

16         THE COURT:  Anything else?  Mr. Turchi, anything

17  else?

18         MR. TURCHI:  I'm just consulting with my client.

19         (Conferring).

20         MR. TURCHI:  Nothing further.

21         THE COURT: Any cross, Mr. Simmons?

22         MR. SIMMONS:  Yes, Judge.

23  CROSS-EXAMINATION

24  BY MR. SIMMONS:

25    Q    Good afternoon, Officer.  My name is Howard Simmons.

1   My client is Lucristia Johnson.  You arrested Lucristia Johnson

2   on November 29, 2023, correct?

3       A    Correct.

4       Q    You're the arresting officer in this case, correct?

5       A    Correct.

6       Q    When was the first time that you had contacted the

7   parole officers that day, was that 9:30 in the morning?

8       A    It was approximately 8:45 during the first visit.

9       Q    So, you personally visited 20 West 115th at 8:45 a.m.?

10      A    No.

11      Q    That was a different visit, I'm sorry.

12      A    Correct.

13      Q    When was the first time that you personally got to 20

14  West 115th Street?

15      A    Approximately 9:55 hours.

16      Q    P.m. in the evening, correct?

17      A    Morning.

18      Q    9:55 a.m.  And when you were in thew apartment at 20

19  West 115th, did you observe the firearm in the apartment?

20      A    The firearm, when I got there the firearm was outside

21  of the apartment door.  If you were facing the apartment door,

22  it was located to the lower left.

23      Q    You never observed the firearm within the apartment 2B,

24  correct?

25      A    No.

**Erin E. Gray, RPR**

CROSS-SALINAS-DEFENSE/SIMMONS                    113

1       Q      What about the narcotics?

2       A      The narcotics were inside of the apartment.

3       Q      When you got there?

4       A      Yes.

5       Q      And following your visit to the apartment that's when

6   you went and secured a search warrant, correct?

7       A      Repeat that, I'm sorry.

8       Q      After you visited the apartment, that first time, you

9   then got and secured a search warrant, correct?

10      A      I was safeguarding the apartment and I was trying to

11  get a search warrant, correct.

12      Q      And it took you until 8 p.m. that evening to finally

13  get back there and execute the search warrant?

14      A      Correct.

15      Q      You placed my client, Ms. Johnson, under arrest,

16  correct?

17      A      Correct.

18      Q      And did you do that at your first visit the morning or

19  that evening after you executed the search warrant?

20      A      It was later that evening.  I believe it was prior to

21  the execution of the search warrant.

22      Q      Did you ever observe my client in possession of a

23  firearm?

24      A      No, sir.

25      Q      Or in possession of any narcotics?

                    Erin E. Gray, RPR

1      A      No, sir.

2      Q      Why did you arrest her?

3      A      The reason why she was arrested it was an investigation

4  from the knowledge and speaking to the parole officers, there

5  was two individuals inside the bedroom where the firearm was

6  recovered from.   Those two individuals were one, Leon Greathouse

7  and the second was Lucristia Johnson.

8      Q      And you arrested Mr. Burts also, correct?

9      A      Correct.

10     Q      And he was the lease holder of the apartment through

11  Mr. Greathouse, correct?

12     A      I don't believe that is correct.

13     Q      Well, one of the exhibits was a NYCHA lease holder form

14  with Mr. Burts' name on it?

15     A      Correct.

16     Q      And Mr. Greathouse's name was on that lease as well,

17  correct?

18     A      Correct.

19     Q      And my client, Ms. Johnson, she was not on that lease,

20  correct?

21     A      Not on that specific lease, no.

22     Q      Did you voucher the firearm?

23     A      Yes, I did.

24     Q      Did you subsequently send it out for any investigation

25  by the police department, ballistics or anything of that nature?

1      A      Yes, it was sent to the lab for operability and

2   testing, operability and testing.

3      Q      What kind of gun was it; do you recall?

4      A      Yes, it was a black 9 millimeter Glock.

5      Q      Was it a Glock 19 or Glock 17?

6      A      I do not recall.

7      Q      You testified one of the exhibits was a speed loader,

8   correct?

9      A      Yes.

10     Q      Was that item actually used to load bullets into a

11  Glock pistol?

12     A      It's a device that -- it's a firearm accessory that's

13  used to speed up the reloading of a firearm.

14     Q      So the bullets are placed inside of that plastic device

15  and then loaded into the magazine, correct?

16              MS. MOVIUS:   Objection.

17              THE COURT:   Sustained.

18     Q      Did you place my client in handcuffs yourself?

19     A      I did not.

20     Q      Was she in handcuffs when you got to the apartment that

21  morning?

22     A      Not that I recall.

23     Q      Do you recall where she was in the apartment when you

24  got there that morning?

25     A      Yes.

1    Q    Where was that?

2    A    In the living room of the apartment.

3    Q    And that's where Burts was, correct?

4    A    Correct.

5    Q    And Mr. Greathouse he was in the bedroom handcuffed,

6  correct?

7    A    Correct.

8    Q    Did you observe the gun inside the apartment when you

9  got there that morning?

10   A    No, sir.

11   Q    Did you observe it in the apartment --- withdrawn.

12        You said that you observed the weapon outside the

13  apartment in the hallway when you got back that evening,

14  correct?

15   A    Correct.

16   Q    Did you take that gun into custody yourself?

17   A    Eventually I took custody of it.

18   Q    Where was it when you saw it was in a duffle bag?

19   A    It was in a duffle bag.

20   Q    Did you take it out of the duffle bag?

21   A    I did not.

22   Q    Did you have any involvement in engaging in the testing

23  of the operability of that firearm?

24        MS. MOVIUS:  Objection.

25        THE COURT:  Sustained.  Outside the scope of the

1        hearing.

2           Q      Had you ever had any information about Ms. Johnson

3    being involved in any criminal activity before that date?

4           A      No.

5           Q      Was that the first time that you ever met her was that

6    day?

7           A      Yes.

8           Q      Did you ask her any questions when you arrested her?

9           A      Not that I recall.

10          Q      Did you fill out any paperwork with regards to this

11   case?

12          A      Yes.

13          Q      Did you yourself get any body-cam -- withdrawn.

14                 Did you have a camera on your uniform when you were in

15   the apartment?

16          A      Yes.

17          Q      And that body-cam was disclosed to the Prosecutor?

18          A      Yes.

19          Q      Did you view that body-cam before coming in to testify

20   today?

21          A      Yes.

22          Q      Did you review your police reports before you came in

23   here today to testify?

24          A      Not all of them.

25          Q      Did you -- withdrawn.

1          Did you testify in the grand jury with regards to this

2    case?

3      A    Yes.

4      Q    Did you review your grand jury testimony today before

5    you came here to testify?

6      A    Yes.

7      Q    Did you meet with the Prosecutor to go over your

8    testimony before you came in here today?

9      A    Yes.

10     Q    How many times did you meet her in preparation for this

11   hearing, Officer?

12     A    Um, maybe four or five times.

13     Q    After you arrested my client, did you search her?

14     A    I did not search her.

15     Q    Did you recover any contraband from her personally from

16   her body?

17     A    No.

18     Q    You were responsible for the arrest procedure back at

19   the PSA 5, correct?

20     A    PSA 6, sir.

21     Q    Sorry, PSA 6.  But you said PSA 5 was there as well.

22   They got the call initially to go to the apartment, correct?

23     A    Correct.  They got the 9-1-1 call.

24     Q    Had you ever been in that apartment before that day?

25     A    No.

1    A    The bedroom where Mr. Leon Greathouse was in,

2   handcuffed.

3    Q    It was inside the bedroom, correct?

4    A    Correct.

5    Q    Was U.S. currency inside that waist pack?

6    A    If I remember correctly, yes.

7         THE COURT:  Nothing else?

8         MR. SIMMONS: That's it, Judge.

9         THE COURT:  Okay.  We're going to break.  Thank you

10   so much.  You can step down.

11         (Whereupon, the witness exits the courtroom at this

12   time.)

13         THE COURT:  We'll see everybody back here at 2:15,

14   okay.

15         MS. MOVIUS:  Thank you, Judge.

16         (Whereupon, a lunch recess is taken and further

17   proceedings continue on next page by JoAnna Cogliano.)

18

19

20

21

22

23

24

25

PROCEEDINGS

1    * * * * * * * * * ** * * * * * * *

2          A F T E R N O O N   S E S S I O N

3    * * * * * * * * * * ** * * * * * *

4          THE CLERK:  Recalling number 1 and 3 on

5    the calendar, Leon Greathouse and Lucristia

6    Johnson; Indictment 75963 of 23.

7          THE COURT:  All parties including the

8    defendants are present.

9          Would you call your next witness, please.

10         MS. MOVIUS:  Yes, your Honor.

11         Before I call the next witness, I would

12    like to admit a pre-certified document.  It is

13    the signed conditions of release form by Mr.

14    Leon Greathouse; it has been marked as People's

15    Exhibit 4 and bears a business records

16    certification, for the Judge.

17         Both defense counsel have already viewed

18    this document.

19         THE COURT:  Any objection to People's

20    Exhibit 4 coming into evidence?

21         MR. SIMMONS:  Not for me.

22         THE COURT:  Mr. Turchi.

23         MR. TURCHI:  Yes.

24         THE COURT:  Any objection to the People's

25    Exhibit 4 coming into evidence.

PROCEEDINGS

1    MR. TURCHI:  Judge, I am probably not

2  going to have an objection.

3    THE COURT:  It's been certified, so you

4  either have an objection or you don't, then

5  you'll tell me what it is.

6    MR. TURCHI:  I am going to withhold

7  objections until I cross her, because there are

8  certain things about it that are unclear to me.

9    THE COURT:  So then if you are

10  objecting --

11    MR. TURCHI:  Then I am objecting.

12    THE COURT:  Then I can't put it into

13  evidence.

14    MR. SIMMONS:  Judge, it's a certified

15  business record.

16    THE COURT:  I know.  I am trying to figure

17  out what his objection is.

18    If it's a certified --

19    MR. TURCHI:  You know, respectfully, I

20  object.

21    THE COURT:  Okay.  But it's a certified

22  business record, so what is your objection?

23    MR. TURCHI:  What is my objection, my

24  objection is there's multiple dates that I

25  think need to be explained, pages, it's unclear

PROCEEDINGS

1   to me if they belong in that order.

2       I have another version of that, that is

3   different, and I have to flesh that out before

4   I say I don't have an objection to that

5   document.

6       THE COURT:  Objection is overruled.

7       Mark it as People's Exhibit 4 in evidence.

8       (People's Exhibit 4; Received in

9   evidence.)

10      MR. TURCHI:  What is the exhibit number?

11      MS. MOVIUS:  4.

12      People now call Parole Revocation

13  Specialist Chyna Morris.

14      (Witness entering the courtroom.)

15      THE COURT OFFICER:  Put your hand on the

16  Bible.

17      THE CLERK:  Do you swear or affirm that

18  the testimony you are about to give is the

19  truth, the whole truth, and nothing but the

20  truth?

21      MS. MORRIS:  Yes.

22      THE CLERK:  Thank you.

23      Please be seated.

24      THE COURT OFFICER:  In a loud, clear voice

25  state your full name, spelling your last name.

DIRECT EXAMINATION/MORRIS/PEOPLE

1        MS. MORRIS:  Chyna Morris, M-O-R-R-I-S.

2        THE COURT OFFICER:  County of residence,

3    command.

4        MS. MORRIS:  Parole Violation Unit,

5    Manhattan, New York, Downstate.

6        THE COURT:  So I am going to ask you to

7    keep your voice up.  Please wait until the

8    questioner finishes his or her questions before

9    you respond, so you are not talking over one

10   another, and we have a good record.

11       If you don't understand a question just

12   ask to have it rephrased.  If you need to take

13   a break just ask.

14       MS. MORRIS:  Okay.

15       THE COURT:  You may proceed.

16       MS. MOVIUS:  Thank you, your Honor.

17   C H Y N A  M O R R I S, having been duly called as a

18   witness on behalf of the People of the State of New

19   York, first having been duly sworn, testified as

20   follows:

21   DIRECT EXAMINATION

22   BY MS. MOVIUS:

23       Q    Good afternoon.

24       A    Good afternoon.

25       Q    What is your current title?

DIRECT EXAMINATION/MORRIS/PEOPLE

1    A    Parole Revocation Specialist.

2    Q    What is that?

3    A    Basically we serve as, or I serve as the
4    state prosecutor in parole violation hearings.

5    Q    How long have you held that role for?

6    A    I was appointed December of 2023.

7    Q    What were you doing before that?

8    A    I was a parole officer in Manhattan 3 area
9    office.

10    Q    How long were you a parole officer for?

11    A    I joined the department January 2018.

12    Q    What were some of your duties as a parole
13    officer?

14    A    I was tasked with a case load, I would
15    help releasees basically integrate into the
16    community.  I would help them abide by their
17    conditions of release, and just help them make their
18    adjustment back to civilian life.

19    Q    Throughout your career, approximately how
20    many parolees would you say you supervised?

21    A    I would say like over 300.

22    Q    Throughout your career, have you conducted
23    home visits?

24    A    Yes.

25    Q    Approximately, how many would you say?

DIRECT EXAMINATION/MORRIS/PEOPLE

1     A     A large number; maybe 400.

2     Q     How about searches?

3     A     The same.  A very large number.

4           It's part of our duties.

5     Q     Just in general, can you tell us what is

6     the function of the office of parole?

7     A     The function of the office of parole is to

8     work with releasees, and make sure they abide by

9     their conditions of release while they're serving

10    the remainder of their term.

11    Q     What are some of the requirements that a

12    parolee must follow when they're under DOCCS

13    supervision?

14    A     If given, they must abide by their curfew.

15    They must abide by remaining in their approved

16    residence during curfew hours.  Must reframe from

17    alcohol, drugs.

18          If they're mandated to complete

19    programs, they must complete that program.  They

20    must remain within the State of New York.  They must

21    abide by any directive provided by DOCCS staff

22    member.  The new conditions they cannot abscond from

23    parole supervision.

24          Meaning, they cannot lose contact

25    with us.  They must attend any and all parole

DIRECT EXAMINATION/MORRIS/PEOPLE

1    violation hearings, among.

2        Q    Are there any requirements with regard to

3    travels out of state?

4        A    Yes.  They must remain within the State of

5    New York unless they're given permission by their

6    parole officer.

7        Q    What is the process of getting permission

8    to leave the state look like?

9        A    They need to ask us.  We need to review

10   their case.  We need to make sure they are in

11   compliance.  We need to verify where they're going,

12   that they receive permission from that person or

13   that place that they are -- it's permissible for

14   them to go there.

15            We need to speak to our bureau chief

16   and our S.P.O., Senior Parole Officer, and then

17   receive confirmation.  If they're traveling, we need

18   to get travel details.  It's a very lengthy process.

19       Q    If someone were to travel out of state, if

20   a parolee were to travel out of state without that

21   approval that you just went through, what would that

22   be considered?

23       A    A parole violation.

24       Q    Now, are parolee is also under an

25   obligation to report police contact?

DIRECT EXAMINATION/MORRIS/PEOPLE

1      A    Yes.

2      Q    Can you describe that?

3      A    So once a parolee has police contact

4    they're required to notify us preferably within 24

5    hours.

6      Q    Why is that requirement in place?

7      A    Because they are -- while they're on

8    parole they're to abide by all provisions of law,

9    and we need to investigate their arrest.

10     Q    If someone were to have, or specifically

11   if a parolee were to have police contact, and not

12   report it to the parole office, what would that be

13   considered by your office?

14     A    A parole violation.

15     Q    Does a parolee have a requirement to

16   report any addresses that they're living in?

17     A    Yes, they -- we have an approved address

18   for them.  If they want to change that approved

19   address we have to investigate that address, and

20   have to receive prior approval before moving to a

21   new address.

22     Q    What is the purpose of that?

23     A    The purpose of that is, their approved

24   address is how we supervise them while they're in

25   the community.

DIRECT EXAMINATION/MORRIS/PEOPLE

1                We need to know about where their

2    whereabouts is, because they're still being

3    supervised by the state, so we need to know that

4    they are within their approved address, during that

5    curfew, or that's the place that they were known for

6    them to be.

7         Q    What are some of the ways that a parolees

8    address is verified?

9         A    We would go to the residence ourselves.

10               If they want to live with someone we

11   would speak to that person.  If it's an address that

12   they own themselves, we would ask for the lease, and

13   we would just confirm that it's permissible.

14        Q    When you say go to the house, is that

15   essentially a home visit?

16        A    Yes.

17        Q    What time do you usually conduct home

18   visits?

19        A    Depending on a releasees level.

20               If they have a curfew, I would go

21   during curfew hours.  If they do not have a curfew,

22   I would go during the hours where I feel like it's

23   reasonable for them to be there, like 5:00 a.m. in

24   the morning or 10:00 a.m., 11:00 p.m. at night.

25        Q    Why would you plan your hours around that

DIRECT EXAMINATION/MORRIS/PEOPLE

1    time like you just mentioned?

2        A    Because they don't have a curfew, so I

3    usually try to plan it around their schedule, or

4    like I said, times that I think they should be there

5    is part of my duties to confirm their address.

6        Q    Now, does a parolee also have a

7    requirement to report their employment to the parole

8    office?

9        A    Yes.

10       Q    Can you explain that?

11       A    So part of their conditions of release is

12   to seek and obtain employment, so it is important

13   for us to know that they're pursuing that.

14            Also that ties into their curfew, you

15   know, we can amend their curfew due to their

16   schedule, and also allow us to again be privy of

17   their whereabouts.

18       Q    Now, a couple of minutes ago you mentioned

19   the levels of parole.

20            Can you explain what the various

21   levels of parole are?

22       A    So the levels range from level one to

23   level four.  A compass level is designed to help us

24   understand how to supervise them.

25            A level one is intensive, and a level

DIRECT EXAMINATION/MORRIS/PEOPLE

1    four is lease intensive.

2         Q    P.R.S. Morris, do you know someone by the

3    name of Leon Greathouse?

4         A    Yes.

5         Q    How do you know this individual?

6         A    I used to supervise him when I was a

7    parole officer.

8         Q    What dates did you supervise Mr.

9    Greathouse for?

10        A    I was officially assigned to his case

11   January of 2023 until I was promoted in

12   December 2023.

13        Q    Would you recognize Mr. Greathouse if you

14   were to see him today?

15        A    Yes.

16        Q    Please take a look around the room, and if

17   you see Mr. Greathouse point him out, and identify

18   an article of clothing that he is wearing?

19        A    He is right there with a beige sweater on.

20             THE COURT:  Let the record reflect the

21        witness has identified the defendant.

22        Q    What is the conditions of release

23   agreement?

24        A    It's, they must sign those conditions

25   before they are released from the facility.

DIRECT EXAMINATION/MORRIS/PEOPLE

1                      If they agree to those conditions

2      then they're authorized to be parole, on parole.

3          Q     When you say they, who is that?

4          A     Inmates or we call them a releasee.

5          Q     What is the purpose of having a releasee

6      sign the conditions of release agreement?

7          A     It's so they're aware of the expectation,

8      it's so they are aware of what is expected of them,

9      and how we expect them to behave while they finish

10     out the remainder of their term.

11         Q     Are you aware of whether Mr. Greathouse

12     signed a conditions of release document in

13     accordance with his release to parole?

14         A     Yes, he did.

15         Q     So I am handing up what's already in

16     evidence as People's Exhibit 4.  Go ahead and flip

17     to the third page of that document.

18                      Can you tell us what this document

19     is?

20         A     This is his certificate of release to

21     community supervision.  It's what a releasee signs

22     prior to them leaving the facility, and being on

23     parole supervision.

24         Q     Does it relate to any specific parolee?

25         A     Yes, it relates to Leon Greathouse.

DIRECT EXAMINATION/MORRIS/PEOPLE

1      Q    Can you tell us what Mr. Greathouse's

2    conditions of release are as are documented on that

3    paper?

4      A    Number one, I would proceed directly to

5    the area to which I have been released, and within

6    24 hours of this next available business day after

7    my release --

8           THE COURT:  Would you slow down a little

9        bit, for the court reporter.

10          MS. MORRIS:  Sorry.

11     A    Make my arrival report to the community

12   supervision office indicated below.  I will make

13   office and/or other reports thereafter as directed

14   by my parole officer, assign Bureau Manhattan 3,

15   assigned bureau address 314 West 40th Street, city,

16   state, zip, Manhattan, New York 10018.

17          Bureau phone number (212)239-6355;

18   assign Parole Officer M. Flores.  Assigned Senior

19   Parole Officer M. Loverin.  Emergency after hours

20   and weekends contact the community supervision

21   operation center and parenthesis says CSOC

22   abbreviation (212)239-6159.

23     Q    Skipping ahead to the fourth page,

24   itemized list of the things on that page.

25          Can you go through that list with us?

DIRECT EXAMINATION/MORRIS/PEOPLE

1          THE COURT:  Since it's in evidence, why

2     don't you just zero in on the one thing you

3     want to ask.

4     Q    What does that document say about

5     permission to search?

6          A    We are permitted to search his person, and

7     his residence, and the common areas.

8          Q    What does that document say about leaving

9     the State of New York?

10         A    He is not allowed to leave State of New

11    York without permission.

12         Q    What does that document say, if anything,

13    about the possession of narcotics or firearms?

14         A    He is not allowed to have narcotics or

15    firearms.

16         Q    What does that document say with respect

17    to reporting employment or address locations?

18         A    He must seek, obtain, and maintain

19    employment and/or academic or vocational program.

20              In terms of his residence, he needs

21    to permit me to visit the residence.  Permit search,

22    inspection of person, residence, and property; and

23    we'll discuss any proposed changes in my residence,

24    employment, or program status with my parole

25    officer.

DIRECT EXAMINATION/MORRIS/PEOPLE

1    Q    Is that document signed by Mr. Greathouse?

2    A    Yes.

3    Q    Can I take that document back.

4         So when you started supervising Mr.

5    Greathouse in January of 2023, what was his level of

6    supervision?

7    A    A level four.

8    Q    What did that entail?

9    A    So that is not -- there's no curfew with a

10   level four, and I need to do a home visit every four

11   months, and he needs to report to the office every

12   four months.

13   Q    And again, how does level four compare to

14   the other levels of parole?

15   A    Level four is the least intensive.

16   Q    Can you tell us, in general, what you knew

17   about Mr. Greathouse at the time you took over as

18   his parole officer?

19   A    The first time I visited his residence was

20   in March of 2023.  In April I did receive a call

21   from Maine Drug Enforcement stating that Mr.

22   Greathouse was -- may have been involved in a

23   hand-to-hand interaction with a Confidential

24   Informant.

25        Based on my review of his case, they

DIRECT EXAMINATION/MORRIS/PEOPLE

1    have been watching Mr. Greathouse or involved, there

2    has been an investigation concerning Mr. Greathouse

3    for a while.

4              THE COURT:   Who is they?

5              MS. MORRIS:   Maine Drug Enforcement.

6              THE COURT:   Like to the State of Maine?

7              MS. MORRIS:   Yes.

8         Q    That was April of 2023?

9         A    Yes, I received a call from one of the

10   agents.

11        Q    What did you do after receiving that

12   information?

13        A    I informed my supervisor, my Senior Parole

14   Officer.  Yeah, my Senior Parole Officer, and also

15   my bureau chief.  After that I maintained contact

16   with the agent, and we exchanged information to

17   further his investigation, and also ours as well.

18        Q    At a certain point, was Mr. Greathouse's

19   parole supervision level increased?

20        A    Yes, it was.

21        Q    When was it increased?

22        A    In May of 2023 the assistant regional

23   director reviewed Mr. Greathouse's case, and decided

24   that he should be placed on electronic monitoring

25   device, and his level was lowered based on the

DIRECT EXAMINATION/MORRIS/PEOPLE

1   investigation concerning drugs.

2        Q    When you say lowered, it went from a level

3   two to what level?

4        A    I'm sorry, I meant from a level four to a

5   level two.

6        Q    From a level four to a level two, I

7   misspoke; apologies.

8                     Is level two, what is it considered

9   in relation to level four?

10       A    Level two there is a curfew, and he has to

11  come to the office monthly, and I have to see him in

12  his residence monthly.

13       Q    Why was his parole level lowered at this

14  time?

15       A    It was lowered due to the drug

16  investigation, since it was ongoing, and we had --

17  they stated he left the State of New York without

18  permission.

19            THE COURT:  When you say they stated --

20            MS. MORRIS:  Maine Drug Enforcement.

21            THE COURT:  Did they provide you with any

22       photographs?

23            MS. MORRIS:  They did.

24            THE COURT:  You were able to recognize him

25       in Maine?

DIRECT EXAMINATION/MORRIS/PEOPLE

1          MS. MORRIS:  So I only saw him maybe once
2     or twice after that, I personally wasn't able
3     to identify him.
4          It was also very dark.
5          THE COURT:  Can you speak up a little?
6          MS. MORRIS:  Sorry, yes.
7          I personally wasn't able to identify him.
8     I only saw him once or twice after that, and
9     the picture was taken by the Confidential
10    Informant, so it was very dark.
11    Q    Now, throughout this time that you are
12    supervising Mr. Greathouse, did you attempt to visit
13    him at his listed address?
14    A    Yes.
15    Q    Did you have any successful home visits?
16    A    Some success; sometimes I saw him,
17    sometimes I didn't.
18    Q    Can you explain what you mean when you
19    didn't see him?
20    A    There was times where I tried to go to his
21    residence, and he wasn't there.
22         THE COURT:  Was this in violation of his
23    curfew?
24         MS. MORRIS:  Yes.
25         There was one particular time where I went

DIRECT EXAMINATION/MORRIS/PEOPLE

1    to his residence, and I encountered another

2    male there. His name -- he -- I later found

3    out it was Paul Hill. Mr. Greathouse stated he

4    lived there alone.

5        This happened in September of 2023.

6    Mr. Hill stated that he actually owned the

7    apartment. I told him that's conflicting

8    information. I would have to investigate it,

9    if that's true then his -- I might have to

10   investigate whether he's permissible, he can

11   live there.

12       Me and Mr. Hill had a contentious back and

13   forth. He stated -- he mentioned another

14   parole officer, which made me think he was on

15   parole himself, so I said this is no longer a

16   safe environment for us to visit, and most

17   likely the address will be denied. Mr. Hill

18   made some remarks. I tried to call

19   Mr. Greathouse, he called me back later saying

20   due to our interaction, my interaction with

21   Mr. Hill, he is no longer permitted to stay

22   there.

23       Q    So at that point, did Mr. Greathouse find

24   a new residence?

25       A    Yes, he proposed a residence. I told him

DIRECT EXAMINATION/MORRIS/PEOPLE

1    he has to find a new residence.

2              I don't feel safe with me or my

3    fellow officers going to that residence.  He gave me

4    an address in the Bronx.  I verified with that

5    person, it was a family friend, that he can live

6    there, so he did provide that address, and I did

7    approve their address.

8       Q    Did you attempt to conduct a home visit at

9    that new address?

10      A    I conducted a home visit during curfew

11   hours.  He was not there.

12              If I do a negative home visit I make

13   a follow-up call.  He called me later on stating

14   that he had to do something with his car.  He also

15   stated that he does not feel comfortable living

16   there, because it's very crowded, and he has his own

17   apartment, he's going to work on providing me a

18   lease for that apartment, and I stated okay.

19              And he did eventually provide a lease

20   to the apartment.  It was an apartment in the Bronx

21   --- I'm sorry, in Manhattan. I believe on West 115th

22   Street.

23      Q    Is that 20 West 115th Street?

24      A    Yes.  This occurred in November, I believe

25   November 2023.

DIRECT EXAMINATION/MORRIS/PEOPLE

1      Q    What occurred, the attempted home visit at

2    the Bronx apartment?

3      A    Right.  Then he provided the lease shortly

4    after.

5      Q    Was a home visit ever conducted at 20 West

6    115th Street?

7      A    Yes.

8          MR. TURCHI:  Your Honor, I'm so sorry to

9    interrupt.

10         My witness I think is looking for the

11   room, can I have two minutes to try to locate

12   him, and deliver him.

13         THE COURT:  Sure.  Do you want to take

14   Mr. Greathouse in the back?

15         (Whereupon, there was a pause in

16   proceedings.)

17         THE COURT:  Get Mr. Greathouse back out.

18              *           *           *

19         THE COURT:  Case back on, hearing.  All

20   parties including both defendants are present.

21         I remind the witness she is still under

22   oath.  You may proceed.

23         MS. MOVIUS:  Thank you, your Honor.

24      Q    So we left off with home visits at 20 West

25   115th Street, was a home visit conducted at that

DIRECT EXAMINATION/MORRIS/PEOPLE

1   apartment before November 29, 2023?

2       A    No.

3       Q    Now, I want to back up a little bit, and

4   discuss a period of time when Mr. Greathouse was on

5   electronic monitoring.

6            What were the requirements or

7   restrictions of that electronic monitoring?

8       A    Mr. Greathouse had to stay within his

9   approved residence during curfew hours.  He also had

10  to stay within the State of New York.

11      Q    Did Mr. Greathouse ever seek a pass to

12  leave the State of New York during the time he was

13  on electronic monitoring?

14      A    Yes, there was a time that he said he had

15  to go to Miami, Florida as he is a musical artist.

16           THE COURT:  He had to go to Maine and

17      Florida?

18           MS. MORRIS:  Miami, Florida.

19           Sorry, I have a Bronx accent.  Yes, he had

20      to go to Miami, Florida for an event as he was

21      a musical artist.

22      Q    What process did Mr. Greathouse go through

23  when seeking approval to go to Miami?

24      A    He provided the event information.  He

25  provided the plane tickets.  He stated who he was

DIRECT EXAMINATION/MORRIS/PEOPLE

1    going with.

2              He said, he was going with his

3    manager.  We verified that the event was an official

4    event.  We monitored his progress on the electronic

5    monitoring device, his progress with parole, he was

6    in compliance, therefore, we deemed that it was

7    acceptable for him to go to the event; and we did

8    remove the electronic device at that time.

9         Q    After he returned from Maine was the

10   device placed back on him?  Oh, Miami.

11        A    No, it was not placed back on him.

12        Q    Can you describe for us what you knew

13   about Mr. Greathouse's employment throughout the

14   time you were his parole officer?

15        A    So Mr. Greathouse stated that he owns

16   several businesses.  He was a musical artist, he

17   owned a clothing company, several businesses.  We

18   did ask him for verification.

19              It is customary although releasee

20   states he owns a business we have to verify that

21   it's generating income.  I did request an income tax

22   or some type of verification regarding the income

23   generated from these businesses, and I did not

24   receive it.

25        Q    Do you know about when you asked Mr.

DIRECT EXAMINATION/MORRIS/PEOPLE

1   Greathouse for that income verification?

2        A    I asked him during home visits.  I asked

3   him one time during -- I'm sorry, I asked him during

4   office visits. I asked him one time during a home

5   visit.  He did submit a W-2 for one of his

6   businesses, but it was a net loss, so I said that

7   did not qualify for what I was requesting.

8        Q    What was the purpose of trying to get this

9   information from Mr. Greathouse?

10       A    According to Mr. Greathouse because he

11  owned several businesses he works 24/7.  He cannot

12  give me, as I stated before, with a level four I try

13  to work with their schedule, he stated he cannot

14  provide me with a schedule.  He stated if I have to

15  do a home visit, I could just let him know.

16                 I said that is not how parole

17  supervision works.  I need to know his schedule, so

18  he was providing conflicting information.

19       Q    I am directing your attention to

20  September 26th of 2023, do you recall around that

21  date?

22       A    Yes, I believe that's the time where I

23  received notification from Maine that he was

24  involved in a traffic stop from the same agent

25  called me, stated he was involved in a traffic stop.

DIRECT EXAMINATION/MORRIS/PEOPLE

1          They verified his identity through a

2     driver's license.  I asked for the police report,

3     and they supplied the police report.

4          Q    Just to clarify, who is the he you are

5     referring to?

6          A    The agent.

7          Q    Who was involved in the traffic stop?

8          A    I'm so sorry, Leon Greathouse.

9          Q    Did Mr. Greathouse ask permission to go to

10    Maine at that time?

11         A    No, he did not.

12         Q    Now, moving onto October 19th of 2023, do

13    you recall that date?

14         A    So I received, that date I received

15    another call from a different agent, from the Maine

16    Drug Enforcement, he stated that there was a drug

17    stop going on as he was on the phone with me, this

18    time they provided a recording of Mr. Greathouse's

19    license.  They sent it to me, the officer I guess

20    that was looking at his license, and they also

21    followed it up with another police report.

22         Q    Did Mr. Greathouse seek approval from

23    parole to leave the State of New York that time?

24         A    No.

25         Q    Jumping forward to November, about a month

DIRECT EXAMINATION/MORRIS/PEOPLE

1    later, ultimately a decision was made to search the

2    defendant's residence?

3             THE COURT:  Can I ask a question, I'm

4        sorry.

5             You said that the October 19, 2023, you

6        got notification that there was a drug stop.

7             MS. MORRIS:  It was a traffic stop.

8             THE COURT:  Another traffic stop.

9             MS. MORRIS:  Another traffic stop.

10            THE COURT:  Did Mr. Greathouse inform you

11       of either one of these traffic stops?

12            MS. MORRIS:  No, he did not.

13            THE COURT:  Which is also a violation of

14       parole rules?

15            MS. MORRIS:  Absolutely.

16            THE COURT:  I'm sorry.  Go ahead.

17            MS. MOVIUS:  Thank you, Judge.

18       Q    Ultimately a decision was made to do a

19    parole search of Mr. Greathouse's new residence at

20    20 West 115th Street, Apartment 2B; can you describe

21    what went into making the decision to do that

22    search?

23       A    So it was a manner -- it was a -- it was

24    based upon various factors.  We could not verify his

25    employment, the constant visits to Maine, the

DIRECT EXAMINATION/MORRIS/PEOPLE

1    ongoing drug investigation, according to those

2    officers that conducted the traffic stop, it was a

3    very high drug area, very -- a lot of drug activity

4    in those areas, so we decided to do a search.

5                    He met the criteria for a search at

6    that time.  I felt like we needed to do something a

7    little more in Mr. Greathouse case.

8                    THE COURT:  This was when?

9                    MS. MORRIS:  The search was conducted

10   November of 2023.

11        Q    Were you present when the search was

12   conducted?

13        A    I was not.

14        Q    Why not?

15        A    I believe I was off that day.  I would

16   have to look at my schedule, but I was not present.

17        Q    Now, you said you stopped supervising Mr.

18   Greathouse in December of 2023?

19        A    Correct.

20        Q    Why did you stop supervising him at this

21   point?

22        A    I was promoted to a parole revocation

23   specialist.

24                    MS. MOVIUS:  I have no further questions.

25                    THE COURT:  You just opened the door, I

CROSS EXAMINATION/MORRIS/DEFENSE

1    hope you realize that.

2         Do you understand what you just did?  Go

3    ahead, cross.

4         MR. TURCHI:  Yes, Judge.  Thank you.

5    CROSS EXAMINATION

6    BY MR. TURCHI:

7    Q    Good afternoon, Officer Morris.

8         My name is David Turchi.  I represent

9    Leon Greathouse.  I am going to ask you some

10   questions.  Please keep your voice up.

11        If you don't understand a question I

12   ask please tell me, and I will rephrase; do you

13   understand?

14   A    Yes.

15   Q    You were promoted December 2023, correct?

16   A    Correct.

17   Q    That was the month after Mr. Greathouse

18   was arrested in this case, correct?

19   A    Correct.

20   Q    Mr. Greathouse was never violated for

21   leaving New York State, was he, prior to

22   November 29, 2023?

23   A    Prior to that, no.  We didn't want to

24   interfere with the drug investigation.

25   Q    When was Mr. Greathouse downgraded to

CROSS EXAMINATION/MORRIS/DEFENSE

1   level two?

2        A    I believe it happened in June of 2023.

3        Q    You said that was a decision by the

4   assistant director, did I get that right?

5        A    The assistant regional director.

6        Q    Who was that?

7        A    We -- I would have to refer to my notes,

8   because we have a new assistant regional director

9   now.

10        Q    Do you have your notes with you here

11   today?

12        A    They're in the witness room.

13             MR. TURCHI:  Can I confer with the DA,

14        please?

15             THE COURT:  Sure.

16        Q    Handing you for identification purposes

17   Defense Exhibit A.  Just take a look at that.

18             Let me know if those are your notes.

19        A    Yes, these are my notes.

20        Q    Do those notes tell you who the assistant

21   regional director was who downgraded Mr. Greathouse

22   in May of 2023?

23        A    Yes.

24        Q    Who?

25             THE COURT:  Are you offering these

CROSS EXAMINATION/MORRIS/DEFENSE

1    notes --

2              MR. TURCHI:  Of course not, no.

3              THE COURT:  So you are just doing this to

4     refresh your recollection.

5              You're going to look, see if it refreshes

6     your recollection, if it doesn't then just

7     close it, and tell us it doesn't.  If it does

8     then tell us who it was.

9              MS. MORRIS:  Okay.  A.R.D. Jones.

10             MR. TURCHI:  Okay.  Thank you.

11             You can turn that upside down.  If you

12     need to refer to it, that's fine, just ask the

13     Judge, okay?

14             MS. MORRIS:  Okay.

15        Q    Is it your testimony that a traffic stop

16    in and of itself is a violation of probation?

17        A    Of parole.

18        Q    Yes.

19        A    It depends on what time the traffic stop

20    occurred.

21        Q    But if it's for a routine traffic

22    violation like failure to yield, rolling stop?

23        A    Yes, because he violated the provisions of

24    law.

25        Q    Now, Mr. Greathouse reported to you in the

CROSS EXAMINATION/MORRIS/DEFENSE

1    months leading up to November 29th as directed, yes?

2        A    Yes.

3        Q    He answered all questions, correct?

4        A    Not truthfully.

5        Q    Not truthfully or not to your

6    satisfaction?

7        A    Not truthfully.

8        Q    In October of 2023, he was residing at a

9    location with landlord, Paul Hill?

10       A    Yes.

11       Q    Paul Hill was an approved address?

12       A    My altercation --

13            THE COURT:  That's not the question.

14            Was it an approved address.

15       Q    Did Paul approve that address?

16       A    I don't believe -- not in October of 2023.

17       Q    Do you know how long Mr. Greathouse had

18   been living at that location?

19       A    No, I do not.

20       Q    Were you -- when you were assigned --

21   withdrawn.

22            When did you start supervising

23   Mr. Greathouse?

24       A    I was assigned his case officially

25   January 2023.

CROSS EXAMINATION/MORRIS/DEFENSE

1    Q    All right.  At that time you reviewed his

2    file?

3    A    Yes.

4    Q    You became familiar with his approved

5    address?

6    A    Yes.

7    Q    What was his approved address at this

8    time?

9    A    The address on West 137th Street.

10    Q    Is that the Paul Hill address?

11    A    Yes.

12    Q    Okay.  Thank you.

13          Now, you were involved in the

14    decision to conduct a house search for Mr.

15    Greathouse on November 29, 2023, that's when the

16    search was done, but the decision was made, you were

17    part of that decision?

18    A    I never had a case conference with

19    anybody.  We do searches every month, and there are

20    certain cases that we consider eligible for a

21    search.  Sometimes it's random, sometimes we

22    consider them eligible.

23          I was not apart of the search, so

24    that case was reviewed, and selected on that day.

25    Q    But were you part of the decision to do

CROSS EXAMINATION/MORRIS/DEFENSE

1    the search that day?

2         A    I wasn't part of the decision.  I wasn't

3    there that day.

4         Q    Did you previously testify on direct that

5    you were present with supervisors and discussed with

6    them issues of employment, and Maine?

7         A    Not on that day during a case conference.

8         Q    I'm not talking about that day

9    specifically.  I know you weren't working.

10             What I am asking when the decision

11   was made, let me ask this way --

12             THE COURT:  Do you know when the decision

13        was made to search?

14             MS. MORRIS:  I don't know specifically

15        when the decision was made, no.

16        Q    Within a few weeks before?

17        A    I don't know specifically when the

18   decision was made.  I know why it was made.

19        Q    Okay.  You were present at the time the

20   decision itself was made, not the search, but for

21   the decision?

22        A    I don't know when it was made, so I can't

23   say I was present.  I don't know when they made that

24   exact decision.  I know I conducted multiple case

25   conferences, which led to the search.

CROSS EXAMINATION/MORRIS/DEFENSE

1      Q      You had those conferences with
2    supervisors?

3      A      Yes.   Every month.

4      Q      Those supervisors, did they include S.P.O.
5    Dolly Vega?

6      A      I know at the time S.P.O. Sass was
7    involved.   I am not sure if S.P.O. Vega was
8    involved.

9      Q      Jennifer Sass was involved though.

10     A      I had multiple case conferences with her
11   regarding.

12     Q      Okay.   During the course of these
13   conferences with Sass, were you aware that Mr.
14   Greathouse had filed a grievance against you,
15   Officer Sass, and several others pertaining to his
16   parole status?

17     A      Yes.

18     Q      You discussed that with Officer Sass and
19   other supervisors?

20     A      Yes.

21     Q      Were you aware is in the months leading up
22   to the search in this case that Mr. Greathouse had
23   retained a law firm to attempt to contact your
24   office to get records?

25     A      Was I aware.

CROSS EXAMINATION/MORRIS/DEFENSE

1      Q     I'll rephrase.

2             Did Mr. Greathouse have attorneys

3  contact parole regarding his parole status, and

4  parole records?

5      A     Any legally matters we're not privy to.

6             We have a whole different department;

7  if he contacted parole regarding a legal matter I

8  would not be notified about that.  The legal

9  department would take over.

10     Q     As far as you knew, did Mr. Greathouse

11  have attorneys contacting parole?

12     A     I don't know.  I did not know that.

13     Q     Were you aware that Mr. Greathouse had

14  previously -- withdrawn.

15             Mr. Greathouse had reported a lot of

16  business activity, correct?

17     A     Yes.

18     Q     Okay.  I think you had mentioned a fashion

19  line; is that correct?

20     A     A clothing line.

21     Q     Yes.

22     A     Yes.

23     Q     Music, as well?

24     A     Yes.

25     Q     Okay.

CROSS EXAMINATION/MORRIS/DEFENSE

1          THE COURT:  Did he ever provide any proof

2      of these businesses?

3          MS. MORRIS:  The only proof I got was a

4      tax return, but it was negative net loss of

5      $15,000.

6          THE COURT:  And these businesses were on

7      there, clothing --

8          MS. MORRIS:  It was just his clothing

9      business, and I believe a record label he

10     provided an EIN letter for both of those.

11     Q    Did Mr. Greathouse ever provide a receipt

12 for approximately $355,000 as income?

13     A    Yes.

14     Q    It was your understanding that was from a

15 civil rights lawsuit from about a year prior?

16     A    I understand that's what he stated.

17     Q    Mr. Greathouse spoke to you frequently

18 about getting eased off parole; is that correct?

19     A    He stated that his IO is based on a law

20 that no longer exists.  I believe he stated

21 something like that.

22         THE COURT:  His what?

23         MS. MORRIS:  His Instant Offense, what he

24     was on parole for.

25     Q    Did you ever address his concerns about

CROSS EXAMINATION/MORRIS/DEFENSE

1    easing the conditions of his parole or possibly even

2    getting off of it?

3         MS. MOVIUS:  Objection.

4         It's a confusing question.

5         THE COURT:  Yes.  Ever.

6    Q    All right.  In the year 2023, did you ever

7    address Mr. Greathouse concerns about the conditions

8    of his parole with him?

9    A    I stated that he was eligible for merit

10   termination, that's the only thing I discussed with

11   him.

12   Q    What is merit termination?

13   A    Certainly releasees are eligible for merit

14   termination, so their case would be reviewed every

15   three months or so, and if they satisfy all their

16   conditions we can advocate for them to released from

17   parole.

18   Q    All right.  Did that process ever get

19   started in 2023?

20   A    Yes.

21   Q    Okay.  How did that process --- did that

22   process make any progress in 2023?

23   A    He received a deferral.

24   Q    What's that?

25   A    His merit termination was deferred for, I

*[handwritten margin notes: "Discrimination/misconduct = Conspiracy" next to line 13; "willful/wanton supposed to be off parole" and "Reason / Discrimination con w/ Art. II, U.S. Const 14th amend vio." next to lines 24-25]*

CROSS EXAMINATION/MORRIS/DEFENSE

1     believe approximately six months due to his

2     investigation.

3          Q     Okay.  When you say investigation, what do

4     you mean?

5          A     The drug investigation and Maine.

6          Q     Let's turn to Maine.

7                You had spoken with Maine police

8     officers?

9          A     An agent.

10         Q     An agent.  A government agent?

11         A     From the Maine Drug Enforcement.

12         Q     From Maine?

13         A     Yes.

14         Q     Now, you had mentioned there was a

15    discussion of a Confidential Informant in Maine,

16    yes?

17         A     Yes.

18         Q     You mentioned there was a photo taken, but

19    it was too dark to make an ID; is that correct?

20         A     Yes.

21         Q     In the course of your conversation with

22    Maine, approximately June 31st of 2023, did the

23    Maine investigator or Maine agent, excuse me, report

24    that their Confidential Informant was unable

25    themselves to ID Mr. Greathouse as the perpetrator

CROSS EXAMINATION/MORRIS/DEFENSE

1    there?

2        A    Yes, I believe so.

3        Q    Did you have a number of conversations

4    with the agent about body camera footage of Mr.

5    Greathouse or the perpetrator in Maine?

6        A    Are you asking if the agent had body cam

7    footage?

8        Q    I'm asking if you inquired of the agent,

9    whether you asked him if they had body cam?

10        A    I could have possibly asked them.

11            THE COURT:  I just have a question.

12            The two stops, was his driver's license

13    produced to you for the two stops?

14            MS. MORRIS:  Yes.

15            THE COURT:  With a picture on it of him?

16            MS. MORRIS:  The second time the driver's

17    license was produced.

18        Q    Were you ever provided by surveillance

19    from the agent in Maine?

20            MS. MOVIUS:  Objection.

21            THE COURT:  Overruled.

22            You opened this door, and I am going to

23    let him walk right through it.

24        A    No, they never provided surveillance.

25        Q    But you asked for it?

CROSS EXAMINATION/MORRIS/DEFENSE

1    A    A surveillance video.

2    Q    Yes.

3    A    I could have possibly asked for it.

4    Q    Would it be your habit to ask for

5    surveillance and body cam, so you can corroborate

6    that the parolee was in fact the person they claimed

7    him to be?

8         THE COURT:  I don't care what her habit

9         would be.  I just care what she did in this

10        particular case.

11        MR. TURCHI:  All right.

12   Q    Did you ask Maine to -- withdrawn.

13        Did you take steps to confirm that

14   the perpetrator in Maine was the same person as

15   Mr. Greathouse?

16   A    Yes.

17   Q    But other than a faxed driver's license,

18   you did not receive anything from Maine, correct?

19   A    No.

20        THE COURT:  No, not correct or yes,

21        correct.

22        MS. MORRIS:  Yes, correct.

23        I received a driver's license.

24        MR. TURCHI:  Thank you, Judge.

25   Q    To your understanding, Mr. Greathouse was

CROSS EXAMINATION/MORRIS/DEFENSE

1     never arrested by Maine authorities?

2          A    Yes.

3          Q    Correct?

4          A    That's my understanding.  Yes, he was

5     never arrested by Maine authorities.

6          Q    I recognize you use the word correct --

7               THE COURT:  Maybe if you don't ask a

8     negative question, she wouldn't have that

9     problem.

10              MR. TURCHI:  Touche, Judge, touche.

11         Q    One moment.  Prior to November 29, 2023,

12    New York State Parole did not violate Mr. Greathouse

13    -- let me rephrase.

14              Prior to November 29, 2023, did New

15    York State Parole violate Mr. Greathouse for leaving

16    the state?

17         A    No, because we did not want to interfere

18    with the investigation.

19         Q    Turning to Mr. Hill, who is your

20    predecessor in supervising Mr. Greathouse?

21         A    P.O. Myers Washington.

22         Q    Did P.O. Myers Washington, to your

23    knowledge, ever interview or meet with Mr. Paul

24    Hill?

25         A    I believe she did.

CROSS EXAMINATION/MORRIS/DEFENSE

1      Q     That would be standard procedure for the

2    supervisor, correct; meeting -- let me rephrase.

3                Meeting with a parolees landlord

4    would be standard procedure for a parolee

5    supervisor, yes?

6      A     Yes.

7      Q     All right.  That, of course, could be the

8    separate parole officer that Mr. Hill referenced

9    when you spoke to him?

10               MS. MOVIUS:  Objection.

11               THE COURT:  I don't understand the

12               question, so I will sustain the objection.

13     Q     Okay.  You testified previously that

14    Mr. Hill had referenced another parole officer?

15     A     Yes, it was not P.O. Myers Washington.

16     Q     But you don't know who that parole officer

17    was?

18     A     I do know that parole officer.

19     Q     Who was it?

20     A     P.O. Epps.

21               He stated, ask P.O. Epps who I am.  I

22    know P.O. Epps is a parole officer.

23     Q     Directing your attention to September 29,

24    2023, was that the day you had interacted with

25    Mr. Hill?

CROSS EXAMINATION/MORRIS/DEFENSE

1      A     I'm so sorry, can you say the date again.

2      Q     November 29, 2023.

3            THE COURT:  You said September.

4            (Requested portion was read by the court

5      reporter.)

6            MR. TURCHI:  It is September.  It's

7      09/29/23; I will ask again.

8      Q     Directing your attention to September 29,

9      2023, was that the day you interacted with Paul

10     Hill?

11     A     Yes.

12     Q     That was the only day you interacted with

13     Paul Hill?

14     A     Correct.

15     Q     Following that interaction with Paul Hill

16     Mr. Greathouse informed you he had to leave that

17     particular residence?

18           THE COURT:  Mr. Greathouse informed her

19     that he had to leave.

20           MR. TURCHI:  Correct.

21     A     Yes.

22     Q     That was as a result of the interaction

23     between you and Mr. Hill, correct?

24     A     Yes.

25     Q     That interaction was in fact contentious,

CROSS EXAMINATION/MORRIS/DEFENSE

1    wasn't it?

2         A    Yes, it was.

3         Q    He referenced he was upset about the hours

4    that parole was coming to his home?

5         A    That's correct.

6         Q    And he indicated he was frustrated with

7    how often parole was coming to his home?

8         A    Yes.

9         Q    And he also became -- withdrawn.

10              At any point in your interaction with

11   Mr. Hill, did you reach for your firearm?

12        A    No.

13        Q    At any point in your interaction with

14   Mr. Hill, did you reach for your firearm?

15        A    No.

16        Q    At any time in your interaction with

17   Mr. Hill, did you give him any commands?

18        A    Just to identify himself as Greathouse

19   stated that he lived alone.

20        Q    Anything else?

21        A    Just to identify himself.

22        Q    How did that interaction end?

23        A    I left the premises.

24        Q    Now, because Mr. Greathouse then had to

25   find new lodging, did there come a time that he

CROSS EXAMINATION/MORRIS/DEFENSE

1    proposed a new living situation to you?

2        A    Yes.

3        Q    When was that, approximately?

4        A    It was pretty soon after the incident.

*Same day she forced Greathouse out residence*

5        Q    That was the 20 West 115th Street,

6    Apartment 2B premises?

7        A    If that's in the Bronx.  He proposed an

8    address in the Bronx.

9        Q    What happened with that proposal?

10        A    I conducted a home visit, and he was not

11    present during curfew hours.

12        Q    So you did not approve it?

13        A    The address was approved in the Bronx.  I

14    conducted a home visit, and he was not there.

15        Q    Okay.  Did there come a time he sought

16    approval for 20 West 115th Street in Manhattan?

*Employee liability*

17        A    Yes.

18        Q    When was that, approximately?

19        A    Shortly after my visits.

20        Q    Okay.  How is it he sought your approval?

21        A    He stated that he was getting an

22    apartment.  I told him that I needed a lease if he

*She harassed Mrs tboll*

23    was to own the apartment, considering what happened

24    before with Mr. Hill.  He stated he is working on

25    the lease, and he will provide a lease.

CROSS EXAMINATION/MORRIS/DEFENSE

1      Q     There came a time he provided a lease for

2    you?

3      A     Yes.

4      Q     I'm going to show you a multi page

5    document, asking it be deemed marked Defense Exhibit

6    B for identification at this point.

7                I'm showing it to the Prosecution.

8    Take a moment, look at that, and when you are ready

9    tell me when you received this document.

10               If you recognize it, if so, what you

11   recognize it to be?

12     A     So I do recognize this as the lease that

13   he provided.  I don't recall the specific date I

14   received it.

15     Q     Okay.  Did you receive it before

16   November 29, 2023?

17     A     Yes.

18     Q     Okay.  Is this a true and accurate copy of

19   what Mr. Greathouse submitted to you in support of

20   his application to live at this Manhattan residence?

21     A     Yes.

22     Q     It became part of the parole file?

23     A     Yes.

24     Q     Which is regularly kept in the ordinary

25   course of parole business?

CROSS EXAMINATION/MORRIS/DEFENSE

1      A    Yes.

2           MR. TURCHI:  Okay.  I'd ask now that the

3      sticker be imposed, and entered into evidence.

4           Defense Exhibit B in evidence.

5           THE COURT:  Any objection.

6           MS. MOVIUS:  No, Judge.

7           THE COURT:  Defense B is in evidence.

8           Would the court reporter please mark it.

9           (Defense's Exhibit B; Received into

10     evidence.)

11          THE COURT:  Anything else, Mr. Turchi?

12     Q    Officer Morris, so that document was

13     provided to you by Mr. Greathouse indicated that

14     this was a NYCHA resident lease agreement?

15     A    Yes, my title is specialist.  I don't want

16     things to get confused.

17     Q    I'm so sorry.

18     A    I am parole revocation specialist; I am

19     not a officer.

20     Q    Okay.  Do you prefer Ms. Morris or

21     Specialist Morris?

22     A    You can call me Specialist Morris.

23     Q    Specialist Morris.

24     A    I'm sorry, what was your question?

25     Q    I did not ask it yet.

CROSS EXAMINATION/MORRIS/DEFENSE

1           This is a NYCHA resident lease

2    agreement, correct?

3           A    That's what it states; yes.

4           Q    For the Martin Luther King houses?

5           A    Yes.

6           Q    It's between a James Berts and

7    Mr. Greathouse?

8           A    Yes.

9           Q    Okay.   Who is James Berts?

10          A    Mr. Greathouse identified that as a

11   roommate, as Mr. Berts as a roommate.

12          Q    I want to direct your attention to the

13   last page with the signatures.

14               Let me know when you see the last

15   page with the signatures.

16          A    I see the last page.

17          Q    You see that's November 10, 2023?

18          A    Yes.

19          Q    That's about when Mr. Greathouse presented

20   this to you?

21          A    I believe so.

22          Q    Now, that is signed by Mr. Greathouse,

23   correct?

24          A    Correct.

25          Q    As tenant, correct?

CROSS EXAMINATION/MORRIS/DEFENSE

1       THE COURT:  As what?

2       (Requested portion was read by the court

3    reporter.)

4       Q    Tenant.

5       A    Correct.

6       Q    It is also signed in the presence of James

7    Berts, correct?

8       A    Correct.

9       Q    And then underneath that it says New York

10   City Housing Authority by property manager, and then

11   printed it say James Berts, correct?

12      A    Correct.

13      Q    You agree that next to Mr. Greathouse name

14   there's a second space there for another tenant,

15   correct?

16      A    Correct.

17      Q    That's blank, correct?

18      A    Correct.

19      Q    All right.  Do you believe James Berts, at

20   the time you received this from Mr. Greathouse, did

21   you believe James Berts was the property manager for

22   NYCHA?

23      A    No, I believe he was a roommate, as

24   Greathouse stated he was a roommate.

25      Q    To your understanding, did NYCHA approve

CROSS EXAMINATION/MORRIS/DEFENSE

1    this lease?

perjury *

2         A    It was my understanding that it's a legit

3    lease.

4         Q    To your understanding, did NYCHA, itself,

5    approve this lease?

perjury →
inbility

6         A    It seemed like a legit lease to me.

7         Q    You don't see any NYCHA personnel

8    signature on here though, correct?

9         A    Correct.

10        Q    Okay.  Now, we can take that back.

11             Other than your suspicions, which

12    were not confirmed prior to November 29th, Mr.

13    Greathouse was compliant; he was generally

14    compliant, insofar as he would come to your office

15    when requested, and was not arrested?

16             MS. MOVIUS:  Objection.

17             THE COURT:  Sustained, as to form of the

18             question.

19        Q    Mr. Greathouse in the months leading up to

20    November 29, 2023, would come to your office as

21    requested?

22        A    Yes.

23        Q    In the months leading to November 29,

24    2023, he did not get arrested, correct?

25        A    Not that I am aware of.

CROSS EXAMINATION/MORRIS/DEFENSE

1        Q    In the months leading to November 29,

2    2023, Mr. Greathouse was not violated by parole?

3        A    Not at that time.

4            THE COURT:  Was he violated for this

5    arrest?

6            MS. MORRIS:  Absolutely.  I believe it was

7    a culmination.

8        Q    Specialist, I am going to direct your

9    attention to June 23, 2023, or thereabouts.

10            At that time, did parole impose

11   special conditions on Mr. Greathouse?

12       A    I believe that's the date we installed the

13   GPS conditions.

14       Q    And he filled out a form, correct?

15       A    Yes, a form was filled out laying out the

16   conditions.

17       Q    Were you the person that created that

18   form?

19       A    It's a premade form.

20       Q    And you can fill it out, there's bank --

21       A    The signature part you can fill out.

22       Q    I'm just going to show --

23            THE COURT:  Can you step down for a

24   minute?

25            (Witness exiting the court room.)

1    (Continued from previous page.)

2              THE COURT:  I realize that unfortunately she opened

3    the door, but.

4              MR. TURCHI:  I'll --

5              THE COURT:  Not so incredibly widely.

6              MR. TURCHI:  I'll tell you where I'm going with it.

7    If you tell me to stop, I'll stop.

8              So, around this time they impose conditions and one

9    of the conditions was not to have contact with, quote, and

10   she wrote in, by hand, quote unquote victims.  My client

11   balked at that and she was like, oh, it's a typo, and

12   reissued that crossing out --

13             THE COURT:  Okay, I don't.

14             MS. MOVIUS:  What's the relevance?

15             THE COURT:  I don't see the relevance of that at

16   all.

17             MR. TURCHI:  I'll move on.

18             THE COURT:  Can you bring her back, please?

19             THE COURT OFFICER:  Witness entering.

20             (Whereupon, the witness re-enters the courtroom at

21   this time.)

22             THE COURT:  I remind you you're still under oath.

23             In her absence, I asked you not to go down that

24   road.

25             (Conferring.)

                    Erin E. Gray, RPR

*prejudice —* (handwritten margin note at line 5)

1              THE COURT:  Mr. Turchi.

2    CONTINUED CROSS

3    BY MR. TURCHI:

4         Q    Specialist Morris, when was the earliest that Maine

5    contacted parole about Mr. Greathouse?

6         A    I don't understand your question.

7         Q    You had testified, I think, sometime around July, I

8    want to say, approximately, of 2023, you spoke with an agent

9    from Maine?

10        A    The earliest I spoke to an agent was April 2023.

11        Q    April 2023.

12             Had Maine contacted anyone else at Parole about Mr.

13   Greathouse prior to that time?

14        A    I believe they contacted P.O. Myers Washington.

15        Q    Okay.  And that was as early as January of 2023?

16        A    I don't recall the specific date.

17        Q    Okay.  Directing your attention, you still have the

18   notes in front of you there?

19        A    Yes.

20        Q    Again, take a look at it only if it refreshes your

21   memory, okay.

22        A    Okay.

23        Q    You can take a look, if it refreshes your recollection

24   also as to when Maine first contacted parole or Ms. Myers

25   Washington or anyone in parole?

                        Erin E. Gray, RPR

1       THE COURT:  That's a compound question.  Do you

2  want her -- what do you want her to do?

3       MR. TURCHI:  She indicated she needed --

4       THE COURT:  What are you asking her to look for?

5       MR. TURCHI:  When Maine first contacted New York

6  City Parole.

7       THE COURT:  Okay.

8       See if there's anything there that refreshes your

9  recollection.

10      THE WITNESS:  The notes start from --

11      THE COURT:  Does it refresh your recollection or

12  not?

13      THE WITNESS:  I mean, okay, from let me see.

14      THE COURT:  Not reading from the notes, but looking

15  at it and oh, yeah, that was the date, okay.

16      THE WITNESS:  So, some entries are redacted so I'm

17  not going to be --

18      THE COURT:  So, it doesn't refresh your

19  recollection?

20      Q    It doesn't.  So you can turn it upside down again,

21  please, and just a moment.

22      A    Sure.

23      Q    After your altercation with Mr. Hill, you told Mr.

24  Greathouse he needed to find housing even if it was to go to

25  Bellevue's Mens Shelter, yes?

1      A    As customary if a releasee does not have a residence

2    they need to --

3                    THE COURT:  Okay, did you --

4                    THE WITNESS:  Yes.

5                    THE COURT:  Did you do that?

6                    THE WITNESS:  I apologize for the answer, yes.

7                    THE COURT:  Thank you.

8                    (Conferring.)

9                    MR. TURCHI:  You know what, nothing further at this

10   time.

11                   THE COURT:  I'm assuming you don't have anything

12   for this witness?

13                   MR. TURCHI:  I do not.

14                   THE COURT:  Any redirect?

15                   MS. MOVIUS:  No, your Honor.

16                   THE COURT:  You can step down, thank you very much.

17                   THE WITNESS:  Thank you.

18                   (Whereupon, the witness exits the courtroom at this

19   time.)

20                   THE COURT:  Are the People resting?

21                   MS. MOVIUS:  Yes, your Honor, the People rest.

22                   THE COURT:  Okay.  For the purpose of the hearing

23   is the Defense putting on a case?

24                   MR. TURCHI:  Yes.  Mr. Greathouse is.

25                   MR. SIMMONS:  Ms. Johnson is not.

1           THE COURT:  You want to call your first witness

2     then?

3           MR. TURCHI:  The Defense calls Paul Hill, who I

4     believe is in the hallway.

5           THE COURT:  Is Ms. Johnson resting?

6           MR. SIMMONS:  Yes, Judge.

7           MS. MOVIUS:  Judge, before Mr. Hill gets here IF we

8     can have an offer of proof as to Mr. Hill's testimony given

9     that this is about a different residence.

10          THE COURT:  We don't need an offer of proof.  You

11    kind of opened this door.

12          MS. MOVIUS:  It's a different residence that was

13    months before --

14          THE COURT:  I understand.  I understand.

15          MS. MOVIUS:  -- the incident.

16          THE COURT:  It's going to be very, very short.

17          MR. TURCHI:  It is.

18          THE COURT:  Okay.  Mr. Hill can come in.

19          THE COURT OFFICER:  Witness entering.

20          (Whereupon, the witness enters the courtroom at

21    this time.

22          P A U L                      H I L L, a witness

23    called by and on behalf of the Defense, having been first

24    duly sworn, was examined and testified as follows:

25          THE COURT:  He doesn't swear.  He affirms.

1          THE WITNESS:  I'm making a special appearance.

2          THE COURT:  No.  Its either you either have to

3   affirm or swear.

4          THE WITNESS:  I affirm, but I'm also making a

5   special appearance.

6          THE COURT:  No, there's no such thing.

7          THE WITNESS:  It is a such thing.

8          THE COURT:  There is not.

9          THE CLERK:  Do you solemnly swear or affirm —

10          THE WITNESS:  I affirm.

11          THE CLERK:  Do you solemnly swear or affirm that

12   the testimony you're about to give before this Court shall

13   be the truth, the whole truth, and nothing but the truth; do

14   you so swear or affirm?

15          THE WITNESS:  I affirm.

16          THE COURT:  Have a seat.

17          THE COURT OFFICER:  Have a seat.  Pull the chair up

18   to the mic.  In a loud and clear voice, for the record,

19   state your full name, spell your last name.

20          THE WITNESS:  My name is Paul Hill.  I'm the

21   authorized representative of Paul hill.  First name P-A-U-L,

22   last name H-I-L-L.

23          THE COURT OFFICER:  County of residence.

24          THE WITNESS:  County is Manhattan.  Residence is

25   555 Malcolm X. Boulevard.

1          THE COURT:  Okay.

2          THE WITNESS:  New York, New York 10037.

3          THE COURT:  Okay.  So, Mr. Hill, I'm going to ask

4    you to keep your voice up.  Please wait till the questioner

5    finishes his or her questions before you respond.  If you

6    don't understand a question, just ask to have it rephrased.

7    And if you need to take a break just ask, okay.

8          THE WITNESS:  Okay.

9    DIRECT EXAMINATION

10   BY MR. TURCHI:

11      Q    Good afternoon, Mr. Hill.

12      A    Hey.

13      Q    How long have you resided at your current address?

14      A    At my current address I only reside there a few months.

15      Q    Okay.  And was there a time you resided at 114

16   West 37th Street, apartment 5C, in Manhattan?

17      A    Yes.

18      Q    When was that, approximately?

19      A    That was from the year of 2019 to end of 2023.

20      Q    Okay.  And are you familiar with a gentleman named Leon

21   Greathouse?

22      A    Yes.

23      Q    Okay.  And you see Mr. Greathouse with us here today?

24      A    Yes, I do.

25      Q    Okay, the gentleman to my left?

1    THE COURT:  Sustained.  Leading.

2    MR. TURCHI:  Judge.

3    THE COURT:  I mean.

4    MR. TURCHI:  Okay.  All right, all right.

5    THE COURT:  And strike that.

6    MR. TURCHI:  All right.

7    THE COURT:  You want to have him ID him, have him

8    ID him in a correct way.

9    Q    How do you know Mr. Greathouse?

10   A    Um, I know him from the neighborhood, from the

11   community.

12   Q    Okay.  Did there come a time that Mr. Greathouse lived

13   with you?

14   A    Yes.

15   Q    And was that an approved parole residence?

16   A    Yes.

17   Q    Okay.  And approximately when to when?

18       THE COURT:  Can I ask the relevance of this?  Why

19   don't we get to what you specifically want?

20       MR. TURCHI:  It's one more foundation and I'm going

21   to ask how long he lived there and why it ended and that's

22   pretty much it.

23   Q    From when to when approximately did Mr. Greathouse

24   reside there?

25   A    It was -- he resided there from around 2020, the end of

1    2020 I believe until some time 2023.

2        Q    Okay.  And why did Mr. -- are you aware of why Mr.

3    Greathouse's residency with you ended?

4        A    I do.  I'm aware of why it ended.

5        Q    Yes, all right.  Can you please tell us how that

6    happened?

7        A    Well, his current -- well, he had two parole officers

8    that was there.  And it seems that when the first one was

9    switched then it became an issue.

10              THE COURT:  Is that a phone?

11              THE WITNESS:  I'm sorry.

12              THE COURT:  Turn your cell off, please.

13              THE COURT OFFICER:  Silence your phone.

14              THE WITNESS:  Okay.  All right, yes.

15              THE COURT:  Thank you, sir.

16        A    It became a issue.  It was just uncomfortable once the

17    second parole officer started appearing.  I can't recall her

18    name at the time, it's been some time, I can't recall the name,

19    but everything was fine when the first parole officer was, you

20    know, coming through and everything, doing the wellness checks

21    or whatever they do.  And once they switched it up and then it

22    became a situation.

23        Q    Okay.  And directing your attention to September 29,

24    2023, did you have an altercation with the new parole officer?

25        A    Yes, I did.

1      Q     Can you tell us what happened, please?

2      A     She knocked on the door and five in the morning.  I

3  answered the door, she --

4              THE COURT:  Okay, phone off, please.

5              THE WITNESS:  Yes.

6              THE COURT:  Phone off, please.

7              THE COURT OFFICER:  Turn it off.

8              THE WITNESS:  I don't know how that's even

9  happening.  I got it on silent.

10             THE COURT OFFICER:  Turn the phone all the way off.

11             THE COURT:  Thank you, sir.

12             THE WITNESS:  Sorry.

13             THE COURT:  That's okay.  Thank you.

14     A     All right, so, yes, she came through at 5:30, 5 in the

15  morning.  I opened the door and, um, she was already kind of

16  like disgruntled.  I guess she seen it was just me and I didn't

17  have no like -- normally I have my son there at the time when

18  she's there, but this time he wasn't there and --

19             THE COURT:  Mr. Greathouse was not there?

20             THE WITNESS:  Mr. Greathouse was there.  But my son

21  wasn't there.  So, when she was at the door she actually

22  came in and when she seen it was just us two there I guess

23  she assumed that I could possibly been a parolee or

24  whatever.

25             THE COURT:  Okay, I'm going to strike she assumed.

1    You don't know what's happening in her head.

2         THE WITNESS:  I don't, right.

3         So, she had actually started treating me kind of

4    like a parolee, asking me for my ID.

5         THE COURT:  Were you on parole at the time?

6         THE WITNESS:  No.

7         THE COURT:  Okay.

8         THE WITNESS:  She asked me for my ID.  It was just

9    a uncomfortable situation.

10        THE COURT:  Okay.

11   Q    At any point did she reach for her weapon?

12   A    She always had her hand around her service weapon.

13   She's dealing with, I figure she's dealing with, you know, two

14   males or whatever the case.  She's a woman.  So, she always had

15   her hand like just for intimidation to make sure people stay in

16   their place, I guess.

17   Q    How did you that make you feel?

18        THE COURT:  Okay.

19        MS. MOVIUS:  Objection.

20        THE COURT:  Sustained.  Has absolutely, positively

21   no relevance to this hearing.

22   Q    And how did this incident end?

23   A    It ended with she basically she left and then I guess a

24   couple weeks later she came back and she, I guess, she just

25   didn't really want him to stay there.

                    Erin E. Gray, RPR

DIRECT-HILL-DEFENSE/TURCHI                    184

```
 1              MS. MOVIUS:  Objection.

 2              THE COURT:  Sustained.

 3              THE WITNESS:  Aren't they supposed to say

 4     objection?

 5              THE COURT:  They don't have to.  It's my --

 6              THE WITNESS:  All right, cool.

 7              THE COURT:  It's sustained.  You can't, you can't.

 8     Q    Not what they're thinking, sir, just what they said and

 9  did.

10     A    Oh, what they said.  Okay, well, basically she gave a

11  nasty attitude that day.  When she came back a couple weeks

12  later --

13              THE COURT:  What did she say?

14              THE WITNESS:  She just was just --

15              THE COURT:  What did she say?  If you don't

16     remember, that's fine.

17              THE WITNESS:  I don't, I don't recall.  It was

18     just --

19              THE COURT:  Move on to something else.

20     Q    Do you remember what she said in sum and substance?

21  Meaning, if you don't remember the exact words the basic gist of

22  what she was saying?

23     A    The basic out of everything is that she really didn't

24  want him to stay there.  Really wasn't no problem going on, it's

25  just since she came around.  But she didn't want him to stay
```

1    there because she felt that --

2              THE COURT:  Sustained.

3    A    -- there wasn't no furniture.

4              THE COURT:  Sustained.  You don't know what's in

5    her mind.

6              MR. TURCHI:  He said --

7              THE WITNESS:  She did come in --

8              THE COURT:  Sustained, sustained.  Move on to

9    something else.

10             THE WITNESS:  Okay.

11   Q    Okay.  And how did that interaction end?

12   A    It ended with her leaving and then basically giving Mr.

13   Greathouse a letter informing him that he wasn't able to reside

14   at the residence anymore.  Really for no reason actually.

15   Q    All right.  And Mr. Greathouse moved out in accordance

16   with that?

17   A    Well, he was forced to move out.

18             MS. MOVIUS:  Objection.

19             THE COURT:  Sustained.

20             MR. TURCHI:  All right.  I have nothing further.

21             THE COURT:  Any cross?

22             MS. MOVIUS:  Briefly, your Honor.

23   CROSS EXAMINATION

24   BY MS. MOVIUS:

25   Q    Mr. Hill, isn't it true you also requested that Mr.

Erin E. Gray, RPR

1    Greathouse leave your apartment?

2         A    No.

3         Q    That's not true?

4         A    No.

5              MR. TURCHI:  Objection.  She's arguing with him at

6    this point.

7              THE COURT:  No.

8              MR. TURCHI:  Okay.

9              THE COURT:  Overruled.

10             MS. MOVIUS:  I don't have any further questions,

11   Judge.

12             THE COURT:  Anything further?

13             MR. TURCHI:  No.

14             THE COURT:  You can step down.  Thank you, Mr.

15   Hill.

16             I'm assuming you don't want to --

17             MR. SIMMONS:  No questions.

18             (Whereupon, the witness exits the courtroom at this

19   time.)

20             THE COURT:  Mr. Turchi, are you calling any other

21   witnesses are or are you resting?

22             MR. TURCHI:  We're resting.

23             THE COURT:  Okay.  Are you putting on a rebuttal

24   case?

25             MS. MOVIUS:  No.

1          THE COURT:  So everyone's resting?

2          MR. TURCHI:  Yes.

3          THE COURT:  Do you want to argue now or do you want

4    to brief?

5          MR. TURCHI:  Brief, please.

6          THE COURT:  Brief.

7          MR. SIMMONS:  Sure.

8          THE COURT:  How much time do you want to brief it?

9          MR. TURCHI:  Let me confer with my client.

10         (Conferring).

11         MS. MOVIUS:  For the record, I would prefer to

12   argue today.

13         THE COURT:  Well, it's just like -- doesn't matter.

14         MR. TURCHI:  Judge, would you -- I think I might be

15   going away.

16         THE COURT:  When do you want to get your motions

17   in?

18         MR. TURCHI:  Would you allow me to get it in by the

19   first week of April?

20         THE COURT:  Sure.

21         MR. TURCHI:  Thank you.

22         THE COURT:  So, Defense motions are due April 1st

23   with People's response -- is that okay for you, Mr. Simmons?

24         MR. SIMMONS:  Yes, Judge.  Just so you know, I'm

25   ready to argue now.

PROCEEDINGS                                            188

1           THE COURT:  But I'm not going to bifurcate.

2           MR. TURCHI:  I'm fine, I'm fine, just letting you

3      know.

4           THE COURT:  With response -- two weeks enough time

5      for you to respond or you want more?

6           MS. MOVIUS:  Two should be fine, Judge.

7           THE COURT:  April 15th.  And I'll put it back down

8      for decision here.  May 5th work for everybody?

9           MS. MOVIUS:  Yes, Judge.

10          MR. TURCHI:  Sure.

11          THE COURT:  May 5th for decision.  But it's my

12     understanding that we're going to put on Ms. Johnson's case

13     for possible disposition prior to that?

14          MR. SIMMONS:  Sure.

15          THE COURT:  And then, if necessary, we'll have her

16     show up on May 5th.

17          So how much time do you think you need for a

18     possible disposition?

19          MR. SIMMONS:  That's up to the Prosecutor, Judge.

20          MS. MOVIUS:  We can do a week.  Just need time to

21     put the language together.

22          MR. TURCHI:  And, Judge, just because it was placed

23     on the record --

24          THE COURT:  One second, can we get this?

25          It will have to be either March 3rd, 4th or 5th and

Erin E. Gray, RPR

PROCEEDINGS                                    189

1    after that it would have to be March 19th.

2              MR. SIMMONS:  5th, Judge.

3              THE COURT:  Does March 5th work for the People, is

4    that enough time?

5              MS. MOVIUS:  If we could call it in the morning

6    that would be preferable.

7              THE COURT:  If she could get here first thing.

8              MR. TURCHI:  My client is always here 9:30.  I'll

9    try to be here 9:30.

10             THE COURT:  March 5th, possible disposition on

11   consent.  And if not we'll have the same motion schedule.

12             You wanted to say what?

13             MR. TURCHI:  I wanted to make a record.  Since it

14   is indicated that the co-defendant in this case with the

15   almost identical charge is getting probation, I just wanted

16   to say it's unfortunate that nothing even close to that is

17   being considered for my client.  That having been said, I'm

18   not sure he would take it.

19             THE COURT:  They're also in a very different

20   situation.

21             MR. TURCHI:  Well, only in terms of record, but

22   nonetheless, I wanted to say that.

23             THE COURT:  And facts.

24             That being said, we'll see everybody back here on

25   May 5th unless there's a disposition on March 5th, okay.

                    Erin E. Gray, RPR

PROCEEDINGS                                            190

1           MR. TURCHI:  All right, you'll see us either way.

2           THE COURT:  Thank you.

3           MR. SIMMONS:  Judge, if there's a disposition I

4    guess that will preclude the need for --

5           THE COURT:  You to file anything.

6           MR. SIMMONS:  -- submission of the papers.  But,

7    we'll see.

8           (Whereupon, the case is adjourned to March 5,

9    2025.)

10                *         *         *         *

11

12           Certified to be a true and accurate transcript of

13    the stenographic minutes taken within.

14

15    _JoAnna Cogliano_                    _Erin E. Gray_

16    JoAnna Cogliano                     Erin E. Gray, RPR
      Senior Court Reporter               Senior Court Reporter

17

18

19

20

21

22

23

24

25

EXHIBIT-V

New York State - DOCCS
Community Supervision
SPECIAL CONDITIONS OF RELEASE TO PAROLE SUPERVISION

Name: GREATHOUSE,LEON
Date of Release: 01/27/2021

Page: 1
NYSID: 08465767L
Supervision Maximum: 07/07/0707

I, GREATHOUSE,LEON          , acknowledge that the following Special Conditions
have been imposed upon me and that these Special Conditions will remain in
effect until the termination of my legal period of supervision  07/07/0707
unless otherwise amended, in writing, by the Department of Corrections and
Community Supervision.

- I WILL report to my assigned Parole Officer on __Tuesday__ of each and                    (R2)
every week, or as directed, between the hours of __10pm__ and __7am__,

I WILL report at location: __M3- 314 W 40th St NY NY__
Phone: (_____) _____-_____

Other reporting conditions: _____

_____

_____

- I WILL NOT have contact with the following individual(s) __Victims__.          (37)
_____. This means that I WILL NOT attempt
to meet in person, communicate by letter, telephone, electronic device (i.e.
computer) or though a third pary, or via other means, the above individual(s)
without knowledge and permission of my Parole Officer.

- I WILL remain in the geographic confines of the county(s) of __New York__       (44)
__State__.  If I travel outside of the above mentioned county(s), I will
obtain a travel pass from my Parole Officer granting permission for such
travel.

- Other Conditions: __Comply with GPS Conditions__                    (50)

_____

- I WILL remain in my approved residence from __10pm__ to __7am__, seven          (61)
days a week.  Exceptions to my curfew may be permitted with PRIOR approval from
my Parole Officer.

- I WILL cooperate fully with the implementation of the Electronic Monitoring     (63)
Program.  I WILL NOT tamper with any equipment and WILL ensure that all
equipment is returned to the Department of Corrections and Community
Supervision upon completion.

_Refused to sign_

Releasee Initials: _____   Witness Initials: __CM__   Date: 06/23/2023

EXHIBIT-W

Community Supervision
SPECIAL CONDITIONS OF RELEASE TO PAROLE SUPERVISION

Page:                    1
Name: GREATHOUSE,LEON                      NYSID: 08465767L
Date of Release: 01/27/2021        Supervision Maximum: 07/07/0707

I, GREATHOUSE,LEON            , acknowledge that the following Special Conditions
have been imposed upon me and that these Special Conditions will remain in
effect until the termination of my legal period of supervision  07/07/0707
unless otherwise amended, in writing, by the Department of Corrections and
Community Supervision.

                                                                    (R2)
- I WILL report to my assigned Parole Officer on __Tuesday__ of each and
every week, or as directed, between the hours of __10pm__ and __7am__ .

I WILL report at location: __M3-314 W 40th St NY NY__
Phone: (     ) ____-____

Other reporting conditions: _____

_____

_____

                                                                    (37)
- I WILL NOT have contact with the following individual(s) ~~Victims~~
__associates em 10/2/23__ . This means that I WILL NOT attempt
to meet in person, communicate by letter, telephone, electronic device (i.e.
computer) or though a third pary, or via other means, the above individual(s)
without knowledge and permission of my Parole Officer.

                                                                    (44)
- I WILL remain in the geographic confines of the county(s) of __New York__
__State__ .  If I travel outside of the above mentioned county(s), I will
obtain a travel pass from my Parole Officer granting permission for such
travel.

                                                                    (50)
- Other Conditions: __Comply with GPS Conditions__

_____

_____

                                                                    (61)
- I WILL remain in my approved residence from __10pm__ to __7am__ , seven
days a week.  Exceptions to my curfew may be permitted with PRIOR approval from
my Parole Officer.

                                                                    (63)
- I WILL cooperate fully with the implementation of the Electronic Monitoring
Program.  I WILL NOT tamper with any equipment and WILL ensure that all
equipment is returned to the Department of Corrections and Community
Supervision upon completion.
           __Refused to sign__
Releasee Initials: _____    Witness Initials: __CM__    Date: 06/23/2023

JUDGE VYSKOCIL

25 CV 07164

Leon Greathouse

GRVC

09-09 Hazen Street

East Elmhurst,New York 11370


New York County Supreme Court,Criminal Term

111 Centre Street

New York,New York 10013


August 27th,2025


Re.:People v Leon Greathouse,ind.:75963-23


Attention Clerk of the Court:

This is a letter of intial disclosure to the Court in reference to defendant Leon Greathouse's filing

of a 42 U.S.C. Section 1983 & U.S.C. Section 1985 complaint.



Defendant Leon Greathouse


CC.:PF.LG.